# EXHIBIT 5

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 NORTHERN DISTRICT OF ILLINOIS

 3                        EASTERN DIVISION

 4  SERGEY MAYOROV,           )

 5                            )

 6         Plaintiff,         )

 7                            )

 8      -vs-                  )No.  13 C 5249

 9                            )

10  UNITED STATES OF AMERICA,)

11                            )

12         Defendant.         )

13  _____)

14           The deposition of GUISEPPE DIMAGGIO, called by

15  the Defendant for examination, pursuant to Subpoena and

16  pursuant to the Federal Rules of Civil Procedure for the

17  United States District Courts pertaining to the taking

18  of depositions, taken before Tracy Kerney, Certified

19  Shorthand Reporter, at 131 South Dearborn Street,

20  Suite 1700, Chicago, Illinois, commencing at the hour of

21  10:30 a.m., on the 30th day of April, A.D., 2014.

22

23

24
```

1

BARKLEY
Court Reporters

```
 1   A P P E A R A N C E S:

 2        PERKINS COIE, LLP, By
          MR. ABIMAN RAJADURAI
 3        131 South Dearborn Street, Suite 1700
          Chicago, Illinois  60603
 4        9312) 324-8400
          (312) 324-9400 (fax)
 5        arajadurai@perkinscoie.com

 6                        -and-

 7        NATIONAL IMMIGRATION JUSTICE CENTER, By
          MR. MARK J. FLEMING
 8        208 S. LaSalle Street, Suite 1300
          Chicago, IL  60604
 9        (312) 660-1628
          (312) 660-1505 (fax)
10        mfleming@heartlandalliance.org

11            On behalf of the Plaintiff;

12        ASSISTANT UNITED STATES ATTORNEY, By
          MR. JAMES M. KUHN, SR.
13        219 South Dearborn Street, 5th Floor
          Chicago, IL 60604
14        (312) 353-1877
          (312) 886-3501 (fax)
15        james.kuhn@usdoj.gov

16            On behalf of the Defendant.

17

18

19

20

21

22

23

24
```

BARKLEY
Court Reporters

```
1                        I N D E X

2                        WITNESSES

3   ALL WITNESSES:                          PAGE:

4
      GUISEPPE DIMAGGIO:
5
          Examination by MR. RAJADURAI
                                            4:6
6
                         EXHIBITS
7
    NO.:      DESCRIPTION:                   PAGE:
8
9   1         Policy:
              For Identification            29:24
10
    2         Memo:
11            For Identification            32:1

12  3         Processing Packet:
              For Identification            36:10
13
    4         EARM View Person Details:
14            For Identification            50:20

15  5         Amended Response:
              For Identification            53:23
16
    6         Immigration Detainer:
17            For Identification            56:9

18  7         First Set of Interrogatories:
              For Identification            58:14
19
    8         NRC Intake Property Inventory:
20            For Identification            62:4

21  9         Form I-485:
              For Identification            63:6
22

23

24
```

3

GUISEPPE DIMAGGIO

**BARKLEY**
Court Reporters

```
 1                          (Witness duly sworn.)

 2                       GUISEPPE DIMAGGIO,

 3   called as a witness herein, having been first duly sworn, was

 4   examined and testified as follows:

 5                          EXAMINATION

 6   BY MR. RAJADURAI:

 7        Q.   Good morning, Mr. Dimaggio.

 8        A.   Good morning.

 9        Q.   My name is Abiman Rajadurai.  I represent the

10   plaintiffs in this case.  This is Mark Fleming,

11   plaintiff's attorney.

12             Could you begin by stating and spelling your

13   name, for the record.

14        A.   Sure.  First name is Guiseppe,

15   G-U-I-S-E-P-P-E, last name, Dimaggio, D-I-M-A-G-G-I-O.

16        Q.   And where do you reside?

17        A.   In Norridge.

18        Q.   What's the address?

19             MR. KUHN:  Don't need it.  Go on to something

20   else.  We're not going to give it to you, so go on to

21   something else.

22   BY MR. RAJADURAI:

23        Q.   Have you been deposed before?

24        A.   No.
```

4

BARKLEY
Court Reporters

1    Q.   Some basic ground rules, this is basically a

2  question-and-answer format here.  If you don't

3  understand a question, just ask me to repeat it or

4  rephrase it.  Your attorney may object as he did moments

5  ago.  You can answer, unless he instructs you not to

6  answer.  Answer verbally.  Nodding or hand gestures, she

7  can't take down.  I'll try and finish my question, then

8  you can respond.

9         If you need to take a break, let me know.

10  We'll go through for a little bit now and if you need to

11  take a break, we can.  If not, we'll try and go through

12  and try and finish and get out of here.

13         Do you have any questions --

14    A.   No.

15    Q.   -- of the rules?

16         Anything that would prevent you from

17  testifying completely and truthfully today?

18    A.   No.

19    Q.   Did you prepare for this deposition in any

20  way?

21    A.   No.

22    Q.   You didn't look at any documents?

23    A.   Yeah, I did.

24    Q.   What documents did you review?

GUISEPPE DIMAGGIO

BARKLEY
Court Reporters

