# EXHIBIT 6

## Page 1

```
         IN THE UNITED STATES DISTRICT COURT
       FOR THE NORTHERN DISTRICT OF ILLINOIS
                   EASTERN DIVISION

SERGEY MAYOROV,               )
                              )
     Plaintiff,               )
                              )
     vs.                      ) No. 13 CV 5249
                              )
UNITED STATES OF AMERICA      ) Judge Pallmeyer
                              )
     Defendant.               )


                      VOLUME II

        The deposition of GUISEPPE DiMAGGIO,
called by the Plaintiff for examination, taken
pursuant to notice and pursuant to the Federal
Rules of Civil Procedure for the United States
District Courts pertaining to the taking of
depositions, taken before Donna Wadlington
Shavers, a Certified Shorthand Reporter, at
208 South LaSalle Street, Suite 1300, Chicago,
Illinois, on the 18th day of July, 2014,
commencing at approximately the hour of 10:04
a.m.
```

## Page 2

```
APPEARANCES:

      LITTLER MENDELSON, P.C.
      BY:  ABIMAN RAJADURAI, ESQ.
      321 North Clark Street, Suite 1000
      Chicago, Illinois  60654
      (312) 372-5520
      arajadurai@littler.com

             - and -

      NATIONAL IMMIGRATION JUSTICE CENTER
      BY:  MARK M. FLEMING, ESQ.
      208 South LaSalle Street, Suite 1300
      Chicago, Illinois  60604
      (312) 660-1628
      mfleming@heartlandalliance.org

          Appeared on behalf of the Plaintiff.


      ILLINOIS-EASTERN DIVISION OF THE
      NORTHERN DISTRICT OFFICE OF THE
      UNITED STATES ATTORNEY
      BY:  JAMES M. KUHN, ESQ.
           ASSISTANT UNITED STATES ATTORNEY
      219 South Dearborn Street, Suite 500
      Chicago, Illinois  60604
      (312) 353-1877
      james.kuhn@usdoj.gov

          Appeared on behalf of the Defendant.
```

## Page 3

```
                     I N D E X

GUISEPPE DiMAGGIO                              PAGE
Direct by Mr. Rajadurai                         4




                     EXHIBITS

DiMAGGIO                                         ID
  1 - 6/10/14 Central Index System - ID
      Search/Display                            12
  3 - 3/8/11 Central Index System - ID
      Search/Display                             9
```

## Page 4

        (Witness duly sworn.)
        GUISEPPE DiMAGGIO,
called as a witness herein, having been first
duly sworn, was examined and testified as
follows:
        **DIRECT EXAMINATION**
**BY MR. RAJADURAI:**
   Q.  Good morning again, Mr. DiMaggio.
   **A.  Good morning.**
   Q.  Hopefully we can keep this short and
sweet.
        Figure I'd run through the
ground rules again.  I'll ask the questions.
Allow you to answer.  Try not to speak over me
or -- so she can keep a clear record.  And then
say yes or no or answer verbally so that she can
write that down.
   **A.  (Nodding.)**
   Q.  So I guess I'll start.
        Are you aware of the Child
Citizenship Act of 2000?
   **A.  Yes.**
   Q.  And when did you first become aware of
that?

Page 5

1   A. At the academy.
2   Q. Okay. And do you remember what year
3 that would have been?
4   A. 2009.
5   Q. Okay.
6       And what is your
7 understanding -- and we'll call it the CCA.
8 What is your understanding of the CCA?
9   A. Well, to facilitate the acquisition of
10 U.S. citizenship of foreign-born children of
11 U.S. citizens and certain requirements have to
12 be met.
13   Q. Do you know what those requirements
14 are?
15   A. They have to be under the age of 18.
16 They have to be lawfully admitted into the
17 United States. They have to have one or both
18 parents U.S. citizens, and they have to
19 physically live in a legal address of their
20 parents.
21   Q. And going back to the academy, what
22 kind of training did you receive on this topic,
23 of the CCA?
24   A. What do you mean what kind of

Page 6

1 training?
2   Q. Was it hard-copy materials or a
3 training seminar or a lecture?
4   A. We were given hard-copy material.
5   Q. Do you remember who gave that to you?
6   A. No.
7   Q. Did you receive any sort of, I guess,
8 verbal teaching for the lecture or any sort of
9 video?
10   A. Verbal teaching, yes.
11   Q. Was that also at the academy?
12   A. Yes.
13   Q. Do you know how long that training
14 was?
15   A. No.
16   Q. Was it part of a larger training or
17 was it a separate, individual training just on
18 the CCA?
19   A. It was not individual. It was maybe
20 like 20 people in our class.
21   Q. I guess that saying, was that the only
22 topic as part of that specific training or was
23 it part of a larger group of topics?
24   A. Part of a larger group of topics, yes.

