# EXHIBIT 7

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3    SERGEY MAYOROV,           )
                                )
 4               Plaintiff,     )
                                )   No. 13 CV 5249
 5         vs.                  )
                                )   Judge Rebecca R.
 6    UNITED STATES OF AMERICA, )   Pallmeyer
                                )
 7               Defendant.     )

 8
 9
10
11
12          The deposition of MAYRA REYNOSO, taken
13    pursuant to the Federal Rules of Procedure, before
14    Melody A. Monk, Certified Shorthand Reporter No.
15    084-004772, at National Immigrant Justice Center,
16    208 South LaSalle Street, Suite 1300, Chicago,
17    Illinois, on Friday, June 6, 2014, commencing at
18    10:10 a.m. pursuant to notice.
```

Page 2

```
 1                    A P P E A R A N C E S
 2
 3    FOR THE PLAINTIFF:
 4         ABIMAN RAJADURAI
           Littler Mendelson, PC
 5         321 North Clark Street
           Suite 1000
 6         Chicago, Illinois 60654
           312.795.3232
 7         312.275.7110 (fax)
           Arajadurai@littler.com
 8    And
 9         MARK FLEMING
10         National Immigrant Justice Center
           208 South LaSalle Street, Suite 1300
11         Chicago, Illinois 60604
           312.660.1628
12         312.660.1505 (fax)
           Mfleming@heartlandalliance.org
13
14    FOR THE DEFENDANT:
15         JAMES M. KUHN, SR.
           Assistant United States Attorney
16         219 South Dearborn Street
           Chicago, Illinois 60604
17         312.353..1877
           James.kuhn@usdoj.gov
```

Page 3

```
 1                         INDEX
                                                    PAGE
 2    Appearances...........................................  2

 3    MAYRA REYNOSO

 4        MR. RAJADURAI................................  4

 5

 6

 7    REYNOSO EXHIBITS                                  PAGE

 8    1..................................................  19
      2..................................................  30
 9    3..................................................  47
```

Page 4

```
 1              MAYRA REYNOSO,
 2    called as a witness herein, having been first duly
 3    sworn, was examined and testified as follows:
 4              EXAMINATION
 5    BY MR. RAJADURAI:
 6        Q.   Good morning.
 7        A.   Good morning.
 8        Q.   My name is Abiman Rajadurai.  I
 9    represent the plaintiff, Sergey Mayorov, in this
10    case.
11             Could you state your name and spell
12    your name?
13        A.   Mayra Reynoso, M-A-Y-R-A, Reynoso,
14    R-E-Y-N-O-S-O.
15        Q.   And what's your date of birth?
16        A.   5/31/77.
17             MR. KUHN:  Wait.  Stop.
18             THE WITNESS:  Oh.
19             MR. KUHN:  You don't need that, do you?
20    Let's -- we'll take -- we'll strike that from the
21    record.  You can just tell him how old you are.
22             THE WITNESS:  Okay.
23        A.   37.
24        Q.   And have you ever been deposed before?
```

Page 5

1   A.   No.
2   Q.   Okay. I'll just go through some ground
3   rules.
4   A.   Okay.
5   Q.   It's a question-and-answer format.
6   I'll ask a question, and if you'd let me finish
7   before you go ahead, that will help the transcript,
8   and then I'll wait until you're done with your
9   answer.
10       If you don't understand a question, ask
11  me and I'll clarify it and help you understand.
12  Your attorney may object. Unless he says do not
13  answer, go ahead and answer. You have to answer
14  verbally instead of nodding or using hand gestures
15  just so it can be recorded.
16       We can take a break at any time. I
17  prefer if a question is pending, that an answer be
18  given before we take the break.
19  A.   Okay.
20  Q.   And then, I guess, are there -- are you
21  taking any medication now which would prevent you
22  from testifying completely or truthfully?
23  A.   No.
24  Q.   Okay. Any other reason that you don't

Page 6

1   think we should move forward with this deposition
2   today?
3   A.   No.
4   Q.   Great.
5       MR. KUHN: I, I have one, but we'll
6   skip it.
7       MR. FLEMING: And one thing, for the
8   court reporter, to speak slowly; otherwise, it gets
9   hard for her to be able to --
10      THE WITNESS: Okay.
11      MR. FLEMING: -- get things down.
12  Q.   Did you review any documents to prepare
13  for this deposition?
14  A.   Yes, I saw a couple of documents in
15  Attorney Kuhn's office relating to this case.
16  Q.   Okay. And did you bring any of those
17  documents with you?
18  A.   No.
19  Q.   Okay. And are you aware of whether
20  those documents have been produced in this
21  litigation?
22  A.   As far as I know, yes.
23  Q.   Okay. Have you discussed this case or
24  deposition with anyone other than Mr. Kuhn?

Page 7

1   A.   No.
2   Q.   Okay. Did you attend high school?
3   A.   Yes.
4   Q.   Where did you attend high school?
5   A.   Whiting High School.
6   Q.   Okay. Did you graduate?
7   A.   Yes, I did.
8   Q.   Did you attend college?
9   A.   Yes.
10  Q.   Where did you attend college?
11  A.   Purdue University.
12  Q.   Did you graduate there?
13  A.   Yes, I did.
14  Q.   What was your degree in?
15  A.   Bachelor of Arts in Sociology, Criminal
16  Justice, and Spanish International Studies.
17  Q.   Any additional schooling beyond
18  undergrad?
19  A.   No.
20  Q.   Any other professional certifications
21  that you've received?
22  A.   Certificate of translation in Spanish
23  from Purdue University as well.
24  Q.   Okay. And what was your first job

Page 8

1   after graduating college?
2   A.   I worked as a security supervisor at
3   Horseshoe Casino.
4   Q.   Okay. And what were your job duties
5   there?
6   A.   Supervise security officers, as well as
7   boarding and under a -- ensuring there was no
8   underage boarding going at the casino, or any type
9   of scheming, panhandling, et cetera.
