# EXHIBIT 8

Page 1

1      IN THE UNITED STATES DISTRICT COURT
       FOR THE NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION

3   SERGEY MAYOROV,             )
                                )
4              Plaintiff,       )
                                )   No. 13 CV 5249
5     vs.                       )
                                )   Judge Rebecca R.
6   UNITED STATES OF AMERICA,   )   Pallmeyer
                                )
7              Defendant.       )

12           The deposition of JENIFER WALL, taken
13   pursuant to the Federal Rules of Procedure, before
14   Melody A. Monk, Certified Shorthand Reporter No.
15   084-004772, at National Immigrant Justice Center,
16   208 South LaSalle Street, Suite 1300, Chicago,
17   Illinois, on Friday, June 6, 2014, commencing at
18   11:03 a.m. pursuant to notice.

Page 2

1                A P P E A R A N C E S

3   FOR THE PLAINTIFF:

4        ABIMAN RAJADURAI
         Littler Mendelson, PC
5        321 North Clark Street
         Suite 1000
6        Chicago, Illinois 60654
         312.795.3232
7        312.275.7110 (fax)
         Arajadurai@littler.com
8   And

9        MARK FLEMING
10       National Immigrant Justice Center
         208 South LaSalle Street, Suite 1300
11       Chicago, Illinois 60604
         312.660.1628
12       312.660.1505 (fax)
         Mfleming@heartlandalliance.org

14   FOR THE DEFENDANT:

15       JAMES M. KUHN, SR.
         Assistant United States Attorney
16       219 South Dearborn Street
         Chicago, Illinois 60604
17       312.353..1877
         James.kuhn@usdoj.gov

Page 3

1                        INDEX
                                                    PAGE
2   Appearances........................................ 2

3   JENIFER WALL
4       MR. RAJADURAI..................................  4

7   WALL EXHIBIT                                    PAGE
8    4................................................ 20

Page 4

1              JENIFER WALL,
2    called as a witness herein, having been first duly
3    sworn, was examined and testified as follows:
4              **EXAMINATION**
5    **BY MR. RAJADURAI:**
6        Q.   Good morning, Agent Wall.  My name is
7    Abiman Rajadurai, and I represent a plaintiff in
8    this case.  This is co-counsel, Mark Fleming.
9              Could you state your name and spell it
10   for the record?
11       **A.   Sure.  It's Jenifer, J-E-N-I-F-E-R,**
12   **middle initial L., last name Wall, W-A-L-L.**
13       Q.   Have you ever been deposed before?
14       **A.   No.**
15       Q.   Okay.  I'll just go through a basic
16   intro right now of the deposition process.
17   Basically it's a question-and-answer format.  I'll
18   ask a question and have an answer.  Your attorney
19   might object.  Unless he tells you not to answer
20   specifically, you can go ahead and answer if you
21   understand the question.
22             If there's ever a point you don't
23   understand a question, just ask me to restate it or
24   clarify it.  I'll try not to speak over you.  Wait

Page 5

1  until I'm done with my question just so it's easier
2  for the transcript.  You have to answer verbally
3  instead of head nods or hand gestures just so she
4  can record the information.  We can take a break
5  whenever you'd like.
6       Is there any, you know, medication or
7  anything you're taking that might prevent you from
8  testifying truthfully or completely today?
9       A.   No.
10      Q.   Okay.  Did you review any documents to
11  prepare for this document?
12      A.   Yes.
13      Q.   And what documents were there?
14      A.   **It was the Stateville -- the list of
15  detainees that came through Stateville the day
16  Mr. Mayorov came through, and Mr. Morton's memo.**
17      Q.   Okay.  And did you happen to bring
18  those with you today?
19      A.   **I did not, no.**
20      Q.   And as far as you know, they've been
21  produced in this litigation?
22      A.   **I am not sure.**
23      Q.   Okay.  That's fine.
24           Did you discuss this case or deposition

Page 6

1  with anyone other than Mr. Kuhn?
2       A.   **No.**
3       Q.   Okay.  Did you attend high school?
4       A.   **Yes.**
5       Q.   What high school did you attend?
6       A.   **Niagra Wheatfield.**
7       Q.   And did you graduate?
8       A.   **Yes, I did.**
9       Q.   Did you attend college?
10      A.   **Yes.**
11      Q.   Where did you attend college?
12      A.   **The University at Buffalo.**
13      Q.   And did you graduate from the
14  University of Buffalo?
15      A.   **Yes, I did.**
16      Q.   What was your degree in?
17      A.   **Political Science - Prelaw.**
18      Q.   Okay.  Any additional schooling?
19      A.   **Obviously the training for my current
20  position, yes.**
21      Q.   Okay.  Any other professional
22  certifications that you studied for or earned?
23      A.   **My current position, immigration
24  enforcement agent.  And then before that, CBP**

Page 7

1  officer.
2       Q.   And what does CBP stand for?
3       A.   **Customs and Border Protection.**
4       Q.   Okay.  And when would you have received
5  the Customs and Border Protection training?
6       A.   **I was hired in December 2003, so it
7  would have been in the beginning of 2004.**
8       Q.   Okay.  What year did you graduate
9  college?
10      A.   **2002.**
11      Q.   Okay.  And what was your first
12  employment after graduating college?
13      A.   **It was during college.**
14      Q.   I guess, when was your first employment
15  after -- or if it continued on?
16      A.   **It continued.**
17      Q.   Okay.  And what was that position?
18      A.   **It was at a nonprofit organization.**
19      Q.   And what was that called?
20      A.   **People, Inc.**
21      Q.   Okay.  And what was your title there?
22      A.   **I'm not sure.  We did -- dealt with
23  developmentally disabled people --**
24      Q.   Okay.