```
 1        A.    I reviewed the packet that was put together
 2   from Jessica.
 3        Q.    And that's Jessica Beckman?
 4        A.    Correct.
 5        Q.    Did you bring any documents with you today?
 6        A.    No.
 7              I thought I left it in the office.  Sorry.
 8        Q.    No problem.  Did you discuss the deposition
 9   with anyone other than your attorney today?
10        A.    No, no one.
11        Q.    Where did you attend high school?
12        A.    Italy, Sicily.
13        Q.    Did you graduate?
14        A.    Yes.
15        Q.    Did you attend college?
16        A.    No.
17        Q.    Any other schooling after high school?
18        A.    No.  I went to one year college, but I didn't
19   finish.
20        Q.    Okay.  What college was that?
21        A.    University of Bladimore.
22        Q.    And that's in Italy?
23        A.    Yes.
24        Q.    Any other certifications?
```

6

GUISEPPE DIMAGGIO

BARKLEY
Court Reporters

1      A.    No.

2      Q.    What was your first employment -- sorry.  When

3  did you move to the United States?

4      A.    21.  I was 21.

5      Q.    What year was that?

6      A.    What year was that?  1998, I believe.

7      Q.    And what employment did you have when you came

8  over to the United States?

9      A.    I worked at Jewels.  I worked at Yale Europe.

10  I worked at Grainger, and I owned my own business for I

11  want to say seven years.

12      Q.    And you're an ICE agent now; is that correct?

13      A.    Correct.

14      Q.    When did you start working at ICE?

15      A.    2009.

16      Q.    And what was your first job attempt there?

17      A.    IEA, immigration enforcement agent.

18      Q.    And what were your responsibilities in that

19  role?

20      A.    I was in Secure Communities, and we received

21  fingerprint queries and we examined the queries and

22  determined whether or not to place detainers.

23      Q.    Okay.  And where do you receive those queries

24  from?

7

GUISEPPE DIMAGGIO

BARKLEY
Court Reporters

1     A.   From different jails and police departments.

2     Q.   As an IEA, who did you report to?

3     A.   To Supervisor Calvin Thompson.

4     Q.   And is that still the supervisor?

5     A.   No.  He is a deportation officer now.

6     Q.   Who do you report to now?

7     A.   Brian Kazinski.

8     Q.   And are you still an IEA?

9     A.   Correct.  Yes, I am.

10    Q.   Who -- starting in 2009, who reported to you?

11 Did you have anyone who reported to you?

12    A.   Nobody.

13    Q.   Other than Mr. Kasinski or Thompson, would you

14 have reported to anyone else?

15    A.   Yes.  Second line in 2009, was

16 Carey Kaufman.

17    Q.    And then when you started in 2009, did you

18 begin working immediately or did you receive any

19 training?

20    A.   Yes.  I went to FLETC in Georgia for six

21 months.

22    Q.   And what were the subjects or topics that you

23 were trained on at FLETC?

24    A.    Immigration laws, firearms, defensive tactics.

8

GUISEPPE DIMAGGIO

BARKLEY
Court Reporters

1      Q.    Anything else?

2      A.    Right now, I can't recall anything else.

3  Immigration laws basically was --

4      Q.    And who taught the immigration law courses?

5      A.    I don't remember his name.

6      Q.    Were they different from the people who

7  trained you in firearms or defensive tactics?

8      A.    Yes.

9      Q.    And did you receive any training materials for

10  the immigration training?

11      A.    Yes.

12      Q.    Were they hard copy, electronic?

13      A.    Hard copies.

14      Q.    Are those in your possession?

15      A.    I still have some.

16      Q.    Okay.  And do you recall what immigration laws

17  you were specifically trained on?

18      A.    Yes.  Inadmissibilities, aliens that basically

19  are not the deportable; and charges, the different

20  charges that we can deport them on.

21      Q.    Did you receive training on the detainers at

22  FLETC?

23      A.    I don't remember.

24      Q.    As part of your responsibilities as an IEA, do

9

BARKLEY
Court Reporters

1   you issue immigration detainers?

2        A.   Currently?  No.

3        Q.   And do you still work in Secure Communities?

4        A.   No.

5        Q.   What's your current position?

6        A.   Removal and detention.

7        Q.   And when did you move into that role?

8        A.   November 2013.

9        Q.   Okay.  Was that a voluntary move on your part?

10       A.   We bid every year and it was a voluntary move,

11  yes.

12       Q.   Okay.  Any other title -- is your title still

13  IEA today?

14       A.   Yes, it is.

15       Q.   Are there any other divisions you're in other

16  than security communities?

17       A.   No.

18       Q.   So do you still issue immigration detainers?

19       A.   No, I don't.

20       Q.   So would that have ended in November 2013

21  issuing detainers?

22       A.   I'm --

23       Q.   Would you have last issued detainers ending in

24  November 2013?

10

GUISEPPE DIMAGGIO

BARKLEY
Court Reporters

1      A.    Correct.

2      Q.    So as an IEA, was one of your responsibilities

3  to issue immigration detainers?

4      A.    Yes, it was.

5      Q.    What are immigration detainers?

6      A.    It's a request to hold for a period of 24 to

7  48 hours to initiate -- a request to hold someone for 24

8  to 48 hours.

9      Q.    And where would that request come from?

10     A.    From ICE.

11     Q.    When did you start issuing immigration

12  detainers?

13     A.    2009 -- after the academy.  So it started

14  2009.  Six months later.

15     Q.    Do you remember receiving any training upon

16  returning from the academy on issuing immigration

17  detainers?

18     A.    Yeah, I did receive some training.  And I want

19  to say I followed someone for a month.

20     Q.    Okay.  And who did you follow?

21     A.    Different IEAs back then.  I want to say

22  Aguial, Guerra and Labone.  I forget his first name.

23     Q.    And approximately how many detainers would you

24  have shadowed them to issue during that time period?

11

GUISEPPE DIMAGGIO

BARKLEY
Court Reporters

1  A. When I first started?

2  Q. Under these three people you just named, how

3 many of those -- how many detainers were issued during

4 that time when you were shadowing them?

5  A. I can't really recall.

6  Q. When was the last time you issued a detainer?

7  A. I want to say November when I -- right before

8 the transition.

9  Q. Okay. Between 2009 and November 2013, how

10 many detainers do you typically issue in a week?

11  A. It depends. There's no --

12  Q. Any estimate? Maybe over a month or a year

13 maybe.

14  A. There's no really -- a number. We don't work

15 on numbers, you know. It depends.

16  Q. Have you done over 50, let's say?

17  A. Have I done over 50?

18  Q. Have you issued over 50?

19  A Yeah, I think so.

20  Q Over a hundred?

21  A. I can't -- I don't know.

22  Q. Sure. And so when you're shadowing the other

23 ICE officers early on, did they provide you with

24 training as to what they were doing or were you just

12

GUISEPPE DIMAGGIO



1  watching?

2        A.    Yes, they do provide me with training, yes.

3        Q.    Did they give you any hard copies or was it

4  all verbal, oral?

5        A.    All verbal.

6        Q.    How soon after shadowing would you say you

7  issued your first detainer?

8        A.    Maybe after a couple of weeks.

9        Q.    Okay.  And how long do you think the shadowing

10  period was?

11        A.    They would -- well, after a couple of weeks,

12  they would just you know sit next to me.  Even though

13  they're showing detainers, they would sit next to me to

14  make sure I was doing everything correctly.  So I would

15  say the whole process was about a month.

16        Q.    And how soon after shadowing would you say you

17  were by yourself to issue detainers on your own?

18        A.    Like I said, after about a month.

19        Q.    Okay.  Other than at the academy, do you

20  remember receiving any written materials on detainers?

21        A.    Yes.

22        Q.    And what materials were those?

23        A.    Materials to advise us on, you know, detainers

24  placed on certain circumstances.

13

GUISEPPE DIMAGGIO

BARKLEY
Court Reporters

1        Q.    Okay.

2        A.    So with -- with, you know, deferred act, you

3     know, things came up, so they were advised on, you know,

4     what took place, a detainer on, who to place a detainer

5     on.

6        Q.    Sure.  And do you keep any of these materials?

7        A.    I believe I do.

8        Q.    I think you mentioned a few circumstances of