Page 7

1   Q. Do you remember what the other topics
2 were?
3   A. No.
4   Q. Did you receive any other follow-up
5 training during your time working with detainers
6 and issuing detainers on this topic?
7   A. Not that I remember.
8   Q. Do you remember ever receiving any
9 updated, hard-copy materials or emails about the
10 CCA?
11   A. I don't remember.
12   Q. You mentioned that one of the
13 requirements is for the minor to be a lawful,
14 permanent resident. How would you go about
15 determining that information of whether an
16 individual is a lawful, permanent resident?
17   A. Record checks.
18   Q. And what checks would those be?
19   A. Checks in CIS, claims.
20   Q. And would you run those checks
21 yourself or do you get that information from
22 someone else?
23   A. I would run it myself, and at that
24 time we were provided hard copies from the

Page 8

1 contract that used to do that for us.
2   Q. Okay.
3       You testified before that it
4 is your understanding that immigration detainers
5 should not be issued against a U.S. -- against
6 an individual that derived citizenship through
7 the CCA, correct?
8   A. That's correct.
9       If we knew that he derived for
10 effect, then yes, it shouldn't be issued.
11   Q. Okay.
12       And what steps would you take
13 to investigate whether a minor or subject
14 derived citizenship through the CCA before
15 issuing a detainer?
16   A. Check CIS, claims.
17   Q. And is there certain information in
18 CIS and claims that you look for? Is there a
19 certain data point?
20   A. The status of their entry and if they
21 are naturalized.
22       MR. RAJADURAI: I guess we'll start
23 with this first exhibit here, and this was
24 previously part of Exhibit 3. We just made it

Page 9

 1  shorter for this one.
 2          (WHEREUPON, DiMaggio
 3          Exhibit No. 3 was remarked for
 4          identification on 7/18/14.)
 5  BY MR. RAJADURAI:
 6    Q.  Are you familiar with this document?
 7    A.  Yes.
 8    Q.  And what would this document be?
 9    A.  It's a document from CIS. This
10  basically shows the status of the subject, the
11  class of admission, point of entry, date of
12  birth.
13    Q.  And what does it provide for
14  Mr. Mayorov's date of birth on this document?
15    A.  Date of birth shows 10/15/1990.
16    Q.  Okay. And what is the code "COA"?
17  What does that stand for?
18    A.  Class of admission.
19    Q.  Okay. And where it says "AS8" for his
20  class of admission, do you know what that stands
21  for?
22    A.  I believe that's --
23        MR. KUHN: This, it being a follow-up
24  deposition, is limited to his familiarity with

Page 10

 1  the Child Citizenship Act of 2000. If you want
 2  to ask questions I'll -- I don't want you going
 3  over all the stuff we went over before.
 4        MR. RAJADURAI: Oh, this will be
 5  pretty quick. This will tie into that.
 6        MR. KUHN: Okay.
 7        THE WITNESS: AS8, I believe that's
 8  the child of an asylee.
 9  BY MR. RAJADURAI:
10    Q.  And does this document show that
11  Sergey became a lawful, permanent resident?
12    A.  Yes, it does.
13    Q.  And where is that?
14    A.  That's by the country of admission.
15  It says child of asylee.
16    Q.  And is the plaintiff's mother's
17  original name provided on this document?
18    A.  Mother's first name, yes. I don't
19  know if it's the original name, but I see
20  mother's first name.
21    Q.  Okay.
22        And based on the information
23  in this document, would you have investigated
24  further to determine if his parents had obtained

Page 11

 1  U.S. citizenship before his 18th birthday,
 2  before issuing a detainer?
 3    A.  Yes.
 4    Q.  Okay.
 5        You previously testified that
 6  a name search for a CIS entry would pick up
 7  aliases for other individuals -- other names,
 8  correct?
 9    A.  Yes.
10    Q.  Do you recall running a search for the
11  plaintiff's mother's or father's CIS entry?
12    A.  Yes.
13        We usually run their mother
14  and their parents name in CIS to see if they
15  are, you know, U.S. citizens.
16    Q.  Okay.
17    A.  This is a 2010 case. 2011 I can't
18  really, you know, for sure say yes, I did that
19  but...
20    Q.  Sure. Absolutely.
21        And do you run those searches
22  to identify whether there is a potential
23  citizenship issue with the CCA?
24    A.  Yes, we do.