10  Q.   Okay. And what years were you employed
11  there?
12  A.   1999 through 2003.
13  Q.   Okay. And what was your reason for
14  leaving that job?
15  A.   I was hired by Immigration
16  Naturalization Service in 2003.
17  Q.   And what was your first position there?
18  A.   I was an immigration inspector.
19  Q.   Okay. What were your responsibilities
20  under that role?
21  A.   I worked at a port of entry, which was
22  O' Hare, and I inspected people coming back into
23  the country, whether they were visitors or
24  returning citizens or residents.

Page 9

1  Q. Okay. And how long were you in that
2  position?
3  A. I was there until September 2006.
4  Q. Okay. And what was your reason for
5  leaving that position?
6  A. I went to work for Immigration and
7  Customs Enforcement in October 2006.
8  Q. Okay. And what was your first position
9  with ICE?
10  A. Immigration enforcement agent.
11  Q. Okay. And is that your current
12  position?
13  A. No.
14  Q. What's your current position?
15  A. Deportation officer.
16  Q. Okay. Is it fair to just call the
17  Immigration Enforcement Authority IEA?
18  A. Immigration enforcement agent?
19  Q. Yeah.
20  A. Yeah.
21  Q. As an IEA, what were your job duties
22  and responsibilities?
23  A. It, it varied. It went as far as
24  picking up individuals at prisons, or taking them

Page 10

1  for fingerprints, or if there was some sort of
2  medical situation, sometimes accompanying them at a
3  hospital, or with, with juveniles, maybe a hotel
4  detail and escorting them back to their home
5  country if they were being deported.
6  Q. Okay. And who did you report to?
7  A. Depending on the rotation --
8  Q. Sure.
9  A. -- it was a supervisory immigration
10  enforcement agent.
11  Q. Okay. And do you remember his or her
12  name?
13  A. There was multiple.
14  Q. Okay. I guess, let's start with, how
15  many rotations did you have as an IEA?
16  A. Oh, my God. I do not remember, to be
17  quite honest, because I was an IEA from '06 all the
18  way through -- I got hired as a deportation
19  officer, which was 2011 -- 2011? 2012? Whatever
20  it was, one of those two years.
21       So we've rotated for a period of time
22  every six months, and then it was every year. So I
23  don't remember the exact amount.
24  Q. Okay. And where were you stationed?

Page 11

1  A. I was stationed in various locations
2  throughout those rotations. I was at the Broadview
3  service staging area where I would deal primarily
4  with detention functions, like transport and the
5  detention of the person in our custody while they
6  were being processed or whatever. And then I also
7  did the Criminal Alien Program, CAP, where I did
8  probably around three years at the Stateville
9  Correctional facility.
10  Q. Okay. And when you started as an IEA,
11  did you receive any sort of training through a
12  seminar or an academy?
13  A. No. My primary training was IOBTC,
14  Immigration Officer Basic Training. And that was
15  through INS in 2003.
16  Q. And what kind of subject matter was
17  covered in that training?
18  A. It was both, both inadmissibility and
19  deportability.
20  Q. Okay. And do you remember who
21  conducted the training?
22  A. No, not -- to be quite honest, no.
23  There was various instructors. There was various
24  classes. I -- that was like 11 years ago. I don't

Page 12

1  remember exactly any names.
2  Q. No problem.
3       Turning to your time at Stateville,
4  what, what years were you at Stateville?
5  A. Up until the point that I was promoted
6  to deportation officer, which was -- I don't
7  remember. It was like two, three years -- it's
8  going on three years. So it was 2011 I was hired
9  or promoted, right? 2011? No, 2012, I was
10  promoted to deportation officer. I might have been
11  there from 2009, possibly, through 2012. I mean,
12  it's an approximate. I can't remember the exact --
13  Q. Sure.
14  A. -- dates.
15  Q. And would you say that was a change in
16  rotation?
17  A. There was rotations, but I would select
18  to just stay there. I was familiar with the
19  concept and, and what was done there. I was one of
20  the senior officers. I had been there for the
21  longest period of time. Therefore, when new people
22  came in, they just asked that I remain there to
23  train the other officers coming in, as far as what
24  was done.

Page 13

1  Q. And were your job duties different from
2 your time at Broadview when you were at Stateville?
3  A. Yes.
4  Q. What were your job duties at
5 Stateville?
6  A. Stateville, we were there to interview
7 the detainees and determine alienage or, you know,
8 if they were subject to deportability or if they
9 had been previously deported, and, of course, you
10 know, their nationality.
11  Q. Okay. When you transitioned to
12 Stateville, did you receive any new training for
13 your job duties and --
14  A. I mean, other than, you know, what
15 needed to be done, like, you know, writing up the
16 detainers and, you know -- just how to basically go
17 through the process of it, no, there was no major
18 training.
19  Q. Okay. And let's say for the writing of
20 the detainers, who performed that training and how
21 frequent?
22  A. Well, I mean, I had been -- I had
23 issued detainers before. It wasn't my first time
24 writing a detainer. It was just a different area

Page 14

1 that I was doing it in.
2  Q. Okay. And who did you report to at
3 Stateville?
4  A. Initially, it was supervisory -- or an
5 SIE, Sean Wright.
6  Q. Could you spell that?
7  A. S-E-A-N, W-R I G-H-T.
8  Q. Thanks.
9     And what years would that have been?
10  A. It was my entire time that I was at
11 Stateville, he was my supervisor.
12  Q. Okay. And did you have people who
13 reported to you?
14  A. I didn't have -- we were all the same.
15 We were all IEAs. I had just been there the
16 longest time when the other two individuals that
17 were working there came aboard, but then we kind of
18 were there for like a couple of years together.
19 So, I mean, you can't say anyone was more seasoned
20 than the other.
21  Q. Okay. On average, during your time at
22 Stateville, how many IEAs were onsite?
23  A. Usually three. There was days where
24 there was only two.

Page 15

1  Q. Would there ever have been a day where
2 there was only one IEA?