Page 8

1       A.   **-- basically just interacting, working
2  with them, helping them perform --**
3       Q.   Sure.
4       A.   **-- functions.**
5       Q.   And what was your reason for leaving
6  that position?
7       A.   **I was hired with Customers and Border
8  Protection.**
9       Q.   Okay.  And what year was that?
10      A.   **I was hired in December 2003.**
11      Q.   And what was your title upon being
12  hired there?
13      A.   **Customers and Border Protection
14  officer, CBPO.**
15      Q.   Okay.  And what were your job duties
16  and responsibilities there?
17      A.   **I worked at a port of entry.  So when
18  people would come into the United States, I'd have
19  to determine their -- whether they were a citizen,
20  interview them, determine whether they were able to
21  enter the United States, interview them to see if
22  possibly they had any contraband, do searches and
23  seizures, make arrests.**
24      Q.   Okay.  Were you involved with

Page 9

1  interviewing individuals as part of determining
2  their citizenship there?
3     A.   Yes.
4     Q.   Okay. Did you receive training on how
5  to do that?
6     A.   Yes.
7     Q.   Where did you receive that training?
8     A.   FLETC. It's in Glynco, Georgia.
9     Q.   Okay. And do you remember who
10 conducted the training?
11    A.   No.
12    Q.   Okay. Fair.
13         And how long were you in that position?
14    A.   I was -- from December of 2003 until
15 June of 2006.
16    Q.   Okay. And do you remember who you
17 reported to?
18    A.   There were various supervisors. It was
19 shift work --
20    Q.   Okay.
21    A.   -- at the border. It's a 24-hour day
22 operation. One of them would be Bulson,
23 B-U-L-S-O-N.
24    Q.   Okay.

Page 10

1     A.   He's a -- Warner was another one,
2  W-A-R-N-E-R. Heinrich (phonetical) -- I'm not sure
3  how to spell that -- he was on another shift.
4     Q.   Sure.
5     A.   So there was at least five supervisors.
6     Q.   Okay. And what was your reason for
7  leaving that position?
8     A.   I took the position with ICE.
9     Q.   Okay. And would that have been in
10 June 2006 when you started with ICE?
11    A.   That's correct.
12    Q.   Okay. And what was your first title
13 upon being hired by ICE?
14    A.   Immigration enforcement agent.
15    Q.   And is that your position today?
16    A.   That's correct.
17    Q.   Okay. And what are your job duties and
18 responsibilities under -- as an IEA?
19    A.   Basically we determine alienage and
20 possible deport -- deportability of people we
21 interview.
22    Q.   Okay.
23    A.   It also includes picking up people from
24 jail, transporting, writing up their paperwork to

Page 11

1  go in front of the immigration judge, sometimes
2  escorting the person back to their country.
3     Q.   And where were you first -- what
4  locations have you worked in as an IEA?
5     A.   Both Broadview and the district office
6  at 101 West Congress Parkway.
7     Q.   Okay. And do you know what years
8  you've been at either of those two?
9     A.   No. We have a six-month rotation for
10 the most part. Now it's a year, but for the most
11 part every six months you'd be, you'd be bidding
12 for where you wanted to be located.
13    Q.   Okay. Were you ever located at
14 Stateville Correctional Center?
15    A.   Yes, I was.
16    Q.   Okay. What years would you have been
17 there?
18    A.   I'd say off and on between 2008 and
19 2012.
20    Q.   Okay. Would that also be on a
21 six-month cycle?
22    A.   Yes.
23    Q.   Okay. And during these six-month
24 rotations, would your supervisor change, or would

Page 12

1  that stay constant?
2     A.   Yes, my supervisor would change.
3     Q.   Okay. Do you mind breaking that down
4  by time, if you remember who your supervisors were?
5     A.   In the beginning, I can't say from
6  exactly what date to what date, Swazell
7  (phonetical), Joseph Swazell was a supervisor, and
8  he was directly above me. He was the SIEA. And
9  then towards the end of that duration, it was
10 Supervisor Wright, Sean Wright, S-E-A-N,
11 W-R-I-G-H-T.
12    Q.   Do you recall, when you were at
13 Stateville, who your supervisor would have been?
14 Would that --
15    A.   That was the time I was at Stateville,
16 both of those supervisors.
17    Q.   Okay. Great.
18    A.   Yes.
19    Q.   And did you have anyone who reported to
20 you while you worked as an IEA?
21    A.   No, I'm the low person on the totem
22 pole. No one reports to me.
23    Q.   Okay. When you first started as a IEA,
24 did you receive any training through a seminar or

Page 13

1 written materials?
2    A. Yes. We went to FLETC for training --
3 well, I went to FLETC for training.
4    Q. And that's in Glynco, Georgia?
5    A. That's correct.
6    Q. And what, what subject matter was
7 covered at the training?
8    A. The INA, the Immigration and
9 Nationality Act; detention standards; various
10 database checks.
11    Q. Okay. Do you remember who conducted
12 that training?
13    A. In the -- we switched teachers because
14 my teacher rotated out. My first teacher was Scot
15 Jackson. Scot, with one "T," Jackson.
16    Q. And do you remember his title?
17    A. No, I -- I'm not sure.
18    Q. Okay. You currently are an IEA,
19 correct?
20    A. That's correct.
21    Q. And do you still report to Mr. Wright?
22    A. No.
23    Q. Who is your current supervisor?
24    A. My current supervisor is not an SIEA;

Page 14

1 it's a SDDO, supervisory detention deportation
2 officer. His name is Podgorni, P-O-D-G-O-R-N-I.
3    Q. As far as you know, what's the
4 difference between an SIEA and an SDDO?
5    A. And SIEA, it's less pay, a lower grade.
6 SDDO is just a higher grade, higher title.
7    Q. Okay. Do you know what an immigration
8 detainer is?
9    A. I do.
10    Q. What is an immigration detainer?
11    A. It's -- if you look at a immigration
12 detainer, it's pretty straightforward of what it
13 is, if you read an immigration detainer.
14      I'd have to look at the particular
15 immigration detainer you're referring to because
16 there's different boxes you check off and it could
17 mean one of many things.
18    Q. Okay. And did you receive training
19 regarding detainers when you started as an IEA?
20    A. You mean when I came back to my office?
21    Q. When you were hired as an IEA, did
22 you -- do you recall receiving training on how to
23 issue a detainer or --
24    A. Yes.

Page 15

1    Q. -- or investigate?
2      And what training did you receive?
3    A. The training in Georgia covered placing
4 detainers.
5    Q. Okay. Did you receive ongoing training
6 as you've been an IEA?
7    A. Are you referring to detainers?
8    Q. On detainers, yes.
9    A. Not training, no.
10    Q. Okay. Do you ever receive written
11 materials on updated policy or changes in policy?
12    A. Yes.
13    Q. How frequently would you say that
14 happens?
15    A. I'd say maybe every six months you'll
16 get a different directive or different guidance.
17    Q. And do you have the authority to issue
18 a detainer?
19    A. I do, yes.
20    Q. Okay. Do you follow a standard
21 procedure when deciding whether to issue a
22 detainer?
23    A. For the most part, yes. Of course,
24 there's exceptions to any rule.