9     specific training.  Do you remember any other certain

10    topics that you received training for in the detaining

11    area or is it the list you provided earlier?

12       A.    Just the list.  Right now, I can't recall.

13       Q.    Do you remember receiving any follow-up

14    training between 2009 to 2013?

15       A.    No.

16       Q.    Did you ever receive updates or memos or other

17    paper documents on new policies?

18       A.    We always do, yes.

19       Q.    How frequent would you say you received those?

20       A.    There's not a pattern.

21       Q.    And would you receive that individually or

22    would that come from a supervisor?

23       A.    That would come from a supervisor and it's not

24    individually.  It goes through the whole ERO.

14

GUISEPPE DIMAGGIO

BARKLEY
Court Reporters

1    Q.   Would it ever be a group training session or

2    would you just receive a mail or e-mail?

3         A.   E-mail.

4         Q.   And when you were issuing detainers, would you

5    follow a standard procedure?

6         A.   Yes.

7         Q.   And where did you learn the standard

8    procedure?

9         A.   I'm sorry.  Repeat the question again.

10        Q.   Where would you have learned the standard

11   procedure from?

12        A    When issuing detainers?

13        Q.   Yes.

14        A.   We have an SOP in place that, you know, I have

15   in my mailbox, and I go off of it.  You know, we do

16   checks, and, you know, all of the checks are necessary.

17        Q.   As far as you know, did that standard

18   operating procedure change from 2009 to November 2013?

19        A.   I don't think so.

20        Q.   And did you have that standard operating

21   procedure in writing also?

22        A.   It was e-mailed to me.

23        Q.   I guess now could you walk me through the

24   process of issuing a detainer, step by step?

15

GUISEPPE DIMAGGIO

BARKLEY
Court Reporters

1    A.    Sure.  Back in 2009, we received -- we

2   received a fingerprint hit from foreign-born national

3   and the contractors would put a packet together, doing

4   all of the checks and they would pass the packet, and we

5   do all of the -- we check all of the paperwork and we

6   make a determination whether or not a detainer needed to

7   be placed.

8    Q.    And I guess going back to the checks, what

9   checks did the contractors run?

10    A.    They run CIS claims and NCIC, EARM, and that's

11   the state department and that's about it.

12    Q.    And were these checks the same for every

13   single potential --

14    A.    Yes.

15    Q.    And are these all electronic databases or are

16   some of these print materials?

17    A.    Electronic databases.

18    Q.    Would you review those materials

19   electronically or would someone gather them and print

20   them?

21    A.    They would print them out and give them to me.

22    Q.    And do you have the responsibility of updating

23   those databases?

24    A.    No, I don't.

16

GUISEPPE DIMAGGIO

BARKLEY
Court Reporters

1       Q.   Did you always work with the same contractors?

2       A.   Some people left, some of the contractors.  I

3 don't recall who.

4       Q.   And I guess going by each of these databases,

5 let's start with CIS, you mentioned.  What would you

6 find on CIS?

7       A.   Their date of entry, their status, whether

8 someone has been deported or not.  Date of birth, name,

9 last name, like I stated, status.

10       Q.   Sure.  What about claims?

11       A.   Claims?  If they have any application pending

12 with CIS or application.

13       Q.   And I think you said NCESO?

14       A.   EARM.

15       Q.   I thought you said --

16       A.   NCIC.

17       Q.   What would you find --

18       A.   Criminal record.

19       Q.   And then what about EARM?

20       A.   If they have been encountered with

21 Immigration.

22       Q.   You mentioned a state department report.  Is

23 that the proper title, state department?

24       A.   If they have a passport, you know.

17

GUISEPPE DIMAGGIO

BARKLEY
Court Reporters

1      Q.    Any other databases?

2      A.    No.

3      Q.    Do you remember the name of the state

4  department report?

5      A.    No.

6      Q.    And how would -- how is the information

7  verified on the system checks?  Did you take any steps

8  to verify the information was accurate?

9      A.    Repeat the question.

10      Q.    So the information that's in the databases

11  that you received, did you take any steps to investigate

12  that the information was correct?

13      A.    We always do -- try to verify information is

14  correct?

15      Q.    What steps would you make to verify that the

16  information on, say, CIS or claims was accurate?

17      A.    Actually, we just go by what the, you know,

18  the database is giving us.  We just make sure that the

19  information that the contractor gives us matches, you

20  know, the hit.  That's what we do.  We just have to make

21  sure that, you know, the information that's given us

22  from the contractor matches the hit, but we have to do

23  by what CIS is providing us.

24      Q.    Okay.  I don't know if you mentioned this

18

GUISEPPE DIMAGGIO

BARKLEY
Court Reporters

1    before, but have you heard of the enforce system?

2         A.    Enforce.

3         Q.    Is that another database?

4         A.    Yes.

5         Q.    And what would be on that?

6         A.    That's -- Enforce is also, you know, our

7    database, you know, that basically tells us if they have

8    been encountered by Immigration.

9         Q.    Okay.  And are you required to gather

10   information from all of these databases?

11        A.    Yes.

12        Q.    And where does that requirement come from?

13        A.    The SOP.

14        Q.    Do you take any steps -- or I should say did

15   you take any steps when issuing detainers to ensure that

16   a potential subject was a U.S. citizen before issuing

17   the detainer?

18        A.    We placed the detainer to start an

19   investigation.  We don't have the file in front of us.

20   Therefore, you know, we just placed the detainer and

21   when it comes to our custody, we would start the

22   investigation.

23        Q.    So the steps as you said, you receive the

24   information, then you would issue the detainer and then

19

GUISEPPE DIMAGGIO

BARKLEY
Court Reporters

1  do an investigation; is that accurate?

2      A.   Yeah.  We receive the information.  We place a

3  detainer based on the information that we have at that

4  moment and when it comes to our custody, we start

5  investigation.

6      Q.   Once -- I guess going back, how would you

7  determine a subject was born in the United States?

8      A.   How would I determine a subject was born in

9  the United States?  By a birth certificate.

10     Q.   Any other resources?

11     A.   Passport.

12     Q.   And would you only look at hard copy or print

13 materials or would you interview?

14          MR. KUHN:  At what point are you talking

15 about?

16          MR. RAJADURAI:  The custody, when they brought

17 him into custody.

18          MR. KUHN:  ICE custody or IDOC custody?

19 BY MR. RAJADURAI:

20     Q.   You said once you place the detainer, then

21 they're in custody, then you would begin investigating,

22 correct.  Is that ICE custody or IDOC?

23     A.   IDOC.  He was never in our custody.

24     Q.   Once they were in IDOC's custody, then you

20

GUISEPPE DIMAGGIO

 1    would investigate?

 2         A.   No.   We don't investigate until they get into

 3    our custody.

 4              MR. FLEMING:   Can we take just a very quick

 5    break, so I can explain.

 6                             (Whereupon there was a brief

 7                              break, after which the

 8                              following proceedings were

 9                              had:)

10    BY MR. RAJADURAI:

11         Q.   Is there any procedure you were given to

12    determine when a subject could have derived U.S.

13    citizenship through a parent?

14         A.   Yes.   The procedure was that, you know, if --

15    to check their parents' nationality.

16         Q.   And how would you do that?

17         A.   By going to the database and looking up their

18    parents' name.

19         Q.   And would you ever look at the A-file for the

20    parent or any other information?

21         A.   The A-file is not in our possession.

22         Q.   Would you ever interview a subject's mother or

23    father?

24              MR. KUHN:   At what point are we talking about

                             21

GUISEPPE DIMAGGIO

BARKLEY
Court Reporters