Page 12

 1    Q.  And would a record of that search
 2  appear in the deportation report, the secured
 3  communities report?
 4    A.  If a copy was printed, yes.
 5        MR. RAJADURAI: Let's refer to another
 6  exhibit here. This is a new one. We can call
 7  this 1.
 8        (WHEREUPON, DiMaggio
 9        Exhibit No. 1 was marked for
10        identification on 7/18/14.)
11  BY MR. RAJADURAI:
12    Q.  Are you familiar with this document?
13  Have you seen this before?
14    A.  Yes, the CIS.
15        Have I seen this particular?
16  I don't know. But yes, I'm familiar with this
17  data. Yes.
18    Q.  And does the plaintiff's mother, Tanya
19  May's original name appear on this document?
20    A.  Well, it shows first name Tanya.
21  Again, I don't know if that's her original name.
22    Q.  I guess the same thing on this
23  document. The COA stands for class of
24  admission?

Page 13

1   A.  COA, yes, class of admission.
2   Q.  So in this case this would provide
3   that Tanya May, alias Mayorova, was a U.S.
4   citizen?
5   A.  Correct.
6   Q.  And does this document provide when
7   the individual became a citizen?
8   A.  Yes.
9   Q.  And where is that?
10  A.  It says "NATZ DATE" on the top right
11  corner.
12  Q.  And based on that information, does
13  that provide the plaintiff's mother became a
14  U.S. citizen before Mr. Mayorov turned 18?
15  A.  Yes.
16  Q.  And does this document show any alias
17  names for Tanya May?
18  A.  Yes.
19  Q.  And what is that?
20  A.  Mayorova.
21  Q.  So if you ran -- I'm sorry.
22      And then what about her first
23  name?  Any aliases there also?
24  A.  Yes.  Tatyana.

Page 14

1   Q.  And that matches the name from
2   Exhibit 3 that you looked at before for his
3   mother's name?
4   A.  Correct.
5   Q.  So based on the information on these
6   two CIS entries, would you be concerned about
7   issuing a detainer to Mr. Mayorov?
8   A.  We still have to investigate because,
9   as I said, they have to live physically, you
10  know, in the same address where the parents
11  lived.  So we still have to investigate to see
12  if he was eligible to become a U.S. citizen or
13  to derive.
14  Q.  And is that also part of the CCA check
15  then to find if they live at the same address?
16  A.  Yes.  That's one of the requirements.
17  Q.  Is there any order in which you
18  investigate the different elements of the CCA?
19  A.  Not that I know of.
20  Q.  Okay.
21  A.  The detainer, like I said, it's not
22  to -- the investigation starts when they come to
23  our custody.
24  Q.  Okay.  So I guess in all the

Page 15

1   requirements of the CCA you can identify the
2   right information in any order that you want?
3   A.  Yes, I guess.
4   Q.  Would you -- based on this information
5   would you have interviewed the plaintiff's
6   mother in this case?
7       MR. KUHN: When?
8       MR. RAJADURAI: After reviewing the
9   CIS entry --
10      MR. KUHN: Before entering the
11  detainer or after?
12      MR. RAJADURAI: Before.  Before.
13      THE WITNESS: Before entering the
14  detainer?
15      MR. RAJADURAI: Yes.
16      THE WITNESS: No.
17  BY MR. RAJADURAI:
18  Q.  And why not?
19  A.  Because he's not in our custody.
20  Q.  How would you determine her address
21  otherwise?
22  A.  I'd have to talk to the subject once
23  they come to our custody and find out.
24  Q.  And did you have an opportunity to do

Page 16

1   that in this case?
2   A.  No.  That is what the detainer does.
3   It gives us a chance to talk to him to find out
4   whether or not he's, you know, a U.S. citizen.
5   Q.  Okay.
6       And then turning back just
7   generally to the CCA.  Does an individual that
8   derives citizenship through the CCA, do they
9   have to file an application or paperwork to
10  become a U.S. citizen?
11  A.  I don't know if they do have to file
12  paperwork.  They could just derive.  I think
13  they can just derive citizenship and they are a
14  citizen.
15  Q.  Okay.
16      Is there any requirement that
17  you have to inquire into a parents' citizenship
18  status if a person is born after the date to
19  qualify for the CCA?
20  A.  Can you repeat that.
21  Q.  Sure.
22      Is there any requirement that
23  you have to inquire, do a search on the parents'
24  citizenship if an individual is born after the