3  A. There could have been a day.
4  Q. Okay. And do you remember the other
5 names of the other IEAs during that three-,
6 four-year period?
7  A. I worked with various IEAs. There was
8 Jennifer Wall, J-E-N-I-F-E-R, W-A-L-L; and then
9 Kevin Smith. Do I need to spell that out?
10  Q. No, that's fine.
11  A. Okay. James Moran, who no longer works
12 for the agency; and Glenn Torres. And then there
13 was fill-ins in between, but they weren't
14 permanently there.
15  Q. You mentioned that you had issued
16 detainers prior to being at Stateville. When was
17 the first time you issued a detainer?
18  A. I worked in a program called The Deport
19 Center where we would issue detainers on
20 individuals in the Bureau of Prisons.
21  Q. And what year would that have been?
22  A. That was when I first started in 2006.
23 I wasn't there very long. Maybe half a year.
24  Q. And did you receive training on the

Page 16

1 detainer process?
2  A. When I first came in, I mean, it was
3 basic training on how to fill it out. I mean, I
4 never received any formal academic -- like academy
5 training.
6  Q. Did you receive ongoing training during
7 your time at The Deport Center?
8  A. Right. It was just like, you know,
9 on-the-job training.
10  Q. Okay. Did you ever shadow anyone to --
11  A. No.
12  Q. Did you follow a standard procedure
13 when issuing detainers through The Deport Center?
14  A. I mean, the basic stuff, determine
15 alienage or whether or not the person was subject
16 to deportability, inadmissibility.
17  Q. And were there any mandatory processes
18 that you had to follow?
19  A. At the time that I was initially
20 working, when I first started, you know, just
21 basically if a person was a U.S. citizen, you
22 wouldn't issue a detainer. And if they were a
23 lawful permanent resident, you know, make sure that
24 the -- you were issuing a detainer because they,

Page 17

1 indeed, were deportable; that it was, indeed, a
2 crime involving moral turpitude.
3   Q.  Okay.  And then are there certain
4 documents that have to be part of the detainer
5 issuance process?
6   A.  No.  I mean, you run checks to verify,
7 you know, whether or not a person is subject to
8 deportability or to actually have an investigation
9 conducted by ICE, but there wasn't anything except
10 for the detainer that was lodged, which is the
11 I-247.
12   Q.  Okay.  And what -- you mentioned some
13 checks.  What checks would you run?
14   A.  I mean, verify -- I verify through
15 Citizenship and Immigration Services, or the CIS
16 system, if they, indeed, had any status in the
17 United States, like if they were a lawful permanent
18 resident, or if they were in process of adjusting,
19 U.S. citizenship, that type of stuff.
20   Q.  Okay.  And then did you also issue
21 detainers at Stateville?
22   A.  Yes.
23   Q.  Okay.  And did you receive any training
24 upon joining Stateville on the detainer issuance

Page 18

1 process?
2   A.  No.  I mean, you -- on, on the job,
3 they, you know, tell you what you should look for,
4 what you shouldn't do.  I mean, obviously it was
5 the same thing.  You're not going to issue a
6 detainer on a person that doesn't need a detainer
7 issued, like a U.S. citizen or a person you may
8 believe to be a U.S. citizen, or a lawful permanent
9 resident that does not fall into the realm of
10 deportability.
11   Q.  And when you say, you know, someone
12 would tell you that, would that be Mr. Wright that
13 you were referring --
14   A.  Well, I mean, it could be headquarter's
15 directives or it could be our field office
16 director.  I mean, it could come through my first
17 line of, of -- first chain of command, but it would
18 usually come from above him.
19   Q.  And do you know the names of who that
20 would have come from?
21   A.  Mr. -- A-5 -- well, he's A-5 now, but
22 he was a supervisory detention deportation officer.
23 James McPeek was in charge of the CAP program
24 during the time I was there.  So most of the stuff

Page 19

1 would have come through him.
2   Q.  And were you aware that an immigration
3 detainer was issued against the plaintiff in this
4 case, Mr. Mayorov?
5   A.  I was not aware until I was told that
6 it had happened.
7   Q.  Sure.
8     (Exhibit 1 marked).
9   Q.  We'll call this Exhibit 1.  Have you
10 seen this document before?
11   A.  I have.
12   Q.  Could you tell me what it is?
13   A.  It's a directive from our assistant
14 secretary at the time, Dunmore, and as far as
15 citizenship claims and the issue -- directive as to
16 how we should issue, I guess, immigration -- or the
17 discretion for U.S. citizen -- people -- well,
18 people that were led to believe to be U.S.
19 citizens, whether or not you should issue detainers
20 or be discrete.
21   Q.  Okay.  And did you ever receive
22 training on how to implement any of these policies
23 that are discussed in this document?
24   A.  I mean, basically you're told, you

Page 20

1 know, if the person is a U.S. citizen -- I mean,
2 there's not any type of -- you receive general
3 training at the academy.  So, I mean, they tell you
4 if a U.S. citizen -- it's a U.S. citizen, I mean,
5 they're not subject to anything that applies to
6 deportability or inadmissibility.
7   Q.  And did, did you attend the training
8 academy upon joining ICE or at any time during ICE?
9   A.  I went to an advanced law, law
10 enforcement refresher training.  It was called
11 ALERT.
12   Q.  And what kind of subjects did they
13 discuss at the ALERT?
14   A.  It was, you know, basic pitting -- just
15 a refreshing training, you know, as far as
16 processing and, of course, you know, defensive
17 tactics, handcuffing --
18   Q.  Okay.
19   A.  -- weapons.
20   Q.  Was there any training about detainers
21 there?
22   A.  I don't recall.
23   Q.  If you look at the second paragraph on
24 page 1 here --

Page 21

1  A. Okay.
2  Q. -- there's a statement that says: As a
3  matter of law, ICE cannot assert its civil
4  immigration enforcement authority to arrest and/or
5  detain a USC.
6  A. Uh-huh, yes.
7  Q. Is that your understanding of the
8  detainer policy?