Page 16

1    Q. Sure. Is there a documented procedure
2 of certain issues that you have to look into?
3    A. No.
4    Q. No?
5    A. No.
6    Q. What are, what are the items that you
7 look into when you're deciding whether to issue a
8 detainer?
9    A. Alienage, first of all, whether the
10 person was born in the United States or whether
11 they possibly derived or -- derived citizenship or
12 naturalized. If a person's here illegally,
13 removability. If they are a resident, they're
14 still subject to the INA and they have to follow
15 the laws.
16    Q. And do you prepare documents as you're
17 gathering and compiling all this information?
18    A. You mean as I'm creating a detainer?
19    Q. Yeah.
20    A. Yes, I do.
21    Q. Okay. What kind of documents do you
22 create?
23    A. During our time at Stateville, each
24 thing is different. During our time at Stateville,

Page 17

1 if we put a detainer on someone, we'd have a work
2 folder on that person.
3   Q.  Okay. What were your job duties and
4 responsibilities as an IEA at Stateville?
5   A.  At Stateville?
6   Q.  Yes.
7   A.  At Stateville, we talk to every single
8 inmate coming through the prison, and then we talk
9 to the person to see if we were interested in
10 investigating their alienage and deportability.
11 And also part of that would be going to the records
12 office and placing detainers on certain
13 individuals.
14   Q.  Okay. I guess I'll start with
15 Exhibit 1 from before. If you would just grab
16 this.
17       Have you seen this document before?
18   A.  This one?
19   Q.  Yes.
20   A.  The memo? Yes, I have.
21   Q.  What's your understanding of the memo?
22   A.  My understanding of the memo is that if
23 somebody claims to be a United States citizen when
24 they're in custody, that we are to consult our

Page 18

1 local OCC.
2   Q.  And do you know who that would have
3 been, who you would have had to consult?
4   A.  OCC consists of several individuals.
5 But, again, it's, it's stating if they're in ICE
6 custody, which at Stateville the subject would not
7 have been in ICE custody.
8   Q.  Okay. Did you ever receive any
9 training on how to implement the policies in the
10 memo?
11   A.  Training?
12   Q.  Yes.
13   A.  No.
14   Q.  Okay. And do you know how you would
15 have received this document? Would this have been
16 electronic or given to you at the facility?
17   A.  It would have been via e-mail more than
18 likely.
19   Q.  Okay. And it's your understanding that
20 if a directive comes out, that the policies therein
21 should be followed when issuing a detainer?
22   A.  Yes, when issuing a detainer. But what
23 you're referring to, it says claims by detained
24 individuals.

Page 19

1   Q.  Sure. And then I guess if we turn back
2 to page 1, in the second paragraph there, there's a
3 statement that says, towards the bottom of the
4 second paragraph, As a matter of law, ICE cannot
5 assert its civil immigration enforcement authority
6 to arrest and/or detain a USC.
7       Is that correct?
8   A.  That's correct.
9   Q.  And it's your understanding that that's
10 the policy regarding all detainers that are
11 possibly issued?
12   A.  No.
13   Q.  What was your -- what's your
14 understanding of that statement?
15   A.  Which paragraph are you referring to?
16   Q.  The bottom of the second one, the
17 statement that ICE cannot assert its enforcement
18 authority to arrest or detain a U.S. citizen.
19   A.  Okay. I understand that, but if you're
20 placing a detainer, sometimes you're still
21 investigating whether the person is a citizen.
22   Q.  So it's possible to -- I guess going
23 back, so are you saying it is possible that a
24 detainer would be issued against a U.S. citizen?

Page 20

1   A.  Yes, it's possible.
2   Q.  And in what case would that occur?
3   A.  Do you have a detainer available?
4       MR. RAJADURAI: I can get one.
5       MR. FLEMING: Sure. I can get one.
6       MR. RAJADURAI: Sure. We can get one
7 if you want.
8       (Recess).
9       (Exhibit 4 marked).
10   Q.  All right. I guess we were discussing
11 a detainer being issued against an individual even
12 if they were a citizen.
13   A.  Okay. If you look at a detainer,
14 there's a box checked that states an investigation
15 has been initiated to determine whether this person
16 is subject to removal from the United States.
17   Q.  Uh-huh.
18   A.  It's possible that somebody could be a
19 citizen and use fraud or a misrepresentation to
20 become a citizen, and sometimes we do discover that
21 and we will still place a detainer against that
22 individual --
23   Q.  And does it --
24   A.  -- upon further investigation, sorry.

Page 21

1   Q.   Oh, sorry.
2        Does a detainer request detention of
3   the individual?
4   A.   Not necessarily. It states that we're
5   investigating whether the person is subject to
6   removal --
7   Q.   Okay.
8   A.   -- basically. I...
9   Q.   And as far as you know, are there
10  different policies for when somebody would be
11  detained, or would be subject to detention upon
12  issuance of the detainer, or whether they wouldn't
13  be detained during the investigation?
14  A.   I am not clear on your question.
15  Q.   Sure. Let me try to restate that.
16  That was a lot right there.
17       When this form is checked out, does
18  that -- is there anything that indicates, or is
19  there any policy that says the individual should
20  be, you know, under detention since this box has
21  been checked, or is there a -- is there really no
22  policy about whether detention should occur or not?
23  A.   There really is no policy. We request
24  that the person be turned over to us on one of the

Page 22

1   boxes on the detainer, but we do not make any
2   requests to the jail, the prison, wherever the
3   person may be, of how that person should be
4   treated, I guess, or detained.
5   Q.   Okay. And do you know if this specific
6   detainer required that Mr. Mayorov be detained?
7        MR. KUHN: I'm going to object to the
8   vagueness of the question. Be detained by who?
9   IDOC or ICE?
10       MR. RAJADURAI: IDOC.
11  Q.   Any special other detention by IDOC.
12  A.   A detainer does not request a person be
13  detained. It asks for the person to be turned over
14  to us at the end of their term with that particular
15  agency if a certain box is checked. I mean,
16  there's other boxes you could check: please cancel
17  this detainer. I mean, there's a lot of different
18  ways this can go. It's not really a clear
19  question.
20  Q.   Okay. But the -- but this document
21  would allow for the individual to be detained for
22  an additional 48 hours?
23  A.   This particular detainer, it's
24  requesting that the facility turn the subject over