```
 1   here?
 2            MR. RAJADURAI:  If you had to derive -- if you
 3   had to determine whether someone --
 4            MR. KUHN:  Is this prior to placing the
 5   detainer or --
 6            MR. RAJADURAI:  Prior.
 7            MR. KUHN:  Prior to placing the detainer.
 8            THE WITNESS:  Prior to placing the detainer?
 9   BY MR. RAJADURAI:
10       Q.   Yes.
11       A.   It's a biometric hit, no.
12       Q.   What about after?
13       A.   After when it comes to our custody?
14       Q.   Sure.
15       A.   When it comes in our custody, yes, then it's a
16   full investigation.
17       Q.   Prior to issuing a detainer, if a subject's
18   father or mother is a U.S. Citizen, do you conduct any
19   further investigation into the subject's citizenship
20   status?
21       A.   Yes.  We have to make sure that the subject
22   derived citizenship because they have to file a form and
23   they have to be within -- they have to qualify.  There's
24   many restrictions and many things we have to look at.
```

22

GUISEPPE DIMAGGIO

1      Q.   What are some of those things you look at?

2  What information?

3      A.   Whether or not they entered the United States

4  before age of 18, when the mother naturalized or the

5  father, whether or not they're in wedlock -- you know,

6  in wedlock.  The more -- and, you know, parents, the

7  year that the parents became a U.S. citizen.

8      Q.   And would you investigate a mother's or

9  father's citizenship then prior to issuing the

10  detainers?

11      A.   Prior?

12      Q.   Yeah.

13      A.   No.

14      Q.   Why wouldn't you do that?

15      A.   I would if I have that information in front of

16  me, but in this case, I did not have that information in

17  front of me.  The A-file was not in front of me.  I did

18  not have that information.

19      Q.   Okay.  If someone claims to be a U.S. citizen

20  or you see a note that someone might be a U.S. citizen,

21  what steps would you take to document or investigate

22  that information?

23          MR. KUHN:  Again, prior to issuing --

24          THE WITNESS:  Prior, I would do the same

23

BARKLEY
Court Reporters

1  thing.  If I see a note, I would do the same thing.

2  Just go through my checks and determine whether or not

3  this person is a U.S. citizen based on the information I

4  was given.

5  BY MR. RAJADURAI:

6      Q.   And do you have to document your reasons for

7  issuing a detainer?

8      A.   I'm sorry?

9      Q.   Do you have to document the reasons for why

10  you issued a detainer?

11      A.   Yes.

12      Q.   What information do you document?

13      A.   We document the status of the subject and the

14  reason why we are placing a detainer, whether, you know,

15  he's deportable or not?

16      Q.   And when would you prepare this documentation?

17      A.   We put in a narrative when we place the

18  detainer.

19      Q.   Okay.  Do you have to swear to the

20  truthfulness of your reasons for why a detainer is

21  issued?

22      A.   No.

23      Q.   Could you obtain information about a parents'

24  citizenship electronically, if you wanted to?

24

BARKLEY
Court Reporters

1       A.    If -- if the A-file is digitized, yes.

2       Q.    Was it common when you worked at Secure

3  Communities to see A-files that were digitized?

4       A.    Not many files are digitized.

5       Q.    As far as you know, is it possible to acquire

6  citizenship through one's parents?

7       A.    Yes.

8       Q.    What are the methods that you're familiar with

9  that that could happen?

10      A.    By the parents being natural -- being

11 citizens.

12      Q.    How would a child acquire citizenship through

13 one's parents?  Are you aware of methods?

14      A.    There are different methods.  I would have to

15 have a chart here to describe like age, different

16 scenarios, but there are different scenarios.  You have

17 to look at the year when they -- when the parents

18 naturalized, as I said earlier.  You have to look at,

19 you know, when the child entered the United States.  You

20 have to look at, you know, whether or not the parents

21 are in wedlock.

22      Q.    Do you know if a parent would have a CIS entry

23 if they became a naturalized U.S. citizen?

24      A.    Yes, they would.

GUISEPPE DIMAGGIO

BARKLEY
Court Reporters

1    Q.   And it would be possible for you to review

2  that information?

3    A.   If it's in the database, yes.

4    Q.   As part of your procedures of issuing

5  detainers.  So prior to issuing a detainer, would you

6  investigate whether a person could have derived

7  citizenship?

8    A.   Yes, we do.

9    Q.   And was there a certain trigger as to why you

10 would look into that or would you do that for all cases?

11   A.   If we are investigating or if we're looking at

12 a legal permanent resident, we generally look at the

13 mother's and father's database as well.

14   Q.   Any other methods for how you would

15 investigate that?

16   A.   Not unless it's in our custody.

17   Q.   And what would you do if he was in your

18 custody?  What other methods would you do to

19 investigate?

20   A.   Then you order the A-file.

21   Q.   Are you familiar with derivative U.S.

22 citizenship through the Child Citizenship Act of

23 2000?

24   A.   Yes.

26

GUISEPPE DIMAGGIO

1    Q.    What is your understanding of that law?

2    A.    If someone comes in, enters the country before

3    the age of 18, they're eligible -- I'm sorry.  Repeat

4    that question.

5    Q.    What's your understanding --

6    A.    Which law?

7    Q.    The Child Citizenship Act of 2000.

8    A.    I'm sorry.  I confused that.  No, I'm not

9    familiar with that.

10   Q.    What was the one you were describing?

11   A.    The Dream Act.

12   Q.    So do you have any familiarity with the Child

13   Citizenship Act of 2000?

14   A.    At this moment, no.

15   Q.    Do you know, you know, who else was involved

16   when you issued a detainer, you individually or run it

17   to someone else?

18   A.    A supervisor.  The supervisor checks the work

19   that you do.

20   Q.    Do you need authority from the supervisor to

21   issue the detainer?

22   A.    No.  I send the detainer, I fax it and then

23   the supervisor reviews.

24   Q.    And were there circumstances where the

27

GUISEPPE DIMAGGIO

BARKLEY
Court Reporters

1  supervisor told you not to issue a detainer after

2  reviewing?

3      A.  Yes.

4      Q.  What circumstances do you recall that

5  occurring?

6      A.  Circumstances where the deportability -- the

7  charge is not a deportable charge.  So if the subject

8  was, you know, in jail for an offense that is not a

9  deportable offense, then he would review the case and

10  the supervisor would review the case and make a

11  determination to whether or not that charge is a

12  deportable defense or not, that conviction was a

13  deportable defense or not.  So usually removable

14  defenses versus nonremovable.

15      Q.  Do you ever remember a circumstance where a

16  citizenship or a status of a lawful permanent became an

17  issue?

18      A.  No.

19      Q.  Does the immigration judge or other magistrate

20  judge ever review the detainer before it's issued?

21      A.  Not that I know of.

22      Q.  Okay.  What happens after you issue the

23  detainer?

24      A.  It gets faxed to the facility.

28

GUISEPPE DIMAGGIO

BARKLEY
Court Reporters

1      Q.   Do you ever follow up on the detainers that

2  you issue?

3      A.   Some I do.

4      Q.   Under what circumstances would you decide to

5  follow up on one versus not following up on another?

6      A.   If the subject is getting out of jail, has got

7  a release date that's within a month or two, I follow

8  up.

9      Q.   What would you follow up on?

10     A.   Whether or not he is in our custody.

11     Q.   Any other reason you would continue to

12  investigate an individual after you issued the detainer?

13     A.   No.

14     Q.   So would you say it's fair based on your

15  earlier testimony from the time you started issuing

16  detainers in 2009 from November 2013, that the standard

17  operating procedure has remained the same?

18     A.   Yes.

19     Q.   Do you remember any -- any changes that stand

20  out, minor that you recall being changed or told to

21  change in your process?

22     A.   I don't recall any change.

23                 (Whereupon Dimaggio Deposition

24                  Exhibit No. 1 was marked for

29

GUISEPPE DIMAGGIO

BARKLEY
Court Reporters

1                          identification.)

2    BY MR. RAJADURAI:

3        Q.    Okay.  Let's start with an exhibit now.  Do

4    you recognize this document?

5        A.    No.

6        Q.    If you want to take a look through it, that

7    would be great.  Let me know when you're all set or

8    you're ready to talk about it.

9        A.    Okay.

10       Q.    Having reviewed the document, were you ever

11   trained on how to implement the policies herein?

12       A.    At the academy.

13       Q.    And let's look at Section 4.2.

14       A.    Okay.

15       Q.    It says you can issue a detainer if you have

16   reason to believe that an individual arrested is subject

17   to ICE detention for removal or removal proceedings,

18   correct?

19       A.    Uh-huh.

20       Q.    Is that your general understanding of the

21   policy?

22       A.    Yes.

23       Q.    And what does the phrase "reason to believe"

24   mean to you?  How do you understand that?

                           30

BARKLEY
Court Reporters

1     A.   Exactly what it says, a reason to believe

2  that.  If you have a reason to believe, then you have a

3  reason to believe.

4     Q.   Were you ever trained on what those reasons

5  might be?

6     A.   Yes.

7     Q.   Do you have examples?

8     A.   Yeah.  If you do checks and you're showing

9  that -- you know, the checks are showing that, you know,

10  a subject is here legally, you have reason to believe.

11     Q.   And did you ever receive training after the

12  academy on, you know, any other reasons to believe

13  someone would be the subject of a detainer?

14     A.   No.

15     Q.   Is there anything in section 4.2 which is

16  inconsistent on how you issue detainers when you were

17  issuing detainers?

18     A.   No.

19     Q.   I know you said you hadn't seen this document