Page 17

 1  date the CCA applies?
 2     A.  After the date?
 3        MR. KUHN: I'll object to form of the
 4  question.  But you can go ahead and answer it,
 5  if you can.
 6        MR. RAJADURAI: I guess I can rephrase
 7  --
 8        THE WITNESS: Can you repeat the
 9  question.
10  BY MR. RAJADURAI:
11     Q.  Sure.
12        So I guess based on the CIS
13  entry that you see and there is a date about the
14  age of the individual and they are not 18 yet,
15  are you required to then inquire into the
16  parents' citizenship to determine whether they
17  qualify for the CCA?
18     A.  I don't know if I am required.
19     Q.  Okay.
20     A.  We do -- we do check the information
21  of the parents and try to figure it out whether
22  or not there is a possibility that the child
23  derived citizenship.
24     Q.  Let me ask it a different way.

Page 18

 1        So let's say the child is
 2  under 18 and an LPR based on what you see.  Are
 3  you then required to investigate whether the
 4  parent is a citizen?
 5     A.  Again, I don't know if we are
 6  required.
 7     Q.  In what circumstances would you
 8  look -- inquire into the parents' citizenship
 9  status since you are not required?
10     A.  In this case we do look for -- we do
11  check their parents' class of admission and
12  whether or not they're a citizen.  So I guess if
13  the subject is an LPR, we do -- we check if
14  their parents are citizens.
15     Q.  Okay.
16        And do you know if that's part
17  of any written materials that you have are the
18  requirements or are you just told?
19     A.  I'm not sure.
20     Q.  And would that be recorded anywhere if
21  you investigated into the parents' citizenship
22  prior to issuing the detainer?
23     A.  I don't know.
24     Q.  Would a scenario where you saw an

Page 19

 1  individual subject under 18 and an LPR, would
 2  this scenario caution against issuing a detainer
 3  before you could determine the parents'
 4  citizenship?
 5     A.  Yes.
 6     Q.  And what would you do to, I guess,
 7  alleviate that concern, get rid of that concern?
 8     A.  I would do my database.  I would look
 9  into the database and try to find out, you know,
10  if the parents' naturalized and what year they
11  naturalized and determine whether or not, you
12  know, there's a possibility that they could've
13  derived citizenship.
14     Q.  Okay.
15        I guess under what
16  circumstances would you decide whether a subject
17  had derived citizenship through the CCA?
18     A.  I'd have to have all the information
19  in front of me.  I'd have to have proofs that
20  the subject lived in the same address as the USC
21  parent or parents.  I'd have to have proof that
22  the, you know, subject's parents have
23  naturalized before the subject turned 18.  I'd
24  have to have proof that the subject was legally

Page 20

 1  admitted into the United States.
 2     Q.  So in those cases where you are trying
 3  to determine if the CCA applies, are you the one
 4  required to find all that information out?
 5        MR. KUHN: Again, are you talking
 6  about during an investigation or before --
 7        MR. RAJADURAI: Prior.  These
 8  questions --
 9        MR. KUHN: Before issuing a charging
10  document or before issuing a detainer?
11        MR. RAJADURAI: This will all be prior
12  to issuing the detainer.
13        THE WITNESS: Prior of issuing a
14  detainer?
15        MR. RAJADURAI: Yeah.
16        THE WITNESS: I'm not required of
17  doing that.
18        MR. RAJADURAI: Okay.
19  BY MR. RAJADURAI:
20     Q.  Would there ever be a circumstance
21  where you would issue a detainer without having
22  information about a parents' citizenship status
23  for an individual who may qualify under the CCA?
24     A.  Repeat that.