9  A. Yes.
10 Q. And do you understand that that applies
11 to issuance of all immigration detainers?
12 A. Can --
13 Q. Sure.
14 A. -- you ex --
15 Q. Do you think this statement applies to
16 all potential detainers or detainers that are
17 issued?
18     MR. KUHN: Object to the form of the
19 question.
20     You can answer, if you can.
21 A. I mean, I'm not, I'm not quite
22 understanding what you're trying to --
23 Q. Sure. Do you think this statement --
24 that policy applies to all immigration detainers?

Page 22

1  A. I mean, what this is saying is that if
2  a person is a U.S. citizen, yes. But in the realms
3  of the service, you have to verify whether a person
4  is a U.S. citizen or not.
5  Q. Sure. And, and were you ever
6  instructed on procedures that you had to follow to
7  ensure that you didn't issue a detainer against a
8  U.S. citizen?
9  A. We were told if we believed a person
10 was a U.S. citizen, we should not issue a detainer.
11 Q. And were there any specific procedures
12 you had to follow to confirm or verify that they
13 were U.S. citizen or not a U.S. citizen?
14 A. Part of our job is to verify our
15 systems, which is CIS, to verify whether or not,
16 you know, they are, indeed, a lawful permanent
17 resident or the child of -- I mean, naturalized
18 U.S. citizen, or any other type of things.
19     But, I mean, there could be any other
20 reasons why a person is a U.S. citizen. For
21 instance, they could have been in a -- born abroad
22 on a military base and they would not necessarily
23 be in our systems. And that would be at our
24 discretion whether or not we believe the person

Page 23

1  that is telling us that he was born on a military
2  base is a U.S. citizen.
3  Q. And in those cases where someone was
4  interviewed and said they were a citizen but wasn't
5  in the system, were there other checks you would
6  perform to verify?
7  A. There's no way to verify a person was
8  born on a military base unless they produce a born
9  abroad certificate, but, you know, that just -- as
10 in immigration officer, that's, you know -- you,
11 you were led to believe, yes, I believe that this
12 person is, indeed, a U.S. citizen without the proof
13 in front of you, and, you know, you let the person
14 be, or you can require that they present that sort
15 of proof to you.
16 Q. Okay. And what sort of proof would
17 they offer?
18 A. Well, if you're born abroad, you would
19 have a born abroad certificate that's issued by the
20 U.S. Embassy.
21 Q. Were there other cases you found where
22 someone claimed they were a citizen but the system
23 didn't reflect that, but it wasn't someone who was
24 simply born abroad?

Page 24

1  A. I -- I'm not understanding.
2  Q. Sure. Were there other circumstances
3  where there would be a discrepancy between an
4  interview and the system information regarding --
5  A. I mean, if they weren't born abroad, we
6  wouldn't be using the systems. So, I mean, that,
7  that just being said, you would verify if, like,
8  they were adopted children or children of
9  individuals that later naturalized. I mean, you
10 would go through the systems to verify the
11 information. And, you know, if there was a doubt
12 that the person may not be a citizen, well, then
13 you would ask for more documentation.
14 Q. Okay. Are there any other procedures
15 that you have to follow to note a discrepancy
16 between the system and an interview?
17 A. I mean, everyone has their own working
18 style. So, I mean, everyone works differently. I
19 can't say that this is what you need to do. I
20 mean, you just go through what you feel you need to
21 do in order to determine whether or not a person is
22 a U.S. citizen, whether or not you believe a person
23 is a U.S. citizen, and whether or not you will or
24 will not issue a detainer.

Page 25

1  Q. And are you aware of whether it's
2  possible to derive citizenship through one's
3  parents?
4  A. Yes.
5  Q. Are you familiar with the Child
6  Citizenship Act of 2000?
7  A. I am.
8  Q. What's your understanding of that form
9  of derivative citizenship?
10  A. Well, if they are a child of a U.S.
11  citizen, depending on when they were born,
12  according to the nationality charts, they can or
13  cannot have direct citizenship. And we would
14  usually go through the naturalization charts to
15  verify when they were born, which parent -- or if
16  both parents were U.S. citizens, and whether or not
17  they fell into the realm of being a U.S. citizen.
18  After 2000, only one parent needed to be a U.S.
19  citizen. So as long as they were under the age of
20  18, then they would derive.
21  Q. Okay. Does someone who derives
22  citizenship through the Child Citizenship Act need
23  to file paperwork or an application to become a
24  citizen?

Page 26

1  A. Yes, they do.
2  Q. What paperwork would that be?
3  A. It would be the N-600, I believe.
4  Don't quote me on that. I'm not quite certain.
5  But they would have to go through CIS in order to
6  get the certificate of naturalization. And then it
7  should be updated in the CIS system, but it's not
8  always there.
9  Q. And why wouldn't it be there in the CIS
10  system?
11  A. I have no idea.
12  Q. Would it be your responsibility to
13  update the CIS?
14  A. No, that is a completely different
15  agency.
16  Q. Okay. And so it's your understanding
17  that they are not -- the child would not be a
18  citizen until the N-600 was approved?
19  A. No, they're -- they would still be a
20  citizen, I mean -- or there could be the
21  possibility that they are a citizen, they just
22  failed to file the paperwork sometimes.
23  Q. And did you ever encounter a case where
24  an individual said they derived citizenship through

Page 27

1  the Child Citizenship Act --
2  A. Many times.
3  Q. And did you take steps to verify that
4  information?
5  A. I did.
6  Q. What steps would you take?
7  A. I mean, depending on the case, it could
8  vary from me looking up the parents in the system
9  to verify whether or not they were naturalized
10  citizens; and then, you know, going -- once again,
11  depending on what year they were born, going to
12  natural -- naturalization or nationality chart to
13  see whether -- what realm they fell into it. It
14  could go as far as having the individual give me
15  their parents' phone number and calling the parent
16  up to give me -- possibly information, fax me a
17  copy of the U.S. passport, because sometimes it
18  wasn't reflected in the system that they were,
19  indeed, a U.S. citizen, or giving me their A Number
20  to verify that, indeed, that person was a U.S.