Page 23

1   to us at the end of his sentence. So it's
2   requesting that the subject be turned over to
3   immigration. And as far as 48 hours, I've worked
4   with the state and they do not hold people for 48
5   hours. So it's a request.
6   Q.   Okay. And as far as you know, is it
7   possible to derive U.S. citizenship through one's
8   parents?
9   A.   Yes.
10  Q.   And are you familiar with the
11  derivative citizenship available to a child through
12  to the Child Citizenship Act of 2000?
13  A.   Yes, I am.
14  Q.   What's your understanding of that form
15  of derivative citizenship?
16  A.   My understanding is -- I'd have to look
17  at the act itself to see the dates, but if somebody
18  is a child at the time that their parent becomes a
19  citizen, that they derive citizenship through that
20  parent. There are, there are stipulations of --
21  the person has to -- that the person has to meet to
22  become a citizen.
23  Q.   Okay. And do you take certain steps to
24  investigate whether a subject inmate that you

Page 24

1   screen would have derived citizenship?
2   A.   Absolutely, yes.
3   Q.   What steps would those be?
4   A.   If -- now, each person -- each agent
5   would have a different technique. Are you asking
6   what I would do normally?
7   Q.   Well, I guess, let's start -- is there
8   any general policy that all agents are required to
9   follow when someone might be a potential derived
10  citizen?
11  A.   No.
12  Q.   Okay. And what would you do in your
13  practice?
14  A.   Normally, if I'm interviewing a
15  subject, part of my routine questioning is asking
16  about their parents and the parent's nationality.
17  Unfortunately, in prison, a lot of people don't
18  know what nationality their parents are or if they
19  became citizens. If the subject claims that one of
20  the parents are a citizen, we -- well, I always
21  look further into it to see if they could possibly
22  derive citizenship.
23  Q.   Okay. And how would you do that?
24  A.   It depends on the situation. Sometimes

Page 25

1 they say, my dad was born in the United States. So
2 I'll get dad's phone number and call dad up and
3 talk to dad. Other times, they say, my dad derived
4 citizenship or my dad -- I'm sorry, my dad
5 naturalized. In that case, I would be able to look
6 up the date of his natural -- the father's
7 naturalization.
8     Q.  Okay. And where would you look that
9 up?
10    A.  In CIS.
11    Q.  And are you required to interview an
12 inmate who you think might have derived
13 citizenship?
14    A.  I'm not required to interview anyone.
15 I have some leeway with that.
16    Q.  Okay. Well, how do you decide whether
17 you should interview or not interview a subject?
18    A.  Your definition of interview, by --
19 what is your definition of interview?
20    Q.  I guess meeting with the inmate and
21 asking the questions about their citizenship.
22    A.  We -- as far as talking to an inmate,
23 every single person that comes through the Illinois
24 Department of Corrections we -- at Stateville, we

Page 26

1 talked to that day.
2     Q.  Okay. And are there specific questions
3 you ask them specifically about their citizenship?
4     A.  No, nothing specific.
5     Q.  Okay. Do you know if someone who
6 derived citizenship through the Child Citizenship
7 Act needs to file paperwork or an application to be
8 deemed a citizen?
9     A.  Yes. Eventually -- well, the person
10 should file an N-600.
11    Q.  Okay. And if they haven't filed an
12 N-600, are you aware of whether they are considered
13 a citizen or not?
14    A.  For me, in my investigation, I'm going
15 to -- I'm not -- if I believe someone may be a
16 United States citizen, I'm not going to pursue --
17 I'm not going to place a detainer at that point.
18 I'm going to look into it further.
19    Q.  Okay. I guess my question is: Under
20 the Child Citizenship Act, and your understanding
21 of the act, would the individual need to file an
22 N-600 to be considered a citizen?
23    A.  For my understanding, no.
24    Q.  Okay. Do you, do you take any

Page 27

1 additional steps or other steps when you have met a
2 individual claiming derived citizenship through
3 this act but haven't filed that N-600?
4     A.  Normally I just advise the person to
5 file an N-600. That's about all. I -- if somebody
6 claims that they derived, and if I believe that
7 subject's claim, that's the only action I would
8 take.
9     Q.  Okay. I know you rotate facilities.
10 How many times have you been rotated through
11 Stateville?
12    A.  I'd say three.
13    Q.  Okay. And do you know roughly what
14 time periods those were?
15    A.  Between 2007 and 2012, I'd say.
16    Q.  And they're always six months at a
17 time?
18    A.  Not necessarily, not necessarily.
19 Sometimes you'll fill in for somebody. But if
20 you're stationed out there, it would be for a
21 six-month time frame.
22    Q.  Okay. And did you choose to be
23 assigned to Stateville, or are you assigned there?
24    A.  I chose to be assigned there.

Page 28

1     Q.  Okay. How many ICE agents typically
2 are at Stateville, you know, during these various
3 three periods?
4     A.  Usually there's three agents assigned.
5 However, if somebody calls in sick or somebody has
6 vacation, it could be two.
7     Q.  Okay. And are you all IEAs, or are
8 there other different titles for those individuals?
9     A.  For the most part, we all are IEA, but
10 sometimes the deportation officer will even fill
11 in. But the people actually assigned to Stateville
12 are all IEAs.
13    Q.  Okay. And you're re -- the person
14 you'd report to there would be either Swazell or
15 Wright during that time period?
16    A.  Yes, during that time period.
17    Q.  Okay. I guess we'll start with what
18 was Exhibit 2, this document here.
19         Do you recognize this document?
20    A.  Yes, I do.
21    Q.  Okay. What is this?
22    A.  It's the NRC Intake Property Inventory
23 Record. It's a state document. It's not our
24 document.