20  before.  Do you remember any other documents of this

21  format of policies you received on how to issue a

22  detainer?

23     A.   No.

24                  (Whereupon Dimaggio Deposition

31

BARKLEY
Court Reporters

1                                    Exhibit No. 2 was marked for

2                                    identification.)

3    BY MR. RAJADURAI:

4         Q.   Let's start with Exhibit 2.  You probably

5    won't need that one again.

6              Do you recognize this document?

7         A.   No.

8         Q.   Were you working at ICE Secure Communities

9    when this memo came out in November --

10        A.   2009?  No.  I was at the academy.

11        Q.   So do you ever recall receiving training on

12   the policies in this document?  And if you need to look

13   at the document, feel free.

14        A.   I don't remember receiving training.

15        Q    Do you see on page 1, the second paragraph

16   maybe five lines from the bottom, it says -- as a matter

17   of law -- the paragraph above that.  "As a matter of

18   law, ICE cannot assert its civil immigration enforcement

19   authority to arrest and/or detain a U.S. citizen"?

20        A.   Yes, I see that.

21        Q.   Is that your understanding of the ICE policy?

22        A.   Yes.

23        Q.   Okay.  And do you think that statement applies

24   to the issuance of immigration detainers against

32

GUISEPPE DIMAGGIO

1   U.S. citizens?

2           MR. KUHN:  Object to the form.

3           THE WITNESS:  I'm sorry.  Repeat that question

4   again.

5   BY MR. RAJADURAI:

6       Q.   Do you think that statement applies to the

7   issuance of immigration detainers?

8       A.   Yes.

9       Q.   And were you ever instructed on procedures you

10  had to follow to ensure that you didn't issue a detainer

11  against a U.S. citizen?

12      A.   Yes.

13      Q.   What procedures were those?

14      A.   Reviewing all of the checks.

15      Q.   Were there any other procedures other than the

16  checks to ensure that you didn't issue a detainer

17  against a U.S. --

18      A.   We would contact OCC.

19      Q.   And what is OCC?

20      A.   Office Counsel -- office chief of counsel.

21      Q.   And what you would ask the Office of Chief

22  Counsel?

23      A.   To review all of the checks and see if they

24  can get other documents that we can't to -- whether or

                            33

BARKLEY
Court Reporters

1   not, you know. . .

2      Q.   And how would you decide for a certain subject

3   when to contact OCC or not to contact OCC?

4      A.   If something that we have, it's not enough to

5   prove whether or not the subject is here legally or not.

6      Q.   Do you have any examples of that from having

7   gone through that process?

8      A.   Yeah.  Statutes, you know, if someone has a

9   conviction and we're not sure of the conviction, then we

10   contact the OCC and we ask them whether or not the

11   subject is deportable or not.

12      Q.   Okay.  And who would you contact at OCC?  Did

13   you have a specific contact?

14      A.   No.

15      Q.   Would you ever investigate a parents' records

16   prior to issuing a detainer through OCC?

17      A.   Prior, yes.

18      Q.   Okay.  Under what circumstances would you ask

19   for parents' records from OCC?

20      A.   If they're a lawful permanent resident.

21      Q.   How you would determine if the parent or the

22   subject was a lawful permanent resident?

23      A.   If it's in our records.

24      Q.   Do you remember which records that would be

34

BARKLEY
Court Reporters

1    in?

2       A.   CIS.

3       Q.   You're familiar that the plaintiff in this

4    case is Sergey Mayorov?

5       A.   Yes.

6       Q.   Mr. Mayorov had an immigration detainer placed

7    on him, correct?

8       A.   Yes.

9       Q.   And you were the IEA that issued the detainer?

10      A.   Yes.

11      Q.   Can you tell me about your initial contact

12    with the Mayorov case?

13      A.   It was a biometric hit, which means it's a

14    fingerprint hit.  We -- I did not talk to the subject.

15    I went based on the information that was in our

16    database.

17      Q.   Okay.  So I guess starting with the process,

18    first you got the biometric hit.  What happened next?

19    Did you request information or was information provided

20    to you?

21      A.   The information was provided by the

22    contractors that ran all of the checks available to us

23    at that moment to make a determination.

24      Q.   Okay.  And was the contractor in this case

GUISEPPE DIMAGGIO

BARKLEY
Court Reporters

1    Ms. Beckman or --

2         A.    Yes.

3         Q.    Were there other contractors?

4         A.    In this case, Ms. Beckman, yes.

5         Q.    And do you recall when the detainer was

6    issued?

7         A.    It should be on the detainer.

8              MR. RAJADURAI:   I guess we can do Exhibit 3.

9                      (Whereupon Dimaggio Deposition

10                      Exhibit No. 3 was marked for

11                      identification.)

12   BY MR. RAJADURAI:

13        Q.    Do these documents look familiar to you?

14   Would this be considered a processing packet?

15        A.    Yes.

16        Q.    In looking at the first page here, 201, who

17   prepared this information?  Do you recognize the

18   handwriting on this page?

19        A.    Well, by the -- I don't recognize the

20   handwriting, but it seems like it was completed by

21   Beckman because her name is stated on the front page.

22        Q.    Okay.  And then if we turn to 220, does this

23   tell you what date the immigration detainer was issued?

24        A.    Date, March 16, 2011.

36

GUISEPPE DIMAGGIO

BARKLEY
Court Reporters

1          Q.    And then if we turn back to page 202, the

2    second page in the packet, does this document tell you

3    what date this information was provided to you?

4          A.    12/30/2010, I'm thinking.

5          Q.    Do you know why there was a two-month passage

6    of time between when the packet was provided and when

7    the detainer was issued?

8          A     This is the hit that we received from the

9    facility.

10         Q.    And is this typical of getting a two-month gap

11   between getting the hit and issuing the detainer?

12         A.    I'm not sure of that.

13         Q.    Do you ever recall any other cases where a

14   detainer followed two months after a hit was received?

15         A.    For -- if someone is in IDOC, it's possible

16   because the release date could be, you know, far from,

17   so there's no urgency.

18         Q.    What would you say the typical time between

19   getting a hit and issuing a detainer would be?

20         A.    If it's someone -- if someone is in custody

21   for a DUI and there's a possibility of, you know -- for

22   him to escape, you know, to lose him, we would work on

23   the hit right away.

24         Q.    Okay.  And then I guess, if we flip to

37

GUISEPPE DIMAGGIO

BARKLEY
Court Reporters

1    page 213, do you recognize this information?

2        A.   Yes.

3        Q.   Is this from a particular database?

4        A.   CIS.

5        Q.   Okay.  And what information is provided on

6    this page?

7        A.   The permanent card, green card information.

8    It's showing that he's a resident, permanent resident,

9    since 7/22/2005.  Last name, first name, date of birth,

10   class of admission, country of birth, sex, and the

11   expiration date of the card.

12       Q.   And is this information you would review

13   before issuing a detainer?

14       A.   Yes.

15       Q.   Okay.  What is -- there's an item of category.

16   What does that stand for?

17       A.   Category is the class of admission, asylee,

18   AS8.

19       Q.   Do you know what AS8 stands for?

20       A.   Asylee.

21       Q.   Is it child of asylee or just --

22       A.   Child -- I think it's child of asylee.

23       Q.   So if you saw that information, would that

24   category AS8 tell you that the plaintiff, Mayorov, was a

                              38

BARKLEY
Court Reporters

1    derivative lawful permanent resident through a parent?

2        A.    A derivative lawful permanent resident is

3    not -- there's nothing that tells me that he derives

4    citizenship on this form.

5        Q.    But as far as you know, ASA does stand for

6    child of asylee?

7        A.    Yes.

8        Q.    Would that information trigger you to

9    investigate the parents' status as a citizen?

10       A.    Yes.

11       Q.    Do you recall looking into the parents'

12   citizenship status when you saw this document?

13       A.    I don't remember.

14       Q.    Do you recall looking at other cases where

15   someone was an AS8 category?

16       A.    I do.

17       Q.    And would you ever have investigated their

18   parents' citizenship in those cases?

19       A.    Yes.

20       Q.    And why -- go ahead.

21       A.    I believe that in this case the mother had

22   changed name and I wasn't able to find her in CIS.

23       Q.    But you do recall looking for the mother's

24   information then?

39

BARKLEY
Court Reporters

1     A.    I believe so.  It's a long -- it's 2011.

2     Q.    Okay.

3     A.    That's what I would normally do.

4     Q.    And as far as you recall, you did look for the

5   mother's information?

6     A.    That's what I would normally do.

7     Q.    Do you remember -- go ahead.

8     A.    Like I said, that's a procedure, but that's

9   what I normally do.  I don't remember, like, if I looked

10  over this case, but that's what I usually do.

11    Q.    Okay.  And would there be any record?  If you

12  did run that search for her, would there be a way to

13  find that information?

14    A.    If it was not in the printout, no.

15    Q.    Would you have done that search yourself or

16  would you go back to the contractor for them to look for

17  that information?

18    A.    I would do it myself.

19    Q.    And what system would you look at for that?

20    A.    CIS, claims.

21    Q.    And was there any procedure or steps that you

22  would follow to run that search?

23    A.    Just the last name, first name.

24    Q.    Were you trained on any protocols to look for

40

GUISEPPE DIMAGGIO

BARKLEY
Court Reporters