Page 21

1  Q. Sure.
2      For an individual who might
3  derive citizenship through the CCA, if you don't
4  have information about the parents' citizenship
5  status, would you still issue a detainer?
6  A. Yes.
7  Q. And under what -- and why would you do
8  that? Under what circumstances?
9  A. To do an investigation.
10 Q. And so after you've issued the
11 detainer, you would conduct an investigation
12 into the parents' citizenship status?
13 A. When the subject is in our custody.
14 Q. Okay. And do you recall if you did
15 that in this case?
16 A. Subject was never in our custody.
17 Q. Okay.
18      In other cases when the
19 subject is in your custody, what steps do you
20 take under the --
21 A. I have never worked for the criminal
22 alien program yet, so I can't answer for that.
23 Q. Okay.
24      In your time issuing

Page 22

1  detainers, which I believe was 2009 to 2013, how
2  many individuals did you encounter that you
3  thought may have derived citizenship through the
4  CCA?
5  A. Don't know.
6  Q. Any estimate? 10, 15, a hundred?
7  A. I really -- I don't know.
8  Q. Sure.
9      Do you recall issuing
10 detainers against any individuals who ultimately
11 did derive citizenship through the CCA?
12 A. I don't.
13 Q. Do you recall any other cases where
14 you issued a detainer and then an individual was
15 a U.S. citizen?
16 A. There might have been a couple times
17 where we had to lift the detainer.
18 Q. And do you know what reason the
19 detainer was lifted?
20 A. We were provided with a birth
21 certificate.
22 Q. And then did you have to cancel the
23 detainer? Is that the official --
24 A. Yes.

Page 23

1      MR. RAJADURAI: That's all I've got.
2      MR. KUHN: Okay. Thank you. We will
3  reserve.
4      THE WITNESS: Thank you.
5      (WHEREUPON, a discussion
6       was held off the record.)
7      THE REPORTER: Would you like a
8  transcript?
9      MR. RAJADURAI: Yes. I would like a
10 PDF transcript.
11
12     (WHEREUPON, the deposition
13      concluded at 10:26 a.m.)

Page 24

```
      IN THE UNITED STATES DISTRICT COURT
    FOR THE NORTHERN DISTRICT OF ILLINOIS
                 EASTERN DIVISION

SERGEY MAYOROV,           )
                          )
     Plaintiff,           )
                          )
     vs.                  ) No. 13 CV 5249
                          )
UNITED STATES OF AMERICA  ) Judge Pallmeyer
                          )
     Defendant.           )

              VOLUME II

     I hereby certify that I have read the
foregoing transcript of my deposition given on
July 18, 2014, consisting of pages 1 through 26,
inclusive, and I do again subscribe and make
oath that the same is a true, correct and
complete transcript of my deposition given as
aforesaid, with corrections, if any, appearing
on the attached correction sheet(s).

     ____ Correction sheet(s) attached.

     _____
              GUISEPPE DiMAGGIO


Subscribed and sworn to
before me this ____ day
of _____, 2014.

_____
Notary Public
```

Page 25

```
 1  STATE OF ILLINOIS   )
                       )SS:
 2  COUNTY OF C O O K   )
 3
 4                I, DONNA WADLINGTON SHAVERS,
 5  Certified Shorthand Reporter within and for the
 6  County of Cook and State of Illinois, do hereby
 7  certify that heretofore, to-wit, on the 18th day
 8  of July, 2014, personally appeared before me at
 9  208 South LaSalle Street, Suite 1300, in the
10  City of Chicago, County of Cook and State of
11  Illinois, GUISEPPE DiMAGGIO, produced as a
12  witness for examination in said cause.
13                I further certify that the
14  said witness, GUISEPPE DiMAGGIO, was by me first
15  duly sworn to testify the truth, the whole truth
16  and nothing but the truth in the cause aforesaid
17  before the taking of the examination under oath;
18  that the testimony was reduced to writing in the
19  presence of said witness by means of machine
20  shorthand and afterwards transcribed into
21  typewriting, and that the foregoing is a true
22  and correct transcript of the testimony given by
23  said witness.
24                I further certify that I am
```

Page 26

```
 1  not counsel for nor in any way related to any of
 2  the parties to this suit, nor am I in any way
 3  interested in the outcome thereof.
 4                I further certify that my
 5  certificate annexed hereto applies to the
 6  original and court-reporter produced copies of
 7  transcripts only.  I assume no responsibility
 8  for the accuracy of any reproduced copies no
 9  made under my control or direction.
10                In testimony whereof, I have
11  hereunto set my hand this 27th day of July,
12  2014.
13
14
15
16            _____
17                 DONNA WADLINGTON SHAVERS
                   CSR No. 084-002443
18
19
20
21
22
23
24
```