21  citizen. I mean, it -- there's various ways and
22  multiple ways, and it all depended on that
23  situation, what -- how you would follow through.
24  Q. As far as you're aware or recall, was

Page 28

1  there any mandatory procedure that you had to
2  follow for the Child Citizenship Act?
3  A. No, not that I'm aware of.
4  Q. Are there any requirements as to
5  interviewing the individual?
6  A. It -- it's usually best that you do
7  interview an individual. Sometimes it's not
8  accessible and you're not able to interview, and
9  you are -- you just have a series of information
10  that you have gathered to verify whether or not a
11  person is deportable or not.
12  Q. And do you recall interviewing
13  Mr. Mayorov?
14  A. I don't remember. Apparently I did,
15  but I, I don't have the recollection of talking to
16  him.
17  Q. Okay. Do you have any recollection of
18  whether you would have phoned any of his parents?
19  A. I do not.
20  Q. When you left The Deport Center, did
21  you choose to be assigned to Stateville, or were
22  you assigned there?
23  A. When I was at Deport Center, I wasn't
24  at Stateville; I was at Broadview.

Page 29

1  Q. Okay. Well, sorry, when you left
2  Broadview, did you --
3  A. I was asked to go there because there
4  was no one that wanted to go. It wasn't by choice,
5  but I enjoyed it after I was there.
6  Q. And do you remember who assigned you
7  there?
8  A. Supervisor Sean Wright.
9  Q. And was there anyone else there other
10 than the IEA agents and Mr. Wright?
11 A. At Stateville?
12 Q. At Stateville.
13 A. When I first started at Stateville, I
14 worked with Jenifer Wall and with Glenn Torres.
15 Q. Were there any other ICE -- I guess my
16 question is: Were there any other individuals with
17 different titles from ICE who worked at the
18 facility then?
19 A. No.
20 Q. Okay.
21 A. Supervisor Wright didn't work at the
22 facility.
23 Q. Okay. And where was he located?
24 A. He was located at Broadview, because we

Page 30

1  had a CAP team at Broadview as well.
2  Q. Thanks. Turn to Exhibit 2.
3  (Exhibit 2 marked).
4  Q. Do you recognize this document?
5  A. Yes, I do.
6  Q. And what is this document?
7  A. It is the intake sheet for the
8  Stateville Correctional facility.
9  Q. And does this discuss a process that an
10 inmate has to go through when they arrive at
11 Stateville?
12 A. I mean, it states basically property,
13 which I'm unfamiliar with, and then there's
14 different process -- there's a processing checklist
15 on the right-hand side. And usually, I mean, it
16 didn't happen all the time, depending on the time
17 frame that was allowed during the day, they would
18 see these -- the people on the, the right side as
19 part of their intake. But once, like I said,
20 again, sometimes it didn't happen due to the fact
21 that the jail came in late, there, there was too
22 many people.
23 Q. And as far as you're aware, these items
24 on the right side under Processing Checklist, are

Page 31

1  all those, are all those mandatory items that an
2  inmate has to go through?
3  A. I don't know if they're mandatory
4  because it's not a ICE document; it's a Stateville
5  document. But I do know that they were supposed to
6  go through them. I don't know how mandatory they
7  are.
8  Q. Okay. And do you happen to know how it
9  was determined that an inmate would meet with ICE
10 or not meet with ICE?
11 A. If they met with any of these
12 individuals, we would highlight that they had come
13 through us.
14 Q. Okay. And was there any other
15 information that you'd have to record from your
16 interview?
17 A. If we placed a detainer, we would write
18 detainer next to ICE. But other than that, I don't
19 know what anything -- no one else would write on
20 the sheet --
21 Q. Okay.
22 A. -- because it's a state, it's a state
23 sheet.
24 Q. Sure. Approximately how many inmates

Page 32

1  per day would you screen at Stateville?
2  A. It varied. It could be a slow day and
3  it could be 69, and it could be a very heavy day
4  and it could be over 300.
5  Q. And you mentioned that you would run
6  some system checks on certain individuals. Is that
7  before you met with them through this screening
8  process?
9  A. That would be if we determined that we
10 needed to further investigate the case or their...
11 Q. And so you would never run a system
12 check before an inmate arrived for processing?
13 A. No.
14 Q. Okay. So you don't receive a list in
15 advance of someone who is coming?
16 A. We would receive a list, but it was as
17 they were coming through. It wasn't like a day
18 before. It was the same day.
19 Q. Okay. And when would you determine
20 whether you needed to run a system check on one of
21 the inmates you screened?
22 A. After an interview, if, you know, they
23 claimed to be foreign born, we would ask them to
24 step into our office and conduct a further

Page 33

1  interview. Sometimes the system check was
2  necessary; sometimes it wasn't.
3      Q.  Okay. Do you typically interview all
4  the individuals then that come before --
5      A.  Every individual that came through the
6  jail.
7      Q.  And were there specific questions you
8  always had to ask?
9      A.  No.
10     Q.  What were the questions you had to ask,
11 or what information were you seeking?
12     A.  There were basic questions just, you
13 know, as far as, you know, their inmate number,
14 what they were arrested for. You know, I mean, it,
15 it would vary. I mean, it, it wasn't definite
16 every day. But one of the questions we all usually
17 ask was what city were you born in or where were
18 you born or where did you go to high school, just
19 something to let us know, you know, what -- you
20 know, whether or not they were raised here, whether
21 we needed to go into a further interview with them.
22     Q.  Okay. And were you ever required to
23 document that you inquired about citizenship and
24 what answer you received?

Page 34

1      A.  No.
2      Q.  Okay. Would you have kept notes on the
3  information that an inmate gave to you?