Page 29

1  Q.  Okay.  And as far as you know, does
2  this reflect that all of the inmates have to be
3  processed by ICE or go through ICE processing?
4  A.  I wouldn't say process, but they all
5  have to speak to ICE, yes.
6  Q.  Okay.  Is there ever a case you
7  remember where someone didn't have to go through
8  ICE as part of this process?
9  A.  Sometimes, with time constraints,
10  they'll skip ICE on a particular day.  Normally,
11  they will have to report to us the following day.
12  But for the most part, in order for them to get
13  cleared, they have to speak to us, yes.
14  Q.  And do you see this document?  It's not
15  color, but it's highlighted over ICE.  Is that
16  something you're required to do after seeing an
17  inmate?
18  A.  It's, it's not a requirement, but it
19  was just part of our everyday activity at
20  Stateville saying that we had talked to that
21  person.
22  Q.  Okay.  Any other notes you had to make
23  about an individual that they had been seen by ICE?
24  A.  If we placed a detainer on that date,

Page 30

1  we would write detainer next to ICE.
2  Q.  Okay.  Have you processed inmates for
3  ICE, you know, ever since you arrived at
4  Stateville, or did that start at a later date?
5  A.  I'm not -- what do you mean by
6  processed?
7  Q.  Sure.  Let me -- I guess through the
8  screening process when inmates come in, has that
9  been part of your job duties since you started day
10  one at Stateville, or did you start doing that at a
11  later date?
12  A.  Pretty much day one at Stateville,
13  that's the process.
14  Q.  Sure.
15  A.  You talk to everybody.
16  Q.  Did you receive any training upon
17  moving to Stateville on how to screen an inmate?
18  A.  Not official training, just from the
19  previous agents that were stationed out there.
20  Q.  Okay.  Was there anyone you shadowed or
21  followed to see how a screening process worked?
22  A.  Yeah -- yes.  I'd say Immigration
23  Enforcement Agent Rivera, who is now a DO.
24  Q.  Okay.  And how long did you shadow

Page 31

1  Mr. Rivera?
2  A.  To be honest, I'm not sure.
3  Q.  Okay.  Any other ongoing training other
4  than the directives that we've seen or example we
5  showed you?
6  A.  We have video classes we'll take on
7  various subjects, not necessarily on detainers.
8  Q.  Okay.
9  A.  But...
10  Q.  On average, how many inmates would you
11  screen per day?
12  A.  It could vary anywhere between -- on
13  the low number, I'd say 50; on the high end, I'd
14  say 300.
15  Q.  And are you alone during these
16  interviews, or is it usually with another agent?
17  A.  That depends on our staffing for the
18  particular day --
19  Q.  Okay.
20  A.  -- and how busy we are.
21  Q.  Typically, what would you say for a day
22  of 50 versus a day of 250?
23  A.  On a day of 50, you might have two
24  agents in the room interviewing a subject and you

Page 32

1  might only have -- normally it was only one person
2  in the hall, the -- depending on the day.
3  Q.  Okay.  And were there standard
4  questions or an operating procedure that you
5  followed for screening the individuals?
6  A.  No.
7  Q.  Okay.  Did you kind of create your own
8  script or list of questions that you would go
9  through?
10  A.  No, it would depend on the day what I'd
11  ask the person.
12  Q.  Okay.  And what information would you
13  seek on a -- you know, you mentioned you changed
14  the information.  What -- generally, what
15  information would you seek?
16  A.  Sometimes I just try to make
17  conversation with the subject to see if they had
18  any sort of an accent.  Other times, I'd -- if I
19  was more suspicious that the person wasn't from
20  Chicago or the United States or -- I'd ask them
21  additional questions.  But that would, that would
22  vary depending on the person and...
23  Q.  And then are you required to ask
24  specific questions to determine if someone's a

Page 33

1  United States citizen?
2  A. No.
3  Q. Okay.
4  A. No.
5  Q. Are you required to document that you
6  asked about citizenship, or the answer that you
7  received?
8  A. No.
9  Q. Okay. What would you say ICE's
10 objectives are during this screening process?
11 A. This would be my understanding. It
12 wouldn't be ICE's mission, I'd say. But for the
13 most part, we're looking for violent individuals
14 that -- violent or people that may be a threat to
15 society that may be removable from the United
16 States that we want to investigate.
17 Q. Okay. And did you ever take notes
18 about the individuals that you screened or write
19 down information about them in any sort of report?
20 A. Yes.
21 Q. What kind of documents are these?
22 A. We do a scratch 213.
23 Q. Was that scratch?
24 A. Scratch, like -- a 213 normally is done

Page 34

1  on computer. We'd write it by hand.
2  Q. Okay. And are those records kept
3  anywhere, as far as you know?
4  A. With each detainer, most of the time
5  there's a scratch 213, yes.
6  Q. As far as you know, if a detainer was
7  issued then against Mr. Mayorov, the plaintiff in
8  this case, would there be a scratch 213 for him?
9  A. If it was done at Stateville, there
10 should be, yes.
11 Q. Okay. If you determine an individual's
12 removable from the United States through your
13 interview or screening, what would you do next?
14 A. If the subject is removable --
15 Q. Yes.
16 A. -- from the United States, then I would
17 place a detainer on the subject.
18 Q. Okay. Do you input the data into any
19 other system or record it anywhere else?
20 A. Yes. It's -- at that time, it was
21 called ENFORCE.
22 Q. Okay. Could you describe that
23 database?
24 A. I don't know if I'm allowed to.

Page 35

1  Q. All right.
2     MR. KUHN: Just tell him the general
3  purpose.
4     THE WITNESS: Okay.
5     MR. RAJADURAI: Sure, just general.
6  A. It would just have basic biographical
7  information on the subject, and it would also
8  record that we placed a detainer on the subject.
9  Q. Okay. If you determine that an
10 individual is a United States citizen, what
11 procedure do you follow after that, or what steps
12 do you take?
13 A. We're in the enforcement part of the
14 house. If somebody is a USC -- if we think that
15 the person is a United States citizen, we're not
16 keeping any information on that person.
17 Q. Okay. Did you ever encounter a case
18 where an individual was determined to be a United
19 States citizen but had an ENFORCE database entry
20 with their name?
21 A. It's possible, yes.
22 Q. What situations would that occur in?
23 A. Usually if somebody does a -- an
24 investigation on that person where they look into

Page 36

1  that person with a little bit more than, you know,
2  a 30-second conversation, that they're actually
3  requesting the A File, requesting the parents' A
4  Files, they -- they'll write a report on it in
5  ENFORCE.
6  Q. Okay. And would you ever request an A
7  File on a -- on an inmate that you interviewed?
8  A. Yes, I would.
9  Q. Okay. Under what circumstance would
10 you request the A File?
11 A. Usually if I did not believe what the
12 person said, I would request the A File to see what
13 was inside the A File.
14 Q. And how quickly would you receive that
15 A File?
16 A. Anywhere from two to four weeks.
17 Q. And would you -- were there cases where
18 you would also look into the A File of an
19 individual's parents?
20 A. Absolutely, yes.
21 Q. And would you follow the same procedure
22 of requesting the parents' A File?
23 A. Again, on those cases where I did -- I,
24 I had questions, I, I would look into the parents',