```
 1   a different name, a maiden name that might have changed?
 2   Were there any steps in place to help?
 3        A.   No.
 4        Q.   So is it fair to say that if you had -- did
 5   not have the information on the proper last name, that
 6   you would not be able to find the information?
 7        A.   That's not fair because the database sometimes
 8   catches certain names that are similar and, you know,
 9   sometimes you catch some -- you know, a different name,
10   a different first name or a different -- you know, if
11   the name is slightly different.
12        Q.   More of a fuzzy search, maybe?
13        A.   Correct.
14        Q.   And is that procedure on searching for other
15   names documented in any way?
16        A.   Not that I know of.
17        Q.   Was that something you remember receiving
18   training on on how to search?
19        A.   Yes.
20        Q.   Would that have been at the academy or after?
21        A.   After.
22        Q.   Do you remember interviewing Mr. Mayorov prior
23   to issuing the detainer?
24        A.   No.
```

41

GUISEPPE DIMAGGIO

BARKLEY
Court Reporters

1      Q.   Did you interview either of his parents before

2   issuing the --

3      A.   No.

4      Q.   Did you feel as if you should have interviewed

5   him before issuing the detainer?

6      A.   At that moment, no.

7      Q.   I guess under what circumstances after looking

8   at the system database checks would you decide you

9   should interview someone before issuing a detainer?

10     A.   If I have a reason to believe that the subject

11  might have derived citizenship.

12     Q.   And is there a particular information in these

13  documents between pages 201 to 222 that might trigger

14  that?

15     A.   He's an asylee.  He's a son of an asylee, a

16  child of asylee.  Procedures -- I checked -- procedures

17  are to check their parents, and if the information is

18  not found, I have a reason to believe that he did not

19  derive at the moment.  Therefore, I placed the detainer.

20     Q.   And I guess the question a little differently,

21  is there a particular information or lack of information

22  on these records that would, you know, make you think I

23  need to look further?

24     A.   No, there's no lack of information.

42

GUISEPPE DIMAGGIO



1     Q.    And then you stated that you could not find

2     any information on its mother, correct?

3     A.    The standard procedure is that if -- is a

4     lawful permanent resident to check for their parents'

5     status, and this leads me to believe that I couldn't

6     find information on their parents.

7     Q.    Okay.  And is there any documentation that you

8     have to write or provide to your supervisor that you

9     didn't find the information?

10    A.    I don't know if I have to provide that

11    information.  Obviously, it's not in this packet.

12    Q.    Would you have informed your supervisor that

13    you couldn't find the information?

14    A.    No.

15    Q.    And is there -- is there, like, a written

16    procedure then to check the parents' records or is that

17    something you choose to do based on the training?

18    A.    I'm not sure if it's on the SOP, but we do

19    that based on the training.

20    Q.    In the grand scheme of interviewing potential

21    subjects that you would issue a detainer to, on average

22    a percentage, how many people would you have interviewed

23    before issuing a detainer?

24    A.    Many.

43

GUISEPPE DIMAGGIO

BARKLEY
Court Reporters

1      Q.    Over 50 percent?

2      A.    No.

3      Q.    And I guess, in those cases, why did you

4  choose -- was there an overarching reason, a major

5  reason that you chose to issue --

6      A.    If it's not a biometric and it's a manual hit,

7  then we do an interview.

8      Q.    And did you ever discover someone was a

9  U.S. citizen through an interview that the system didn't

10 identify?

11     A.    If it's a manual hit, it happens.  It happens.

12     Q.    What about an electronic hit, do you recall

13 any?

14     A.    Electronic hits, we don't interview.  We

15 could, but we don't interview because we have all of the

16 information, all of the facts.

17     Q.    And how can you be certain whether someone is

18 or isn't a U.S. citizen without interviewing them?

19     A.    Based on the checks that were provided to us.

20     Q.    Okay.  And whether a person claims citizenship

21 or not, a United States citizen should not receive a

22 detainer, correct?

23     A.    Repeat that.

24     Q.    Whether a person claims to be a United

44

GUISEPPE DIMAGGIO

BARKLEY
Court Reporters

1  States citizen or not, a U.S. citizen should not receive

2  a detainer?

3      A.   Whether or not they claim it?  We still have

4  to do our checks, and if we decided to place a detainer,

5  there is a reason why we are placing a detainer.

6      Q.   Okay.  I guess as far as you know, should a

7  United States citizen ever be issued --

8      A.   If somebody tells me I am a U.S. citizen, it's

9  just their word.  Am I going to go -- you know, believe,

10 you know, what they're telling me that they're a U.S.

11 citizen, that's not what I was trained, you know, to do.

12 I have to go based on facts.

13     Q.   Sure.  But I guess going one step above, as an

14 ICE policy, it's your understanding that a United States

15 citizen should not be issued an immigration detainer?

16     A.   That's correct.

17     Q.   Okay.  Is there any -- I know you said you do

18 some follow-up investigation after issuing a detainer.

19 Is there any written policy on what you would be

20 required to investigate?

21     A.   Not that I know of.

22     Q.   Okay.  Are you aware that ICE have agents at

23 the Stateville Correctional Center that process new

24 inmates?

45

GUISEPPE DIMAGGIO

BARKLEY
Court Reporters

1     A.   Yes.

2     Q.   Were you familiar with any of those agents in

3  December 2010?

4     A.   That, I'm not sure.

5     Q.   That's fine.  I guess turning back to this

6  exhibit here in front of you, page 213, do you see at

7  the top there's a date?

8     A.   Yes.  Which one?

9     Q.   213?

10    A.   Which one?

11    Q.   The one on your left.  No. 2 in the bottom

12  right corner.

13         So on page 213, the date of this document is

14  March 8, 2011, correct?

15    A.   Correct.

16    Q.   And do you know why the system check would

17  reflect that date instead of December 30, 2010 date that

18  are in the other documents ahead of it?

19    A   Like I said, the other document -- like if the

20  other document, it's a hit that we received from the

21  facility.

22    Q.   Okay.

23    A.   These are checks that we do.

24    Q.   Okay.  And was it typical to have a gap

46

BARKLEY
Court Reporters