4      A.  Not -- I mean, depending on the case.
5  I mean, if it was, if it was something where we're
6  going to place a detainer, we would probably keep
7  notes. If it was somewhere we believe the person
8  is a U.S. citizen, I mean, we wouldn't -- there
9  would be no notes, I mean, just a basic yes or no
10 or, you know, system checks, and that -- you know,
11 whether the child was an adopted U.S. citizen,
12 whether he was the child of a U.S. citizen, whether
13 he naturalized, you know, whatever the case may be
14 with the individual.
15     Q.  Okay. And if you determined an
16 individual is removable, what would you do in that
17 context?
18     A.  We would have them sit down and, you
19 know, get their basic information, you know, as far
20 as what -- you know, where they were born and, you
21 know, just basic biographical information.
22     Q.  Okay. And then were there any
23 procedures that had to be followed if an inmate was
24 potentially removable but claimed U.S. citizenship?

Page 35

1      A.  I mean, once again, that would be at
2  the discretion of the officer. Not to say -- you
3  know, I'm not going to speak for anyone else, but
4  it would be at your discretion whether or not you
5  would issue a detainer or not based on the
6  information that you gathered.
7      Q.  Was there any process in place that
8  required you to speak to another officer if there
9  was a difficult decision?
10     A.  Not really, no. I mean,
11 unless there -- it was, you know, something
12 difficult, we had been around long enough to
13 determine whether or not we believed the person was
14 a U.S. citizen or not.
15     Q.  Okay. Were -- did you have permission
16 as an ICE agent to update an individual's
17 electronic records?
18     A.  I'm not following you.
19     Q.  There are a variety -- sounds like
20 there are a variety of systems that contain
21 information --
22     A.  Uh-huh.
23     Q.  -- about an individual. Were you
24 authorized to update any of that information?

Page 36

1      A.  I mean, the only systems that we would
2  update to record information are -- is a system
3  where we would actually input individuals that are
4  going to be placed in immigration proceedings. And
5  a U.S. citizen would not go into that system unless
6  they were, they were being pursued by us because
7  they were involved in illegal activity with
8  immigration.
9      Q.  And what system would that be?
10     A.  It's called ENFORCE.
11     Q.  Okay. So if you had an individual that
12 you determined to be a U.S. citizen, would you be
13 required to update, if it wasn't already recorded
14 in the ENFORCE system, that they were a citizen?
15     A.  Not if they're -- not if I believe they
16 were a citizen. There would be nothing I would
17 document.
18     Q.  Okay. Do you know how long it would
19 take to update an individual's citizenship status
20 on the ENFORCE database?
21     A.  They would not be in that system. They
22 would be in CIS.
23     Q.  Okay. And were you authorized to
24 update CIS?

Page 37

1  A.  No, that's another agency.
2  Q.  Are you familiar with the Secure
3  Communities Processing Center?
4  A.  I am aware of it.
5  Q.  Okay.  What is your understanding of
6  that?
7  A.  That they interview, or possibly -- I'm
8  not sure how -- I honestly don't know how it works.
9  Q.  Okay.
10  A.  I've never worked it.  But I know that
11  they get hits from law enforcement facilities.  And
12  then how it is that they lodge the detainers or
13  whatever I am unfamiliar with.
14  Q.  You are aware that they do review the
15  records of inmates screened by ICE agents at
16  Stateville?
17  A.  I know that they would receive hits.
18  Whether or not they, you know, placed detainers at
19  Stateville, usually if there was a detainer that
20  was sent to the Stateville facility, it was
21  processed through us by one of the administrative
22  staff there.  But if it would have gone to another
23  jail, one of the other facilities, we would have
24  been unaware of it.

Page 38

1  Q.  Okay.  Did you ever work together with
2  any employees of Secure Communities regarding
3  detainers?
4  A.  No, it wasn't our practice.
5  Q.  Okay.  Turning back to the ENFORCE,
6  would you ever update an ENFORCE entry for a lawful
7  permanent resident who you determined to be a U.S.
8  citizen?
9  A.  No.
10  Q.  Do you know whose responsibility that
11  would be?
12  A.  They would not be entered in the system
13  if we believe that they are a U.S. citizen.
14  Q.  Okay.  You mentioned you've run a few
15  checks on inmates that you process.
16  A.  Correct.
17  Q.  Could you name the systems that you
18  would run those through?
19  A.  There would be the -- it would be CIS,
20  Citizenship and Immigration Services; CLAIMS, I
21  don't know what the acronym stands for, but basic
22  that's where any of the paperwork that they have
23  filed maybe -- as far as like the N-400 or when
24  they're renewing green cards or if they have a

Page 39

1  pending petition.  And then if we believe that they
2  could be a U.S. citizen and they claim to have a
3  U.S. passport, I didn't have access to it, but we
4  would sometimes contact the Law Enforcement Support
5  Center so that they could check the State
6  Department website to verify for a issued passport.
7  Q.  Okay.  Would you ever run any
8  additional checks on your own outside of those
9  systems on any individuals?
10  A.  That -- there wouldn't be any other
11  systems that we would run.
12  Q.  Would there be any hard-copy records
13  that you saw about an individual?
14  A.  Yes, there would be.
15  Q.  What records would those be?
16  A.  There would be the printouts that we
17  would print of the records that we ran.
18  Q.  Okay.  So nothing other than from those
19  systems?
20  A.  No.
21  Q.  Okay.
22  A.  No.
23  Q.  Would you ever request to see an A
24  File?

Page 40

1  A.  Not necessarily, no.
2  Q.  Would you ever inquire into an
3  individual's parents as part of your electronic
4  systems checks?
5  A.  Yes.
6  Q.  And under what circumstances would you
7  look to parents?
8  A.  If the person claimed to be a U.S.
9  citizen and the individual did not come up as a
10  U.S. citizen, and just to verify that the parent,
11  indeed, was a U.S. citizen.
12  Q.  And is it required that you look into
13  the parents' electronic records if that -- if an
14  individual makes that claim?
15  A.  It wasn't required.  Like I said,
16  everyone works differently to verify how they
17  believe or whether they believe a person's a U.S.