Page 37

1  yes.
2    Q.  And I think you said, and let me know
3  if this is incorrect, that you're allowed to update
4  the ENFORCE database?
5    A.  Yes, you --
6    Q.  Okay.
7    A.  We are able to update ENFORCE.
8    Q.  Okay.  And would you --
9    A.  But ENFORCE is not CIS.  I just want to
10 make that clear.
11   Q.  Oh, yeah.  No problem.
12       And then are you required to update an
13 ENFORCE entry if it doesn't reflect that somebody
14 is a U.S. citizen and you have determined they are
15 a U.S. citizen?
16   A.  No.  Nothing's in writing about doing
17 it, no.
18   Q.  Okay.  Do you know whose responsibility
19 that would be?
20   A.  As far -- I mean, if you're -- found
21 somebody to be a citizen, for me, I would update
22 it, but nothing's in writing that it has to be
23 done.
24   Q.  Okay.  Would there ever be cases where

Page 38

1  you reported up to anyone to update the ENFORCE
2  database?
3    A.  For me, I always enter my own
4  information.  As far as passing on information,
5  it's not something I do, no.
6    Q.  And do you know how long it would take
7  to update the ENFORCE database to reflect that
8  someone was a U.S. citizen?
9    A.  As far as I know, it's pretty much as
10 soon as you hit save, it's updated.
11   Q.  Okay.  And I know you've mentioned some
12 other databases like CIS.  Do you know how long it
13 would take to update any of those systems to
14 reflect a citizenship status change?
15   A.  I have no idea.
16   Q.  Okay.  Are you familiar with Secure
17 Communities Processing Center?
18   A.  Yes.
19   Q.  What is that?
20   A.  I don't know if I could really define
21 Secure Communities.  It's one of the sections we
22 rotate into, and they have -- it's a 24-hour
23 center.  Sometimes it -- people call in, sometimes
24 they get biometric hits.

Page 39

1    Q.  Okay.  And what's a biometric hit?
2    A.  A biometric hit is when somebody's
3  fingerprints are in and there's a match with our
4  system to the fingerprints that are ran when
5  they're arrested.
6    Q.  Were you aware that Secure Communities
7  Processing Center reviews the records of inmates
8  screened at Stateville?
9    A.  I know they -- that they have in the
10 past.
11   Q.  Okay.
12   A.  I -- yes, I'm aware of that.
13   Q.  When did you first become aware of
14 that?
15   A.  I became aware of it because
16 occasionally I would get a, a e-mail or a call from
17 an agent in Secure Communities asking if I
18 interviewed a particular inmate.
19   Q.  Sure.  And so you're, you're aware that
20 they review records of inmates screened by the ICE
21 agents at Stateville?
22   A.  They don't review records of the ICE
23 agents, no.
24   Q.  Or, no, of the inmates that you've

Page 40

1  screened.
2    A.  It's possible.
3    Q.  Okay.  And do you know if they review
4  all the records of the inmates screened by the ICE
5  agents?
6    A.  No, I am not sure.
7    Q.  Do you know how they make that
8  decision, of which inmate's records to review that
9  you've processed?
10   A.  I believe, and this is what I'm not a
11 hundred percent sure, but I believe it would be
12 through the biometric hits.
13   Q.  Okay.  Do you ever run any other sort
14 of background checks on the inmates other than the
15 electronic systems you've mentioned here already?
16   A.  Other than interviewing and electronic
17 checks and maybe calling family members, no.
18   Q.  Do you ever look into any other
19 hard-copy records other than the A File?
20   A.  I, I don't get what you're asking.
21 Maybe a birth certificate?  I -- stuff like that.
22   Q.  Sure.  And when would you make that
23 request?
24   A.  If somebody claimed that they were born

Page 41

1  in Cook County, I may try to get their Cook County
2  birth certificate.
3     Q.   Okay.  Is there any, you know, protocol
4  that you have or that you're required to follow
5  requiring further investigation to a certain inmate
6  as opposed to another inmate?
7     A.   No.
8     Q.   So your protocols are roughly the same
9  for all the inmates that you'd see?
10    A.   What do you mean by protocol?
11    Q.   The questions that you ask, is there,
12 is there ever a point or any sort of triggers that
13 require further investigation into someone else
14 rather than one inmate versus another?
15    A.   Well, yes, if somebody -- like I said,
16 if they have an accent, if they say they were born
17 somewhere else.  There's different factors that
18 come into play as far as how many questions I'm
19 going to ask someone.
20    Q.   Okay.  And then in your experience,
21 were there cases where you had to discuss an
22 inmate's status with another ICE agent onsite or
23 one of your supervisors offsite?
24    A.   Yes.

Page 42

1     Q.   And what cases would those be?
2     A.   Sometimes we'd have two individuals
3  using the same identity and we'd have to ask a
4  supervisor about placing a detainer on that subject
5  because one person would be a citizen and the other
6  person wouldn't.  Sometimes with the, the
7  naturalization charts -- it's very confusing
8  because there's so many dates -- you'd have to
9  ask -- you'd go to another agent you trusted to
10 say, is it possible this person is a citizen.  So,
11 I mean, there are plenty of times that you do
12 consult with other agents.
13    Q.   Okay.  Do you ever take any sworn
14 statements or record statements of an inmate in any
15 way?
16    A.   Yes, I do take sworn statements on
17 occasion.
18    Q.   Why would you do that?
19    A.   The majority of the time we take a
20 sworn statement, it's on somebody that's been
21 deported previously --
22    Q.   Okay.
23    A.   -- or removed previously.
24    Q.   Is there any requirement that you have

Page 43

1  to take a sworn statement or a recorded statement
2  for an interview?
3     A.   No.
4     Q.   Okay.  Are those records kept somewhere
5  if you do document them?
6     A.   If we have taken a sworn statement, it
7  should be included in the A File.
8     Q.   Okay.  And it's our understanding that
9  there's some sort of log that you keep each day, is
10 that correct, that you summarize kind of the daily
11 report of inmates that you've seen?
12    A.   That's correct.
13    Q.   And would you prepare that, or is that
14 a group effort?
15    A.   It would be -- we'd switch off.  It
16 wouldn't be one particular person's responsibility.
17 But during different time frames, you know, one
18 person may be responsible of the three of you.
19    Q.   And what information is kept on that
20 log?
21    A.   There were different logs.  One log
22 would be every person that we talked to that day
23 and their inmate numbers.  Another log would be
24 people we placed detainers against.