```
 1   between the hit and the check?
 2        A.   In this case, yes.  In this particular case,
 3   yes.
 4        Q.   Do you recall why in this case?
 5        A.   Well, the subject is in prison, and his
 6   release date is not until a later date, so we have a
 7   little bit of time to work.
 8        Q.   That's fair.  And then I guess if you return
 9   to page 206 --
10        A.   Okay.
11        Q.   -- have you seen this document before?
12        A.   Yes.
13        Q.   Do you see where it says location and it says
14   Dixon Springs Boot?
15        A.   Okay.
16        Q.   So at the time the detainer was issued, you
17   were aware that he was in boot camp?
18        A.   No.
19        Q.   You didn't know where he was located when you
20   issued --
21        A.   I did not know that.
22        Q    You were aware that ICE agents were at
23   Stateville when he was processed.  Do you know why?
24        A.   I'm sorry.  Say that again.
```

47

GUISEPPE DIMAGGIO

BARKLEY
Court Reporters

1      Q.    You said earlier that you were aware that ICE

2   has agents at Stateville Correctional Center --

3      A.    Yes.

4      Q.    -- in December of 2010?

5      A.    I did -- I was not aware -- I don't remember

6   if I knew in 2010 whether ICE agents were at Stateville.

7      Q.    Okay.  Assuming they were there, would they

8   have the authority to issue detainers?

9      A.    Yes.

10     Q.    Okay.  And were you familiar with whether ICE

11  agents at Stateville did issue detainers during

12  processing whether in 2010 or any time?

13     A.    Well, I wasn't there.  I can't answer that.

14     Q.    Okay.  That's fair.  Could you turn to 220.

15  It should be at the end there.

16     A.    Okay.

17     Q.    What is this document?  Do you recognize it?

18     A.    220, you said?

19     Q.    Yes.

20     A.    This is an immigration detainer, Form 247.

21     Q.    And did you issue this detainer?

22     A.    Yes, I did.

23     Q.    Do you see the section at the top where it

24  says, You're advised that the action noted below has

48

GUISEPPE DIMAGGIO

BARKLEY
Court Reporters

1   been taken by the U.S. Department of Homeland Security?

2        A.   I see that.

3        Q.   And you checked that box, correct?

4        A.   I checked the first box under that.

5        Q.   Okay.  And on what basis did you check this

6   box?

7        A.   Under the basis that our -- the information

8   that was given to us showed that he was a lawful

9   permanent resident with a deportable defense.

10       Q.   And then at the bottom, you also checked the

11  box that says DHS request, that you maintain custody of

12  this individual for 48 hours; is that correct?

13       A.   That's correct.

14       Q.   And on what basis would you have checked that

15  box?

16       A.   The same basis.

17       Q.   Okay.  And does this document explain why

18  Mr. Mayorov should have been issued a detainer?

19       A.   On this document, it does not.

20       Q.   Would you have attached that documentation to

21  this document at any --

22       A.   Not to the detainer.

23       Q.   Where would that information be?

24       A.   In our narrative.

49

GUISEPPE DIMAGGIO

BARKLEY
Court Reporters

1    Q.   Okay.  And do you recall if you sought

2  approval to issue this detainer before you issued it?

3    A.   Approval?

4    Q.   From your supervisor.  Was this one of the

5  reports that you sent to him?

6    A.   You mean to OCC or --

7    Q.   No.  Earlier, you mentioned that you would

8  have informed your supervisor that you were going to

9  issue a detainer.  Do you recall if this was one of

10  those cases?

11    A.   No, I don't recall that.  I don't recall that.

12    Q.   Okay.  Did you ever obtain a warrant of arrest

13  to have the plaintiff detained for immigration purposes?

14    A.   No.

15    Q.   Okay.  Do you have any knowledge of whether

16  plaintiff was likely to escape before you could obtain

17  any warrant?

18    A.   No.

19                        (Whereupon Dimaggio Deposition

20                         Exhibit No. 4 was marked for

21                         identification.)

22  BY MR. RAJADURAI:

23    Q.   I guess -- I guess we already did that.  I

24  think we'll go to a different Exhibit 4.  We will

GUISEPPE DIMAGGIO

BARKLEY
Court Reporters

1   probably be done with that, I think.  You can look

2   through that a little bit, if you'd like.  Do you

3   recognize these documents?

4        A.   Yes.

5        Q.   What are these documents?

6        A.   These are EARM.  Basically our database where

7   we create events.

8        Q.   And does this document contain information

9   about Mr. Mayorov's citizenship?  I guess if you see on

10  the first page, it says, Country of citizenship?

11       A.   Oh, no, no.  I thought there was more to it,

12  no.

13       Q.   Do you see on page 1, it says, Country of

14  Citizenship?

15       A.   Yes.

16       Q.   What does that say?

17       A.   It says Belarus.

18       Q.   What is the date of this?

19       A.   I'm sorry?

20       Q.   What is the date?  Is there any way to

21  identify what date this report was run?  Would the date

22  in the corner, April 10, 2004, bottom right corner --

23  would that be the date that this EARM was prepared or

24  printed?

                              51

GUISEPPE DIMAGGIO

BARKLEY
Court Reporters

1   A. I'm not sure of that.

2   Q. Okay.  Now, do you know if there's any duty to

3 update the EARM records?

4   A. Yes, we have a duty to update.

5   Q. Would that be your duty to update this kind of

6 record?

7   A. It would be the CAP agent.

8   Q. And how would the CAP agent know to update the

9 records?

10   A. When the subject is in proceedings and being

11 investigated, then they would update the record.

12   Q. Did IEA agents ever have any duty to tell the

13 CAP agent to update information on these reports?

14   A. There's really no reason to update anything

15 that was created here.  The subject was not in our

16 custody.  In this case, you don't have to update

17 anything.

18   Q. So as far as you know, there was no duty or

19 responsibility to update that Mr. Mayorov's citizenship

20 had changed?

21   A. At that point, we did not know.  At that

22 point, we did not know he was a U.S. citizen.  Nobody

23 could have updated anything in the record.

24   Q. Let's say this April 10, 2014 date is correct.

GUISEPPE DIMAGGIO

BARKLEY
Court Reporters

1    Would you have expected this report to be different now

2    knowing the information about Mr. Mayorov?

3         A.   Who printed this form?

4         Q.   We got this from your counsel.  So as far as

5    you know, just from your understanding.

6         A.   But it doesn't show here that he is a U.S.

7    citizen on this form.

8         Q.   Sure.  As far as you know, would you have

9    expected that to be changed, if he was a U.S. citizen?

10        A.   The comments are not going to be on this form.

11   The comments could have been put in another form -- in

12   other parts of the system.

13        Q.   Do you have any ability to know who would run

14   this report?  Would this be one of the reports that

15   Ms. Beckman provided to you?

16        A.   Yes.

17        Q.   Not necessarily this page but --

18        A.   She would provide me with, you know, yes,

19   reports like this.

20        Q.   Okay.  That's fine.  Let's do Exhibit 5.

21   We're probably done with that one.

22                        (Whereupon Dimaggio Deposition

23                         Exhibit No. 5 was marked for

24                         identification.)

53

BARKLEY
Court Reporters

1    BY MR. RAJADURAI:

2         Q.    Have you seen this document before?

3         A.    I don't remember seeing these documents.

4         Q.    These are documents provided by your attorney,

5    the government's attorney, and I guess let's turn to the

6    second page from the end.

7         A.    Oh, second page from the end?

8         Q.    Yeah.

9               Okay.  Do you recognize this document?

10        A.    Now that I'm looking at this document, yes.

11        Q.    What is this?

12        A.    Actually, I recognize it because I saw it --

13   my supervisor, second line supervisor e-mailed it to me

14   yesterday.

15        Q.    Had you ever seen this document before then?

16        A.    No.

17        Q.    Do you happen to know what this document is

18   generally?

19        A.    No, I don't know, but now it shows here that

20   it's Stateville, NRC.  No, I don't know what this is.

21        Q.    Do you see it says USC on there?  Do you know

22   what that note might mean?

23        A.    Child of an USC.

24        Q.    UR -- USC, where it says that?

54

BARKLEY
Court Reporters