18  citizen.
19  Q.  And was it ever your process to take a
20  sworn statement or a recorded statement from an
21  individual?
22  A.  Not unless we felt the person was lying
23  to us, no.
24  Q.  Okay.  Do you know if it was the

Page 41

1 practice of other IEA agents to take sworn
2 statements or recorded statements?
3   A.   I am unaware.
4   Q.   Okay. Do you provide any sort of daily
5 summary for the inmates that you processed on a
6 single day?
7   A.   Yes, we had a, a log where we would
8 list the individuals that we encountered that are
9 foreign-born nationals, and we would produce that
10 document to our supervisors just so that they knew
11 the individuals that we had encountered. But that
12 was it.
13      I mean, they would -- we would just say
14 if we issued a detainer or if, or if they were a
15 lawful permanent resident that were not deportable,
16 or if we came to the conclusion that they may be a
17 U.S. citizen.
18   Q.   Was it a requirement of the log to
19 identify citizenship status?
20   A.   Yes.
21   Q.   Okay. Did you ever take -- I guess,
22 did you ever take a sworn statement of someone who
23 claimed to be a U.S. citizen?
24   A.   I do not remember. It could have

Page 42

1 happened.
2   Q.   Was that something that an inmate would
3 have requested that you take, or would that have
4 been your choice?
5   A.   No, that would have been our choice.
6   Q.   Okay. Is the inmate allowed to provide
7 a statement to you regarding their citizenship?
8   A.   They could, but, I mean, I don't know
9 why an individual would request a sworn statement.
10 I'm not even sure if they would know what a sworn
11 statement was.
12   Q.   Okay. In regards to those logs, were
13 these kind of kept anywhere on your facility, or
14 were they sent off-site?
15   A.   Our logs were done electronically and
16 they were saved on our -- or sent via e-mail. I'm
17 not sure if they were saved on a drive or not.
18   Q.   Okay. Does ICE use any outside
19 companies to assist in the screening process?
20   A.   There was an outside company in Secure
21 Communities. That contracting company is now gone.
22   Q.   And who is that company?
23   A.   I don't know what the name of the
24 company was, to be quite honest.

Page 43

1   Q.   Do you remember the names of any of
2 their employees that is --
3   A.   I did not work with them, so I do not
4 know any of the names of their employees.
5   Q.   Okay. Do you know what the Impact
6 Incarceration Program is?
7   A.   No.
8   Q.   Turning back to the log data, was any
9 of that information of your daily log reports, was
10 that incorporated into ENFORCE, as far as you're
11 aware?
12   A.   No. Unless we were issuing a detainer,
13 it would not go into ENFORCE.
14   Q.   Not particular to you guys, would
15 anyone else who saw the logs update ENFORCE? Are
16 you aware of that?
17   A.   Those logs were not entered into
18 ENFORCE because it, it was just a manner of
19 keeping -- of notifying our supervisors what had
20 happened throughout the day. ENFORCE was only used
21 when we were going to lodge a detainer against a
22 person.
23   Q.   Okay. You mentioned earlier that you
24 became aware that a detainer was issued against

Page 44

1 Mr. Mayorov. When did you first learn of that?
2   A.   I'm not quite sure. It could have been
3 a year ago. I, I may have it confused. There's
4 another ongoing investigation. But I was just told
5 to facilitate any records, if I had any, but we
6 would have never held on to any documents that
7 pertain to a person that we believed to be a U.S.
8 citizen.
9   Q.   Okay. Now, regarding the Impact
10 Incarceration program, you know, another
11 terminology that is used is a Boot Camp at
12 Stateville. Were you familiar with that program?
13   A.   Yes, I am familiar with Boot Camp.
14   Q.   And what's your understanding of the
15 Boot Camp?
16   A.   The Boot Camp program is something that
17 an individual is given by the, the judge where
18 the -- a detainee or individual that's incarcerated
19 gets. In the Boot Camp program, basically they are
20 serving less time based on good behavior and based
21 on the fact that they complete the Boot Camp and go
22 out into -- go back into society and not violate
23 any laws; if not, they have to serve their full
24 time.

Page 45

 1       But basically with the Boot Camp
 2   program, when they came in, it could be a period of
 3   time.  It, it -- I mean, it -- they didn't go into
 4   Boot Camp immediately.  There was a period of time
 5   before they could find a facility where they can
 6   actually engage into Boot Camp depending on the
 7   availability.
 8      Q.   Okay.  And there was a Boot Camp at
 9   Stateville?
10      A.   I don't know.
11      Q.   Okay.  Were you involved with the
12   program then at all?
13      A.   No.
14      Q.   No?
15           Were you aware of the eligibility
16   requirements for the program?
17      A.   I do know that at Stateville, if there
18   was an immigration hold or detainer, they were not
19   allowed to be involved in certain of their
20   programs.  I believe Boot Camp might have been one
21   of them.
22      Q.   And what was your basis for knowing
23   that policy?
24      A.   The inmates themselves would tell you.

Page 46

 1      Q.   Okay.  So you never saw it in writing?
 2      A.   No.
 3      Q.   Okay.  Were you ever aware of an
 4   individual who was allowed to participate in that
 5   Boot Camp program with an immigration detainer
 6   placed against them?
 7      A.   I am not aware.
 8      Q.   Okay.  Do you ever receive information
 9   about whether an inmate had been selected to
10   participate in the program when you screen them?
11      A.   The only knowledge we would have if a
12   person was going to Boot Camp is on the intake
13   sheet -- I don't know if you have one or not --
14   the -- it would say next to their names "boot," and
15   that's how we knew that they were part of a -- or
16   they were supposed to go into Boot Camp.
17      Q.   Any differences in how you'd screen
18   that individual versus someone else?
19      A.   No.
20      Q.   Okay.  Were you aware that Mr. Mayorov
21   was to be part of the Impact Incarceration Program?
22      A.   I mean, I'm sure when he came across me
23   and I interviewed him, I probably saw it.