Page 44

1     Q.   Okay.  Do you know if there's an
2  item -- a line item for someone's citizenship
3  status on either of those logs?
4     A.   I believe there was, yes.
5     Q.   Okay.  And then who would you send that
6  report to?
7     A.   I'd send it to my SDDO, I believe, at
8  that time, which was not my -- yeah, my supervisor
9  would be copied.
10    Q.   Okay.  And is that an electronic record
11 or is that a hard copy?
12    A.   It would be electronic.
13    Q.   Okay.  Are there any other records that
14 you would keep from a screening interview other
15 than this log and then the scratch 213 you
16 mentioned before?
17    A.   We'd keep CIS claims.  Whatever we ran
18 that day on -- specifically on people that we
19 placed detainers on.
20    Q.   Okay.  And would that -- would include
21 if you ran a system check on their parent also?
22    A.   Yes, that would be in with the
23 paperwork with the detainer, if we ran the parent
24 that day.

Page 45

1  Q.  Okay.  Would you keep a scratch 213 or
2  any other records if you didn't issue a detainer?
3  A.  No.
4  Q.  Okay.  Do you know if ICE uses any
5  outside companies to conduct its screenings?
6  A.  Do you mean at Stateville?
7  Q.  Yes.
8  A.  No, it was always ICE staff at
9  Stateville.
10 Q.  As, as far as you know, there were no
11 other contractors or third parties?
12 A.  At Stateville, no.
13 Q.  Okay.  Do you know what the Impact
14 Incarceration Program or Boot Camp is at
15 Stateville?
16 A.  I'm aware of the Boot Camp at
17 Stateville.  I'm not fully knowledgeable of what,
18 what the process is or what they do there.
19 Q.  What's your level of involvement with
20 the program?
21 A.  With the Boot Camp program?
22 Q.  Yes.
23 A.  I don't have any involvement.  I'm a
24 federal employee.  That's a state program.

Page 46

1  Q.  Sure.  Are you aware of any of the
2  eligibility requirements for the program?
3  A.  No, not -- I, I don't know what makes a
4  person eligible, no.
5  Q.  Okay.  Do you know then, you know, what
6  effect an immigration detainer would have on
7  eligibility?
8  A.  I am aware that if somebody did have a
9  detainer, that they may be pulled out of Boot Camp
10 or may not be eligible.
11 Q.  Okay.  Are you aware of any individual
12 who was participated to permit to participate in
13 the program with an immigration detainer lodged
14 against him or her?
15 A.  I don't have any knowledge of that.
16 Q.  Okay.  Do you have -- do you ever
17 receive any information about whether an inmate is
18 to participate in the program when you're screening
19 them?
20 A.  Yes.  If you refer to -- oh, I don't
21 think you introduced that.
22     MR. KUHN:  Sure.
23     MR. RAJADURAI:  We can --
24     MR. KUHN:  You can pull it out here.

Page 47

1  Oh, here it is.
2  A.  No, it's still up here.
3  Q.  We can move into this document if you
4  want.
5  A.  Okay.
6  Q.  Exhibit 3, it's on the second-to-last
7  page here.
8      You recognize this document?
9  A.  Yes, I do.
10     It states that the individual here is
11 going to Boot Camp on this page.
12 Q.  And if it includes that information, is
13 there any change in how you screen an inmate or
14 what questions you might ask?
15 A.  As far as whether they're going to Boot
16 Camp or not, no, it's the same, same line -- same
17 questioning for each person coming through.
18 Q.  Okay.
19 A.  Like I said, I mean, there's no
20 specific questions we ask, but...
21 Q.  Okay.  And were you ever aware that
22 Mr. Mayorov, the plaintiff in this case, was to be
23 part of the Boot Camp program?
24 A.  I don't remember speaking to the

Page 48

1  subject, so I'm not aware that he was part of Boot
2  Camp, no.
3  Q.  Do you ever recall speaking to any
4  other agents, including Agent Reynoso, about
5  Mr. Mayorov?
6  A.  The only time I spoke to her was when I
7  was told that there was a lawsuit and we just
8  looked back to see if we had any information --
9  Q.  Okay.
10 A.  -- at that time.
11 Q.  And do you know what records you looked
12 to?
13 A.  We did find the -- this sheet here and
14 we did provide that sheet.  That was all we had.
15 Q.  Okay.  In looking at that sheet, do you
16 recognize the handwriting on that?
17 A.  Yes.
18 Q.  Whose handwriting is that?
19 A.  It's Mayra's.
20 Q.  Okay.  Do you see where it says USC?
21 A.  Child of a USC?
22 Q.  Yes.
23 A.  Yes.
24 Q.  And what does that stand for?

Page 49

1  A. Basically, on that date she's notating
2  that she chose not to place a detainer on that
3  subject; that that subject may have derived
4  citizenship. But she's not saying he is a USC;
5  she's saying he's a child of a United States
6  citizen.
7  Q. Okay. And do you know who else would
8  receive this sheet other than the ICE agents?
9  A. I'm not positive. In -- at one point
10 they were being scanned in to the supervisor, but
11 I'm not positive if it was during this time frame.
12 Q. Okay. And then if, if, if there is a
13 notation there of child of a U.S. citizen, are you
14 required to update that information or to inform
15 anyone else that you might have a potential claim
16 for citizenship?
17 A. No.
18 Q. Okay. And as far as you know, do you
19 know where Agent Reynoso would have got the
20 information that Mr. Mayorov was a child of a U.S.
21 citizen?
22 A. By talking to him.
23 Q. Okay. Were you aware that -- and --
24 that Mr. Mayorov was to be part of the Boot Camp

Page 50

1  Program?
2  A. I do not remember ever talking to him.
3  Q. Sure. Were, were you aware that the
4  Secure Communities Processing Center reviewed his
5  records after he was processed at Stateville?
6  A. Like I said, I wasn't aware of who they
7  reviewed or what was reviewed.
8  Q. Okay.
9  A. I know things were reviewed because I
10 receive e-mails saying, hey, did you talk to this
11 person or that person. But other than that, I'm
12 not aware that this subject was reviewed by Secure
13 Communities.
14 Q. And do you happen to remember who would
15 have sent those e-mails to you?
16 A. The particular agent, if he or she
17 chose to investigate something further, they may
18 have sent an e-mail to me that day.
19 Q. Okay. Were you --
20 A. It's various agents.
21 Q. Okay. Were you aware that Secure
22 Communities eventually did issue an immigration
23 detainer against Mr. Mayorov?
24 A. Not until today.