```
 1        A.   It says --

 2        Q.   Oh, child of?

 3        A.   Child of USC.

 4        Q.   Do you know what that means?

 5        A.   Exactly what it says.  Child of USC.  It's a

 6   note.

 7        Q.   And do you know why this information would not

 8   have been part of your packet of materials you received?

 9        A.   I don't know that.

10        Q.   Did you happen to know who would have prepared

11   this document?

12        A.   Don't know that.

13        Q.   This is not a typical document you saw as an

14   ICE --

15        A.   No.

16        Q.   Have you ever investigated why ICE agents at

17   Stateville don't issue detainers?

18        A.   No.

19        Q.   And is that -- you were primarily located

20   there, correct?  Were you at Stateville?

21        A.   No.

22        Q.   Okay.  Which facilities were you at?

23        A.   I was in the federal building on Clark.

24        Q.   And were you ever familiar that the ICE agents
```

55

BARKLEY
Court Reporters

1    at Stateville did issue detainers?

2        A.   We're talking about now or back then?

3        Q    Or when -- between 2009 and 2013.

4        A.   Between 2009 to '13, yes.

5        Q.   Okay.  I guess let's turn -- what number are

6    we on?

7             6.

8                          (Whereupon Dimaggio Deposition

9                           Exhibit No. 6 was marked for

10                          identification.)

11   BY MR. RAJADURAI:

12       Q.   Do you recognize this document?

13       A.   Yes.

14       Q.   What is it?

15       A.   It's a detainer.

16       Q.   Is it fair to say it's a cancellation of the

17   detainer?

18       A.   Yes.  Please, cancel detainer being placed by

19   this Office on -- yup.

20       Q.   And you issued this form?

21       A.   Yes, I did.

22       Q.   And why did you issue this form?

23       A.   I was advised from my supervisor that the

24   subject is an USC.  So we lifted the detainer.

56

GUISEPPE DIMAGGIO

BARKLEY
Court Reporters

1      Q.   Who is your supervisor at the time?

2      A.   Well, he's actually -- it was not my direct

3   supervisor, but the supervisor that advised me was

4   Shawn Wright.

5      Q.   And do you know if he's still in the same

6   role?

7      A.   He's a deportation officer right now.

8      Q.   And did you get a reason for why other than he

9   was U.S. citizen?

10     A.   He had told me that they -- they had

11  information that showed that he was a U.S. citizen.

12  Therefore, he --

13     Q.   And do you know who made the discovery of that

14  information?

15     A.   I don't know.

16     Q.   And this is dated March 16, 2011?

17     A.   Yes.

18     Q.   Well, that wouldn't be correct, right,

19  because -- do you think that was an error just because

20  that was the same date his detainer was --

21     A.   We -- well, we print out the same form.

22     Q.   Okay.  Do you happen to know what date the

23  detainer was canceled?

24     A.   No, I don't remember.

GUISEPPE DIMAGGIO

BARKLEY
Court Reporters

1    Q.   Okay.  How soon before you issued this form

2    did you become aware that it was supposed to be

3    canceled?  Was this form prepared immediately?

4    A.   How soon -- I don't remember.  I want to say

5    within months.  I don't remember exactly.

6    Q.   And do you -- did you ask who made the

7    discovery of the information that he was --

8    A.   I did not ask.

9    Q.   Okay.  You would have only spoken to

10   Mr. Wright about this issue?

11   A.   Yes.  That's the only person I spoke to.

12   Q.   Okay.  I think we're okay with that one.

13                         (Whereupon Dimaggio Deposition

14                          Exhibit No. 7 was marked for

15                          identification. )

16   BY MR. RAJADURAI:

17   Q.   Have you seen this document before, Exhibit 7?

18   A.   I don't remember.

19   Q.   I guess if we turn to page -- or response 3,

20   so pages 2 to 3; is that correct?

21   A.   The same document that you just --

22        MR. FLEMING:  Maybe we can use the amended

23   one.  The answer on that one is the same.

24        MR. RAJADURAI:  We will get rid of 7 and go

58

GUISEPPE DIMAGGIO

BARKLEY
Court Reporters

1  back to No. 5, the same one.

2  BY MR. RAJADURAI:

3      Q.   And then if you turn to page 2 and if you look

4  at interrogatory No. 3 and the response --

5      A.   Uh-huh.

6      Q.   -- are you familiar with Ronald Easterday?

7      A.   Yeah.

8      Q.   Who is he?

9      A.   He's a SDEO of our cap unit.

10     Q.   Okay.  And what is his role in that position?

11     A.   He's a supervisor of our cap unit.

12     Q.   And in what cases would he get involved with

13  the detainer issuance or cancellation process?

14     A.   Well, I'm familiar with -- he would be

15  involved if someone comes in our custody, and I don't

16  know his involvement with someone that -- I don't know

17  his involvement, if someone is getting the detainer

18  lifted.

19     Q.   And do you recall ever communicating with

20  Mr. Easterday?

21     A.   No.

22     Q.   About Mr. Mayorov's case.  Do you have any

23  idea of who might have contacted him about this certain

24  case?

59

GUISEPPE DIMAGGIO

1    A.    No idea.

2    Q.    Was it typical to -- I guess in your

3  experience, how many cancellations of detainers were you

4  involved with?

5    A.    Maybe five.

6    Q.    Do you remember the reasons for those?

7    A.    I don't remember the reasons, no.

8    Q.    And would it have come from Mr. Easterday or

9  Mr. Wright or who would it have come from?

10    A.    Sometimes, it would come from informations

11  that we have gathered through the detainee like faxing

12  us a copy of the birth certificate or some kind of

13  evidence that would show that he is a U.S. citizen.

14    Q.    Okay.  And did you ever cancel a detainer on

15  your own authority -- strike that.

16    Did you have the authority to cancel a

17  detainer without getting approval from someone else?

18    A.    I do have the authority to cancel the

19  detainer, but I always seek approval.

20    Q.    Did you receive training on cancellation of

21  detainers?

22    A.    No.

23    Q.    Okay.  If we turn back to Exhibit 2, which is

24  this Morton memo, it says in the bottom paragraph, of

60

GUISEPPE DIMAGGIO

BARKLEY
Court Reporters

1    page 1, "If evidence indicates the individual is a USC,

2    ICE should neither arrest, nor place the individual in

3    removal proceedings"; is that correct?

4         A.   That's correct.

5         Q.   And that's your understanding of the policy?

6         A.   That's my understanding of the policy.

7         Q.   And it also says, "If an individual already in

8    custody claims to be a USC, an officer must immediately

9    examine the merits of the claim and notify and consult

10   with his" --

11             MR. KUHN:  Where does it say -- where are you

12   talking about?

13             MR. RAJADURAI:  I think it's on the second

14   page.  Second page, middle, first under Claims by

15   Detained Individual.

16             THE WITNESS:  Oh, what this is stating if

17   they're in custody of ICE.

18   BY MR. RAJADURAI:

19        Q.   So this is only ICE's custody, as far as you

20   understand?

21        A.   That's what it's saying here.

22        Q.   Okay.  Are you aware of whether his --

23   Mr. Mayorov's detainer was ever reissued?

24        A.   I'm not aware of that.

GUISEPPE DIMAGGIO

BARKLEY
Court Reporters

1      Q.    Okay.  I think we're good with that one.

2            MR. RAJADURAI:  8, Exhibit 8.

3                          (Whereupon Dimaggio Deposition

4                          Exhibit No. 8 was marked for

5                          identification.)

6    BY MR. RAJADURAI:

7      Q.    Do you recognize this document?

8      A.    No, I don't recognize this document.

9      Q.    But are you aware that ICE are part of the

10   processing at Stateville?

11     A.    Now, I -- yes, I am aware of that.

12     Q.    Do you know any of the ICE agents' names

13   between 2009 and 2013 that were in Stateville in

14   processing?

15     A.    I found out that in -- you know, some of the

16   ICE agents, they were in Stateville.

17     Q.    Do you remember their names?

18     A.    Jen Wall.  I don't remember anybody else.

19     Q.    Do you happen to know if she was there in

20   December of 2010?

21     A.    She was there.  I found out through the e-mail

22   I received, yes.

23     Q.    Okay.  And who is that e-mail from?

24     A.    My supervisor.

62

GUISEPPE DIMAGGIO

BARKLEY
Court Reporters

1     Q.    That was?

2     A.    One of my supervisors.  McGorny.

3           MR. RAJADURAI:  Let's see.  Exhibit 9.  We're

4  done with that one.

5                         (Whereupon Dimaggio Deposition

6                          Exhibit No. 9 was marked for

7                          identification.)

8  BY MR. RAJADURAI:

9     Q.    Do you recognize this document?

10    A.    Yes.

11    Q.    And what is this?

12    A.    This is an application to register a permanent

13  resident or adjust status, Form I-485.

14    Q.    And would you have seen this document prior to

15  issuing the detainer?

16    A.    Not this document.  The information that we

17  have showed that he's already of status.

18    Q.    When --

19    A.    Lawful permanent accident.

20    Q     When would you have seen this document or did

21  you ever see this document before today?

22    A.    This document?

23    Q.    Yeah.

24    A.    No, I never seen.

63

BARKLEY
Court Reporters

1    Q.    If we turn back to Exhibit 6, the

2  cancellation -- actually, I think it's exhibit -- the

3  actual issuance, No. -- it's inside the big packet of

4  information, Exhibit 3.

5         Page 220, do you see the phone number there in

6  the box halfway down, the (708) 449-2495?

7    A.    I see that.

8    Q.    Do you recognize that number?

9    A.    I do.

10   Q.    What phone number is that?

11   A.    That's for the detention center in Broadview.

12   Q.    And who would receive calls to that number?

13 Would it be an ICE agent.

14   A.    That's just a general number.

15   Q.    And you said Broadview?

16   A.    Broadview, yes.

17   Q.    And where is that?

18   A.    I believe that -- I believe that's a com

19  center phone number.

20   Q.    Okay.  And would you receive information

21  passed along through the com center ever?

22   A.    I'm sorry.  Repeat that.

23   Q.    Would you receive information about a subject

24  through this com center if someone called this number?

64

BARKLEY
Court Reporters

1    A.    Yes.

2    Q.    And who would pass that on?

3    A.    The person that received the phone call.

4    Q    Do you remember how often you would get

5  information through the come center?

6    A.    It's not a pattern.  It depends, you know.

7  If -- if the com center got a phone call from a jail and

8  someone is ready to be released, they would call me and

9  tell me, you know, right away.  There's no -- there's no

10  pattern, really.

11    Q.    Do you happen to know if there is a voicemail

12  account linked to this?

13    A.    I don't know that.

14    Q.    Did you ever receive any phone calls from

15  Mr. Mayorov?

16    A.    No.

17    Q.    What about from Mr. Mayorov's mother?

18    A.    No.

19    Q.    Did you ever receive any messages that they

20  had contacted this number?

21    A.    No.

22          MR. RAJADURAI:  I'm good on our end.

23          MR. KUHN:  I have nothing.

24          We'll reserve.

65

GUISEPPE DIMAGGIO

BARKLEY
Court Reporters

1                        (Whereupon the deposition

2                          concluded at 12:00 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

66

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  NORTHERN DISTRICT OF ILLINOIS

 3                         EASTERN DIVISION

 4   SERGEY MAYOROV,          )

 5                            )

 6         Plaintiff,         )

 7                            )

 8      -vs-                  )No.  13 C 5249

 9                            )

10   UNITED STATES OF AMERICA,)

11                            )

12         Defendant.         )

13   _____)
```

14        I, GUISEPPE DIMAGGIO, being first duly sworn, on
oath, say that I am the deponent in the aforesaid deposition,
15   that I have read the foregoing transcript of my deposition
taken on the 30th of April, 2014, consisting of pages 1
16   through 70, taken at the aforesaid time and place and that
the foregoing is a true and correct transcript of my
17   testimony so given.

18                      ____ Corrections have been submitted

19                      ____ No corrections have been

20                           submitted

21                      _____
                             GUISEPPE DIMAGGIO
22   SUBSCRIBED AND SWORN TO
before me this _____ day
23   of _____ A.D, 2014
_____
24

                               67

1  Notary Public

2  Northern DISTRICT OF ILLINOIS          )

3  EASTERN DIVISION                       )

4  STATE OF ILLINOIS                      )

5                                         )  SS:

6  COUNTY OF C O O K                      )

7

8          I, Tracy Kerney, Certified Shorthand Reporter,

9  do hereby certify that on the 30th of April, A.D, 2014,

10  the deposition of GUISEPPE DIMAGGIO, called by the

11  Plaintiff, was taken before me, reported

12  stenographically and was thereafter reduced to

13  typewriting through computer-aided transcription.

14          The said witness, GUISEPPE DIMAGGIO, was first

15  duly sworn to tell the truth, the whole truth, and

16  nothing but the truth, and was then examined upon oral

17  interrogatories.

18          I further certify that the foregoing is a

19  true, accurate and complete record of the questions

20  asked of and answers made by the said witness, at the

21  time and place hereinabove referred to.

22          The signature of the witness was not waived by

23  agreement.

24          Pursuant to Rule 30(e) of the Federal Rules of

GUISEPPE DIMAGGIO

BARKLEY
Court Reporters

1  Civil Procedure for the United States District Courts,

2  if deponent fails to read and sign this deposition

3  transcript within 30 days or make other arrangements for

4  reading and signing thereof, this deposition transcript

5  may be used as fully as though signed, and the instant

6  certificate will then evidence such failure to read and

7  sign this deposition transcript as the reason for

8  signature being waived.

9         The undersigned is not interested in the

10 within case, nor of kin or counsel to any of the

11 parties.

12        Witness my official signature on this 14th day

13 of May, A.D, 2014.

14

15

16                      Tracy Kerrey, CSR, RPR
                     License No:  084-004282

17

18

19

20

21

22

23

24

69

GUISEPPE DIMAGGIO

BARKLEY
Court Reporters