24      Q.   But as far as you know, you didn't take

Page 47

 1   any special steps or screen him differently from
 2   any other individual?
 3      A.   No.
 4      Q.   Okay.  Were you ever aware that Secure
 5   Communities Processing Center reviewed
 6   Mr. Mayorov's records after you processed him?
 7      A.   No.
 8      Q.   Okay.  Turn to Exhibit 3.
 9           (Exhibit 3 marked).
10      Q.   Have you seen this document before?
11      A.   I don't believe so.
12      Q.   Okay.  I guess --
13      A.   I might have.
14      Q.   Sure.  And then I guess if we turn to
15   the very last page, maybe that might be more on
16   point.
17      A.   The very last page?
18      Q.   Yeah, it should have a 2 on the -- no,
19   I'm sorry, second to last page.
20      A.   Oh, okay.  This one.
21      Q.   Have you ever seen this document
22   before?
23      A.   Yes.  This was one of the sheets that
24   we received on a daily basis from the state.

Page 48

 1      Q.   Okay.  And is this part of that log
 2   form, or is this a different --
 3      A.   This is something that the state
 4   generates --
 5      Q.   Okay.
 6      A.   -- to basically annotate who has come
 7   into the facility for the day.  And that's how they
 8   kept track of the process or whatever that they
 9   went through, you know, how many people they should
10   have in the area.  But this would just tell us who
11   was coming in for the day.
12      Q.   Okay.  And do you recognize the
13   handwriting on this document?
14      A.   Yes, I do.
15      Q.   Is that -- and whose handwriting would
16   that --
17      A.   That would be my handwriting.
18      Q.   Okay.  And do you see where it says
19   "child of USC"?
20      A.   Yes.
21      Q.   Where did you get that information
22   from?
23      A.   I -- to be quite honest, I do not
24   remember.  If I wrote down child of a U.S. citizen,

Page 49

1 it could have been because I may have conducted the
2 interview myself and ran the checks, or it could
3 have been one of the other agents in the
4 facility -- one of the other IEs that was working
5 with me that could have run the checks and given me
6 the information and I would have written it on the
7 sheet.
8   Q.  Okay. And did you -- would you have
9 logged this information anywhere else?
10   A.  On our sheet that we produced to our
11 supervisors for the amount of work that we had done
12 for the day based on the detainers or nondetainers
13 that we had issued with foreign-born nationals.
14   Q.  And that would be the log you described
15 earlier?
16   A.  Correct.
17   Q.  Okay. Would this -- who else would
18 receive this document here?
19   A.  Everyone at the jail that was working
20 in the intake center.
21   Q.  Okay. And do you know if this document
22 would ever be passed on to the Secure Communities
23 Processing Center?
24   A.  We would scan the document and save it,

Page 50

1 but I don't remember if it -- I mean, I don't know
2 if it would have been passed on to them or if they
3 would have had access to it.
4   Q.  And would you have had to discuss with
5 the supervisor that you had encountered a U.S.
6 citizen that was not verified by the system check?
7   A.  No. I mean, we just logged it in the
8 log and we produced the log to our supervisor.
9   Q.  Okay.
10      (Discussion off the record).
11      MR. RAJADURAI: That's all I have.
12      MR. KUHN: I'm good. We'll reserve
13 signature. I'll take a copy of whatever they have
14 written up.
15      THE REPORTER: Do you want to order
16 transcript?
17      MR. RAJADURAI: Yes.
18      THE REPORTER: Mr. Fleming, do you want
19 a copy?
20      MR. FLEMING: We -- I can just get a
21 copy from him.
22      (Deposition concluded).
23
24

Page 51

```
 1         IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                   EASTERN DIVISION
 3   SERGEY MAYOROV             )
                                )
 4              Plaintiff,      )
                                )   No. 13 CV 5249
 5          vs.                 )
                                )   Judge Rebecca R.
 6   UNITED STATES OF AMERICA,  )   Pallmeyer
                                )
 7              Defendant.      )
 8
 9
10          This is to certify that I have read my
11   deposition taken on June 6, 2014, in the foregoing
12   cause, and that the foregoing transcript accurately
13   states the questions asked and the answers given by
14   me, with the changes or corrections, if any, made
15   on the Errata Sheet attached hereto.
16
17                        MAYRA REYNOSO
18   No errata sheets submitted (Please initial)
     Number of errata sheets submitted        pages
19
     Subscribed and sworn to
20   before me this      day
     of          2014.
21
22
        Notary Public
23
24
```

Page 52

```
 1   STATE OF ILLINOIS )
                       )  SS:
 2   COUNTY OF C O O K )
 3
            I, Melody A. Monk, do hereby certify
 4   that MAYRA REYNOSO was duly sworn by me to testify
     the whole truth, that the foregoing deposition was
 5   recorded stenographically by me and was reduced to
     computerized transcript under my direction, and
 6   that said deposition constitutes a true record of
     the testimony given by said witness.
 7
            I further certify that the reading and
 8   signing of the deposition was not waived, and the
     deposition was submitted to James M. Kuhn, Sr.,
 9   defendant's counsel, for signature.  Pursuant to
     Rule 30(e) of the Federal Rules of Procedure, if
10   deponent does not appear or read and sign the
     deposition within 30 days, the deposition may be
11   used as fully as though signed, and this
     certificate will then evidence such failure to
12   appear as the reason for signature not being
     obtained.
13
            I further certify that I am not a
14   relative or employee or attorney or counsel of any
     of the parties, or a relative or employee of such
15   attorney or counsel, or financially interested
     directly or indirectly in this action.
16
            IN WITNESS WHEREOF, I have hereunto set
17   my hand and affixed my seal of office at Chicago,
     Illinois, this 14th day of June 2014.
18
19
                  Illinois CSR No. 084.004772
20                Melody A. Monk, RPR
21   BARKLEY COURT REPORTERS
     22 West Washington Street
22   15th Floor
     Chicago, Illinois 60602
23   800.222.1231
24
```