Page 51

1  Q. Okay. All right. Were there occasions
2  when you interviewed an individual during screening
3  that you had this -- had an issue arise that you
4  had to speak to a supervisor?
5  A. Yes.
6  Q. What issues would those be?
7  A. Most of the time it would be involving
8  citizenship, whether we should place a detainer,
9  hold off on placing a detainer. Anything
10 that would -- a lot of gray areas, you do -- you'd
11 contact a supervisor and say, I need your input on
12 this, what do you think.
13 Q. Okay. I guess turning back to
14 Exhibit 3, the, the second-to-last page of that
15 document, do you know why Agent Reynoso would write
16 that Mr. Mayorov was a child of a United States
17 citizen?
18 A. She, she would write that if he was not
19 born in the United States and she -- I'm assuming
20 she wrote it from her interview.
21 Q. Okay.
22 A. I, I don't know.
23 Q. I mean, do you know if this
24 information -- I think -- you know, you might have

Page 52

1  answered this before. If this information is not
2  available to other agents, is there any reason to
3  write that down?
4  A. Yes, there is a reason to write it
5  down, because there are two separate sheets we'd
6  submit. One was for people born in the United
7  States. One was for people not born in the United
8  States.
9  Q. Okay.
10 A. She would have wrote that down
11 explaining why she didn't take action against him.
12 Q. Okay. So would you say she's required
13 to put that down?
14 A. No. We're not required, no.
15 Q. Okay. And then would, would this
16 document and the information there ever be
17 incorporated into ENFORCE?
18 A. Not by me. Not by, not by me, no.
19 Q. Do you know who might be responsible
20 for that?
21 A. Again, ENFORCE is -- it's an
22 enforcement tool. As far as putting information in
23 ENFORCE, if you didn't take action against that
24 individual, the majority of the time you wouldn't

Page 53

1   put that information in.
2      Q.   Okay. Are you aware of any Stateville
3   inmates that you processed that received an
4   immigration detainer but then were later determined
5   to be U.S. citizens?
6      A.   Yes.
7      Q.   And how, how, how many would you say
8   you encountered in your time there?
9      A.   Maybe -- in the whole duration, maybe
10  three or four individuals.
11     Q.   And if you could, could you develop how
12  those cases unfold?
13     A.   A lot of times the people in prison,
14  they're not a -- very involved with their parents.
15  They don't know that they're citizens. So at the
16  time we talk to them, they tell us they were born
17  in Mexico, their parents are from Mexico, and they
18  don't realize, oh, my dad became a citizen or my
19  mom became a citizen.
20          So it's very possible that they may
21  have found out after they talked to us. And
22  whenever they'd come back and talk to us or they'd
23  send us letters, we'd look into it and lift the,
24  the detainer if we found them to be a citizen.

Page 54

1      Q.   And in any of those cases, do you
2   remember if the individual was participating in the
3   Boot Camp program, Impact Incarceration program?
4      A.   In those cases that I placed a detainer
5   on somebody?
6      Q.   The cases where it was later determined
7   that they had a U.S. -- they were U.S. citizens.
8      A.   That I -- no, none of my cases.
9      Q.   Okay. Any other cases that didn't
10  involve you?
11     A.   Not that I'm aware of, no.
12          MR. RAJADURAI: Okay. I think that's
13  all I have.
14          MR. FLEMING: That's all.
15          MR. KUHN: I don't have anything.
16  We'll reserve signature. I'll take a copy of
17  whatever.
18          THE REPORTER: Do you want to order?
19          MR. RAJADURAI: Yes.
20          (Deposition concluded).
21
22
23
24

Page 55

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION
3   SERGEY MAYOROV              )
4              Plaintiff,       )
                                )   No. 13 CV 5249
5       vs.                     )
                                )   Judge Rebecca R.
6   UNITED STATES OF AMERICA,   )   Pallmeyer
                                )
7              Defendant.       )
8
9
10          This is to certify that I have read my
11  deposition taken on June 6, 2014, in the foregoing
12  cause, and that the foregoing transcript accurately
13  states the questions asked and the answers given by
14  me, with the changes or corrections, if any, made
15  on the Errata Sheet attached hereto.
16
17                           JENIFER WALL
18
19  No errata sheets submitted (Please initial) ____
    Number of errata sheets submitted ____ pages
20
    Subscribed and sworn to
21  before me this ____ day
    of _____ 2014.
22
23
        _____
24      Notary Public

Page 56

1   STATE OF ILLINOIS )
                      )   SS:
2   COUNTY OF C O O K )
3
4           I, Melody A. Monk, do hereby certify
    that JENIFER WALL was duly sworn by me to testify
5   the whole truth, that the foregoing deposition was
    recorded stenographically by me and was reduced to
6   computerized transcript under my direction, and
    that said deposition constitutes a true record of
7   the testimony given by said witness.
8           I further certify that the reading and
    signing of the deposition was not waived, and the
9   deposition was submitted to James M. Kuhn, Sr.,
    defendant's counsel, for signature. Pursuant to
10  Rule 30(e) of the Federal Rules of Procedure, if
    deponent does not appear or read and sign the
11  deposition within 30 days, the deposition may be
    used as fully as though signed, and this
12  certificate will then evidence such failure to
    appear as the reason for signature not being
13  obtained.
14          I further certify that I am not a
    relative or employee or attorney or counsel of any
15  of the parties, or a relative or employee of such
    attorney or counsel, or financially interested
16  directly or indirectly in this action.
17          IN WITNESS WHEREOF, I have hereunto set
    my hand and affixed my seal of office at Chicago,
18  Illinois, this 14th day of June 2014.
19
                     Illinois CSR No. 084.004772
20                   Melody A. Monk, RPR
21  BARKLEY COURT REPORTERS
    22 West Washington Street
22  15th Floor
    Chicago, Illinois 60602
23  800.222.1231
24