# EXHIBIT 9

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SERGEY MAYOROV,                    )
                                   )
             Plaintiff,            )
                                   )
       vs                          ) No. 13 C 5249
                                   )
UNITED STATES OF AMERICA,          )
                                   )
             Defendant.            )


The discovery deposition of JESSICA

BECKMAN, taken in the above-entitled cause before

Steven J. Brickey, CSR, State of Illinois, at 219

South Dearborn Street, Chicago, Illinois, on the

21st day of February, A.D., 2014, commencing at

10:13 o'clock a.m.

BECKMAN, JESSICA
February 21, 2014

---

**Page 2**

APPEARANCES:
NATIONAL IMMIGRANT JUSTICE CENTER
BY: MR. ABIMAN RAJADURAI
    MR. MARK FLEMING
208 South LaSalle Street
Suite 1818
Chicago, Illinois 60604
(312) 660-1628

    Appeared on behalf of the Plaintiff;

UNITED STATES DEPARTMENT OF JUSTICE
BY: MR. JAMES M. KUHN, SR.
219 South Dearborn Street
Suite 600
Chicago, Illinois 60603
(312) 886-1325,

    Appeared on behalf of the Defendant;


REPORTED BY:

    Steven J. Brickey, CSR
    CSR License No. 084-004675

---

**Page 3**

INDEX
THE WITNESS: JESSICA BECKMAN
                    PAGE

Direct Examination by Mr. Kuhn............ 4
Cross-Examination by Mr. Rajadurai........ 33

EXHIBITS


Marked for
Identification

Government Exhibit No. 1 ................ 8

Government Exhibit No. 2 ................ 32

Plaintiff Exhibit No. 1 ................. 49

Plaintiff Exhibit No. 2 ................. 50

---

**Page 4**

1          (Witness sworn.)
2         JESSICA BECKMAN
3  called as a witness herein, having been first duly
4  sworn, was examined and testified as follows:
5        E X A M I N A T I O N
6  BY MR. KUHN:
7    Q.   Okay.  Good morning.  Could you
8  state your full name and spell your last name for
9  the record?
10    A.   Jessica Beckman, B-E-C-K-M-A-N.
11    Q.   Okay.  And can I get your age,
12  please?
13    A.   Thirty-one.
14    Q.   Have you ever given a deposition
15  before?
16    A.   No.
17    Q.   I'm going to ask you a series of
18  questions and so will my opposing counsel.  All
19  your answers are under oath and will be taken down
20  by the court reporter.  A couple simple rules.
21  Make sure I'm done asking before you start
22  answering and I'll do the same because he has a
23  hard time writing down for two.  Rule number two,
24  you can't shake your head or nod your head.  You

---

**Page 5**

1  have to say yes and you have to say no.
2    A.   Okay.
3    Q.   And rule number three is that if you
4  don't understand my question, tell me.  Ask me to
5  restate it.  Say it again.  Whatever.  If you do
6  answer my question, I'm going to assume that you
7  understood what I asked.
8    A.   Okay.
9    Q.   Where do you currently live?
10    A.   In Chicago, Illinois.
11    Q.   And you were served with a subpoena?
12    A.   Yes.
13    Q.   Is the address on the subpoena your
14  correct address?
15    A.   Yes.
16    Q.   Who do you currently work for?
17    A.   Bank of America.
18    Q.   Your position?
19    A.   Criminal investigator.
20    Q.   Where is your office located?
21    A.   At 135 South LaSalle.
22    Q.   What floor?
23    A.   The 8th floor.
24    Q.   Is it in the Bank of America space?

2 (Pages 2 to 5)

BECKMAN, JESSICA
February 21, 2014

Page 6

1      A.    Yes.
2      Q.    And who is your immediate
3  supervisor?
4      A.    David Flynn, F-L-Y-N-N.
5      Q.    Do you know his title?
6      A.    BSI senior investigator. BSI stands
7  for background screening investigations. Senior
8  investigator.
9      Q.    What type of investigations do you
10  do for Bank of America?
11      A.    I do criminal background checks for
12  new hires, also current associates that are being
13  rescreened for certain criminal criteria that they
14  have to adhere to depending on their position.
15      Q.    When did you start doing work for
16  Bank of America?
17      A.    November of 2012.
18      Q.    And do you have an office phone
19  number?
20      A.    Yes, (312) 828-7115.
21      Q.    And what is your highest level of
22  education?
23      A.    Masters in industrial psychology. A
24  master's degrees.

Page 7

1      Q.    From where?
2      A.    Roosevelt University in Chicago.
3      Q.    When did you graduate? When did you
4  obtain your degree?
5      A.    Goodness. 2009, I believe.
6      Q.    And where did you do your undergrad?
7      A.    University of Iowa.
8      Q.    Psychology?
9      A.    Yes.
10      Q.    When did you graduate from there?
11      A.    May of 2005.
12      Q.    Okay. December of 2010 who were you
13  employed by?
14      A.    That was when I was employed with
15  USIS as a government contractor for immigration.
16      Q.    So you said USIS. Do you mean the
17  Bureau of Immigration and Customs Enforcement?
18      A.    No. USIS is US Investigative
19  Services. That is who employed me as a contractor
20  for immigration. So I was a government contractor
21  for immigration. I was not an employee of INS or
22  ICE as it's now called.
23      Q.    When did you first start working for
24  USIS?

Page 8

1      A.    It was January 2010, I believe.
2      Q.    And when did you stop working there?
3      A.    The same month I started at Bank of
4  America. So November 2012.
5      Q.    And your purpose for leaving?
6      A.    New position. Voluntary.
7      Q.    And as a contractor with USIS for
8  the Bureau of Immigration and Customs Enforcement,
9  what did you do?
10      A.    I assisted the immigration agents in
11  putting packages like this together in order to
12  help them make a decision as to whether or not to
13  place a detainer on individuals in custody.
14      Q.    And when you say like this, you're
15  referring to the first page of what we've marked
16  as Government Exhibit Beckman 1?
17              (Document marked as Government
18              Exhibit No. 1 for
19              identification.)
20  BY THE WITNESS:
21      A.    Yes.
22  BY MR. KUHN:
23      Q.    And you say you would assist putting
24  the package together, what exactly did you do?

Page 9

1      A.    Sure. We had -- I'm trying to
2  phrase it clearly and concisely. We had a
3  computer system over which what we called hits
4  would come through the computer for individuals
5  recently arrested across the entire country who
6  were suspected of -- whose status was
7  questionable, whose citizenship status was
8  questionable for whatever reason whether they had,
9  you know, a Green Card that looked fake or, you
10  know, a fake Social Security Number.
11              We would get those hits as we
12  call them over the computer. We would be provided
13  with identifiers such as their FBI number, state
14  ID number, Social Security Number, name, country
15  of birth, et cetera -- given country of birth and
16  we would then access their rap sheets, their
17  criminal history, as well as other -- their other
18  identifiers through computer databases, computer
19  systems, things like trying to validate their
20  Social Security Number.
21              We would then printout the
22  results of our research and put them in a package
23  such as this Exhibit A and present those packages
24  and we would then sign the packages to indicate to

BECKMAN, JESSICA
February 21, 2014

Page 10

1   the agents who completed the package. We would
2   then provide the immigration agents with this
3   package with all of the information. The
4   immigration agent would then determine whether or
5   not they were going to detain this individual and,
6   if so, they would create a detainer in the system
7   and lodge that detainer.
8       Q.   Who was your immediate supervisor?
9       A.   His name was Craig Thompson. He is
10  no longer there. He is in Maryland. I do have --
11  I can get his contact information if you need it,
12  but Craig Thompson was his name.
13      Q.   And did he also work for USIS?
14      A.   Yes.
15      Q.   Was there anybody who was employed
16  by the government that you worked for that
17  supervised your work?
18      A.   No.
19      Q.   You talked about you got these --
20  you would get hits over a computer system. Do you
21  know what the computer system was that provided
22  you with the hits?
23      A.   It's called TECS, T-E-C-S. That is
24  also the same system that we accessed the rap

Page 11

1   sheets through.
2       Q.   And these people that you received
3   the hits on were they all criminals?
4       A.   They were -- they were in custody.
5   They were recently arrested so they were in
6   custody of the jail.
7       Q.   So they were all in custody?
8       A.   So I hesitate to call them
9   criminals. They were only arrestees.
10      Q.   I think that is an appropriate
11  clarification. And did you just do arrestees in
12  Illinois or was it nationwide?
13      A.   No, we covered about 25 states. Not
14  every state, but I would say about 20, 25 or 26
15  states we covered. We meaning Secure Communities,
16  which is the operation that placed detainers like
17  this, the operation that I worked for. It was a
18  specific branch within immigration called Secure
19  Communities.
20      Q.   So if I understand it correctly, the
21  way it worked is you would get a hit or a
22  notification over the TECS system that someone was
23  in custody who had -- whose immigration or
24  citizenship status was in question or could be

Page 12

1   affected by their involvement in the criminal
2   justice system?
3       A.   Correct.
4       Q.   And then you would gather whatever
5   information you could get from computer databases
6   and put all that together and forward that on to
7   your supervisor or somebody in ICE?
8       A.   We would give them directly to the
9   agents. There would be about five agents there at
10  one time, you know, for that shift. Our shifts
11  were 24/7. So we were first shift, second shift,
12  third shift. This is a 24/7 operation and we gave
13  the packets directly to the agents.
14      Q.   What shift did you work generally?
15      A.   Second shift. 2:00 p.m. to
16  10:00 p.m.
17      Q.   Always or was that rotating or based
18  upon need?
19      A.   They started rotating it right after
20  I left, but, no, I was pretty much that same shift
21  for most of the three years that I worked there.
22      Q.   Did you work for the same agents all
23  the time or did they rotate?
24      A.   They rotated.

Page 13

1       Q.   So did you work with an ICE agent
2   named Giuseppe DiMaggio?
3       A.   Yes.
4       Q.   When you did this Secure Communities
5   work, where were you physically located?
6       A.   It was 535 I believe -- 100 West
7   Congress was the official address.
8       Q.   536 South Clark?
9       A.   Yes, 536 South Clark or 101 West
10  Congress. Same building. Fourth floor, I
11  believe, in a cubicle office space.
12      Q.   In putting together the packages
13  that you would forward to the agents, did you
14  speak with -- did you interview anyone -- in
15  your -- let me rephrase that.
16          In your job as -- when you got a
17  hit on somebody and you went through the computer
18  databases and got information, would you ever
19  interview that person?
20      A.   No.
21      Q.   Have you ever been to Stateville
22  Prison in Joliet?
23      A.   No.
24      Q.   Let's take a look at Exhibit No. 1

BECKMAN, JESSICA
February 21, 2014

Page 14

1    here, Beckman 1. This first page it is entitled
2    SC/Deport Center Processing Sheet, correct?
3        A.    Correct.
4        Q.    And there is some -- what appears to
5    be some handwriting on this page?
6        A.    Yes.
7        Q.    Is some or all of it yours?
8        A.    Some is mine.
9        Q.    Some of the information on the sheet
10   is typewritten?
11       A.    Yes.
12       Q.    Did you do -- was any of the
13   typewritten information on here provided by you?
14       A.    Yes.
15       Q.    So let's talk about this from the
16   beginning. You, in general, receive a hit or a
17   notification and then do you receive a sheet such
18   as this first page or do you generate it?
19       A.    We generate this. This sheet is
20   completely blank. We have many copies of this
21   obviously. It is completely blank and we fill out
22   the top portion and the checkmarks and the event
23   number and then we circle where the hit came from
24   such as source, case, if they're in custody and

Page 15

1    that's it. We just sign our name and other than
2    that it goes to the agent.
3        Q.    Well, the FBI number, do you insert
4    that in there?
5        A.    Yes.
6        Q.    Next to charge, it says res, R-E-Z,
7    berg, residential burglary?
8        A.    Yes.
9        Q.    Is that handwritten by you?
10       A.    Yes.
11       Q.    That's your handwriting?
12       A.    Yes.
13       Q.    Over on the right it says logged by
14   it looks like CW CW, do you know what that means
15   or who put that on there?
16       A.    That is not my handwriting. That is
17   the -- I know who that is. That is the
18   contractor. What we do is we log every single hit
19   in our system just on an Excel spreadsheet. We
20   just log it so we can easily find the events and
21   the event numbers. That just means that it was
22   logged in the Excel spreadsheet for a hit that
23   came through by the contractors, by the government
24   contractors. We did that.

Page 16

1        Q.    Okay. Date, that is typed in by
2    you?
3        A.    Yes.
4        Q.    Coverage time -- or coverage
5    area/time, what does that mean?
6        A.    That is whether or not we were
7    covering that county. Certain counties we only
8    cover during specific times say from 5:00 p.m.
9    until 8:00 a.m. the next morning when jailers are
10   not there, when everyone goes home. We cover them
11   after hours. So that means we were covering that
12   county at that time.
13       Q.    Okay. Location is typed in Will
14   County Stateville Correctional?
15       A.    Yes.
16       Q.    So when you received the hit, this
17   particular person was at Stateville in Joliet?
18       A.    Yes.
19       Q.    And handwritten in slash Vienna
20   Correctional Center? Is that your handwriting
21   there?
22       A.    Yes.
23       Q.    And do you recall why that -- why
24   you would do that?

Page 17

1        A.    I believe there are -- well, there
2    is only one Stateville facility, correct, I
3    believe. So I believe I wrote that there because
4    that's where the person was housed. I don't
5    recall completely.
6        Q.    Okay. Because in Illinois it has
7    changed from time to time, but currently they
8    intake at Stateville, all the prisoners at least
9    that come from the Chicago area, and then end up
10   there and they're designated elsewhere, could
11   Vienna be the place he was designated?
12       A.    Yes.
13       Q.    Phone number you wrote those in
14   there as well?
15       A.    Yes.
16       Q.    And those appear to be from
17   downstate where Vienna is located?
18       A.    Yes.
19       Q.    Subject name typed in Sergey
20   Mayorov?
21       A.    Yes.
22       Q.    And on that same line there is
23   handwritten M18346, that is his Illinois inmate
24   number?

5  (Pages 14 to 17)

L.A. Court Reporters, L.L.C.
312-419-9292

BECKMAN, JESSICA
February 21, 2014

Page 18

1    A.    Correct.
2    Q.    And then also known as you just put
3  in his name without his middle name?
4    A.    Yes.
5    Q.    Alien number, that is from his INS
6  file?
7    A.    Yes.
8    Q.    DOB is date of birth?
9    A.    Yes.
10   Q.    And COB is country of birth?
11   A.    Yes.
12   Q.    Belarus. And you typed all that
13  information in there?
14   A.    Yes.
15   Q.    Where do you get the information
16  when you type it in there?
17   A.    From the database checks if the hit
18  doesn't indicate on there. The hits often -- I
19  take that back. The hit will usually say the
20  country of birth, the date of birth and the name.
21  The alien number we get from our system database
22  check usually, but, again, sometimes the hit would
23  have the alien number on there. So sometimes the
24  hit had all of this information or we retrieved

Page 19

1  this information from our database checks.
2    Q.    Okay. Then if we move to the middle
3  of this page on the left-hand side it says
4  "AS8 '05," do you know what that mean?
5    A.    Asylee status as of 2005. I would
6  assume that is what that means. AS is asylee
7  status.
8    Q.    In the box entitled mandatory
9  fields, there is handwriting in there. With the
10  exception of the reviewing supervisors, is that
11  all your handwriting?
12   A.    Yes.
13   Q.    Now, source, I think you already
14  told us that means Secure Communities?
15   A.    Yes.
16   Q.    What do the other ones mean, if you
17  know?
18   A.    LEA means law enforcement agency;
19  BOP means Bureau of Prisons, CIS is Citizen and
20  Immigration Services, FBNM I don't recall at this
21  time, CAP is another division of immigration, ICE.
22  I don't recall what it exactly stands for.
23   Q.    I think it means Criminal Alien
24  Program?

Page 20

1    A.    Correct. That's right.
2    Q.    So source that is where you got the
3  information that caused you to start putting
4  together the packet?
5    A.    Yes.
6    Q.    So sometimes you'll get a referral
7  from a law enforcement agency?
8    A.    Yes.
9    Q.    Or the Bureau of Prisons --
10   A.    Yes.
11   Q.    -- CIS? Okay. Custody that
12  means -- Y is circled. I assume that means yes?
13   A.    Yes, that means he was in custody at
14  the correctional center.
15   Q.    On the right side, it says Case: IAR
16  is circled?
17   A.    Yes.
18   Q.    Do you know what IAR means?
19   A.    IAR means a hit that was based on
20  fingerprints rather than just a name and date of
21  birth search. It means that his fingerprints were
22  taken and sent to the FBI and then to us.
23   Q.    Do you recall what the other ones
24  mean MAN, CALL, CDI?

Page 21

1    A.    Manual was a -- means they manually
2  sent us the hit, meaning they included the name
3  and date of birth and just manually sent it
4  through and it was not based on fingerprints. A
5  call means a call from an arresting agency with
6  their information. We received a call from them.
7  CDI, I don't recall. Update, I don't recall. And
8  duplicate, D-U-P-L, stands for duplicate.
9  Sometimes we would just get duplicate hits in
10  error or for whatever reason and that just means
11  it was a second hit, but we still had to log it so
12  we circled that.
13   Q.    File, there is three numbers and NA
14  is circled. What do those numbers indicate, if
15  you remember?
16   A.    I don't recall completely. I
17  believe -- I don't recall what those file numbers
18  are. I know that NA means there was no -- none of
19  those files were included in the packet, but I
20  don't recall what those exact file numbers are.
21   Q.    Next it says required checks, what
22  are required checks?
23   A.    The four mandatory checks that we
24  are required to complete when receiving a hit.

6 (Pages 18 to 21)

BECKMAN, JESSICA
February 21, 2014

Page 22

1    Q.   Okay.  The first one CIS, what does
2  that check entail?
3    A.   Citizenship immigration services.
4  That was a system in which we checked the alien
5  registration number, the A-number, and if results
6  came up positive or we were able to populate a
7  result we would check positive as is checked on
8  this sheet.
9    Q.   Is that Central Index System?
10   A.   Yes.  I'm sorry.
11   Q.   And so that means you went to check
12 the CIS database and it was positive for
13 Mr. Mayorov?
14   A.   Yes.
15   Q.   Okay.  What is the claims check?
16   A.   Claims is checking for visas.
17 Things like if they had a temporary visa,
18 temporary status, a visa of any kind basically.
19   Q.   TECS, T-E-C-S, that is checking the
20 TECS computer?
21   A.   Yes.  And then 16 is the rap sheet,
22 the criminal history, and this is checked
23 positive.  So we were able to retrieve a rap
24 sheet.

Page 23

1    Q.   What is number four ENFORCE and/or
2  EARM?
3    A.   That is the system we use to input
4  the events into what we call events.  That is the
5  system we use to log each hit.  That is also the
6  system in which they place -- they create -- they
7  generate and place -- printout the detainers to
8  place.  If it is checked positive, that means we
9  were able to find a previous event created for
10 this person.
11   Q.   Now, the next line says detainer
12 placed yes or no, is that something you fill out
13 or someone else does?
14   A.   It looks like -- it changed while I
15 was there, but it looks like this is what I
16 circled.  At this time in 2010, the agents would
17 printout the detainer, place -- fill out the
18 detainer, fax the detainer, give the sheet back to
19 us, we would complete filling it out for logging
20 purposes and then turn it into be logged.
21   Q.   Okay.  So the circle around the Y
22 for yes is done after the ICE agent makes the
23 determination?
24   A.   Correct.

Page 24

1    Q.   NCIC level, what is that?
2    A.   That was a system that we put in
3  place to determine their criminal level what we
4  called it.  One being the most egregious offenses
5  to being, you know, a little bit lower down and
6  three being the least egregious.  So the criminal
7  information that this particular hit was based on
8  was the highest level, which I'm assuming was
9  residential burglary as written on the top.
10   Q.   What is the event number?
11   A.   That is when we create the event in
12 ENFORCE it generates an event number and that's
13 what we write on the sheet just for login purposes
14 for future reference to be able to go back and
15 look at the event.
16   Q.   Immigration status you circled LPR,
17 which stands for lawful permanent resident?
18   A.   Yes.
19   Q.   How did you determine that?
20   A.   Through by the database checks if
21 we're able to retrieve a Green Card or if the
22 agent -- and/or if the agent interviews them over
23 the phone and determines that they are of legal
24 permanent status then we circle that.

Page 25

1    Q.   Then you printed your name and
2  signed it?
3    A.   Yes.
4    Q.   You probably signed a lot of these?
5    A.   Yes.
6    Q.   And who is your supervisor who -- or
7  the supervisor that signed this?
8    A.   That is Calvin Thompson who signed
9  this.  He was not my direct supervisor.  He was
10 the supervisor for the immigration agents.  So
11 after the immigration agents would place the
12 detainer and we would fill out the packet
13 completely, an ICE supervisor would review it and
14 make sure everything was, you know, legit and sign
15 off on it.
16   Q.   And he was a federal government
17 employee?
18   A.   Yes.
19   Q.   Then the first line in the comment
20 says "detainer by DiMaggio," that looks like it is
21 written by you?
22   A.   Yes.
23   Q.   And you wrote that after Agent
24 DiMaggio determined to put a detainer on him?

7 (Pages 22 to 25)

BECKMAN, JESSICA
February 21, 2014

Page 26

1      A.   Yes.
2      Q.   The next two lines it looks like it
3  says "In narrative, mention convicted for
4  residential burglary and issue a detainer. Create
5  a new event," is that your handwriting or someone
6  else's?
7      A.   No, that is not my handwriting. I
8  believe that is DiMaggio's, but I can't be sure.
9  I'm only assuming since he placed the detainer
10 that he wrote that.
11     Q.   Was that a common or an uncommon
12 event for an ICE agent to actually write something
13 in the comment section?
14     A.   Very common.
15     Q.   All right. If we turn to the page
16 marked number two — two, three, four and five, is
17 this the TECS information that you spoke about
18 previously?
19     A.   Yes. This is the hit, what a hit
20 looks like.
21     Q.   So at the time you completed page
22 number one, you had this information in your
23 possession?
24     A.   Yes.

Page 27

1      Q.   And then look at pages number six
2  and seven. I recognize this as a printout from
3  the Illinois Department of Corrections website?
4      A.   Yes.
5      Q.   Do you do that as well.
6      A.   Yes.
7      Q.   So you went to IDOC whatever their
8  site is and printed out the inmate locator for
9  Sergey Mayorov?
10     A.   Yes.
11     Q.   And then if we look at pages 8, 9,
12 10, 11, 12, 13, 14, 15 all the way up to 18 this
13 is — pages 8, 9, 10 are — these are from the
14 Central Index System?
15     A.   Yes.
16     Q.   And you pull these off of that
17 computer system?
18     A.   Yes, CIS.
19     Q.   And this information told you that
20 Mr. Mayorov was a lawful permanent resident?
21     A.   Yes.
22     Q.   And then if we look at pages 11 and
23 12, it says "claims mainframe system," do you know
24 where this information was from?

Page 28

1      A.   Yes, this was the claims check as
2  indicated on the first page, number two. It
3  indicates any forms, visas that the individual has
4  under their name.
5      Q.   Okay. So if we look on page 11, it
6  says he has a Form I-765 and an I-485?
7      A.   Yes.
8      Q.   Do you know what those forms are?
9      A.   I don't recall right at the moment,
10 no.
11     Q.   At the time?
12     A.   At the time, I knew. I believe
13 I-485 may be a Green Card.
14     Q.   Status?
15     A.   Yeah, I don't recall at this time.
16     Q.   Page 12 this is also from the claims
17 system?
18     A.   Yes.
19     Q.   Page 13?
20     A.   Yes, this appears to be a shot of
21 their Green Card.
22     Q.   And then 14 through 18 this is from
23 the NCIC system?
24     A.   Yes, this is their rap sheet.

Page 29

1      Q.   And that is NLETS, National Law
2  Enforcement something?
3      A.   Yes.
4      Q.   In fact, on page 14, it has your
5  name on it?
6      A.   Yes, that is -- that means the
7  person who ran the check in that system.
8      Q.   So if we go down to page 19, there
9  is an unsigned I-213, was this part of the packet
10 or is this generated later?
11     A.   This is generated later.
12     Q.   So you basically put together pages
13 1 through 18?
14     A.   Yes.
15     Q.   And presented them to Mr. Thompson
16 who approved it?
17     A.   No.
18     Q.   Okay.
19     A.   To DiMaggio. I presented -- we
20 would give the packages to the agents on a
21 rotating basis to even them out. No, I gave them
22 directly to DiMaggio who completed the detainer
23 whatever was required. He gave it back to me and
24 I finished filling out the information, make sure

8  (Pages 26 to 29)

BECKMAN, JESSICA
February 21, 2014

Page 30

1   the cover sheet was complete basically and then I
2   gave it to Calvin Thompson who would review
3   everything.
4       Q.      And after that you were done with
5   this?
6       A.      Correct.
7       Q.      It never came back to you, you
8   didn't have to recheck anything, do any follow up?
9       A.      Correct.
10      Q.      You go onto the next hit?
11      A.      Correct.
12      Q.      Take a look at page 19. That's the
13  I-213. This was done by the ICE agent? You have
14  no role in this one?
15      A.      Correct.
16      Q.      And if we look at pages 20 and 21.
17  That is -- page 20, this is the immigration
18  detainer for Mr. Mayorov.
19      A.      Correct.
20      Q.      It appears to have some of your
21  handwriting on it?
22      A.      Yes.
23      Q.      In what condition is this when you
24  receive it?

Page 31

1       A.      When I receive it, it is signed by
2   the agent. It is generated, filled out by the
3   agent. Those check boxes are filled out by the
4   agent. I receive it and at the time we would
5   sometimes fax them, fax the detainers for the
6   agents. So I would if -- because they normally
7   didn't know the fax number to these places. So
8   they would give them back to us and we would fax
9   them and that fax number was filled out by me.
10  The (312) 347-2447 is just the phone number of the
11  operation that we were in in case the agency had
12  any questions and the IDOC number at the top is
13  written by me just for reference for the facility
14  obviously to identify the individual.
15      Q.      And all the typed information is
16  provided by the ICE agent?
17      A.      Correct.
18      Q.      And if we look at page 21 of the
19  exhibit, this shows that you faxed this down to
20  (618) 658-3609 --
21      A.      Correct.
22      Q.      -- sometime on March the 16th?
23      A.      Correct.
24      Q.      And then what do you do with the

Page 32

1   detainer after you fax it?
2       A.      We include it with the packet and,
3   again, we just make sure the cover sheet is filled
4   out and provided to Calvin Thompson or whatever
5   supervisor was on duty to approve everything.
6   Actually, I take that back. The supervisor would
7   usually look at the detainer first just to glance
8   it over before it was sent and then actually sign
9   it after everything was completed.
10      Q.      And if we look at pages 22 and 23,
11  what is actually marked Government Beckman 2, this
12  is actually the cancellation of the detainer for
13  Mr. Mayorov and the fact sheet, did you have any
14  role in canceling his detainer?
15              (Document marked as Government
16              Exhibit No. 2 for
17              identification.)
18  BY THE WITNESS:
19      A.      No.
20  BY MR. KUHN:
21      Q.      So have you ever met Mr. Mayorov?
22      A.      No.
23      Q.      You've never spoken to him on the
24  phone?

Page 33

1       A.      No.
2           MR. KUHN: That's all I have
3   actually.
4           MR. RAJADURAI: Can we take a quick
5   break to kind of discuss what we need to cover?
6           MR. KUHN: Sure.
7               (Whereupon, a break was taken
8               after which the following
9               proceedings were had.)
10      CROSS      EXAMINATION
11          BY MR. RAJADURAI
12      Q.      Jessica, my name is Abiman
13  Rajadurai. I'm one of the attorneys for Sergey
14  Mayorov and Rick Fleming is here with me also. I
15  have some follow-up questions and additional
16  questions for you.
17      A.      Sure.
18      Q.      You graduated in 2009, correct?
19      A.      Yes, I believe it was 2009.
20      Q.      Did you have any positions before --
21  between graduation and when you started in January
22  of 2010?
23      A.      Yes, I worked at the Grand Lux Cafe
24  as a server.

9 (Pages 30 to 33)

BECKMAN, JESSICA
February 21, 2014

Page 34

1    Q.    That's here in Chicago?
2    A.    Yes.
3    Q.    And with your company USIS, do you
4  know what tasks they help the government with
5  overall, not just including your own job?
6    A.    No.
7    Q.    You don't know what other areas they
8  helped out with other employees?
9    A.    I mean, not particularly. No. I
10 know they do background investigations for
11 different branches of the government, but I don't
12 know in detail.
13   Q.    And what was your first title when
14 you got started with that company?
15   A.    Investigative analyst.
16   Q.    And what were your responsibilities
17 under that title?
18   A.    Basically just everything that I've
19 gone over. We monitor the computer, print off the
20 hits, put together packages for the agents and
21 assist the agents in the paperwork. Basically
22 administrative duties.
23   Q.    How long were you in that position?
24   A.    Three years.

Page 35

1    Q.    You didn't have any other titles
2  during that three year time span?
3    A.    No.
4    Q.    Did you have any people that you
5  supervised in that capacity?
6    A.    No.
7    Q.    How big was your department?
8    A.    There were about 20 government
9  contractors.
10   Q.    Were they all located in that same
11 building on Congress?
12   A.    Yes.
13   Q.    Did you receive training when you
14 started at USIS?
15   A.    Yes.
16   Q.    What were the topics of those
17 trainings?
18   A.    We are in Vermont for about two
19 weeks. The topics covered mainly just the
20 different databases, familiarizing ourselves with
21 the different databases and how to navigate those
22 databases. A couple of days were spent on general
23 immigration law, but only in a very general way.
24   Q.    Do you happen to remember any of the

Page 36

1  topics about the immigration law?
2    A.    Not offhand, no.
3    Q.    Do you remember if you received any
4  materials as part of that training?
5    A.    I'm sure we did. I don't recall
6  exactly what they were and I no longer have that
7  paperwork, but I'm sure there were some training
8  manuals involved.
9    Q.    And you said that was two to three
10 weeks, is that right, when you first get started?
11   A.    Two weeks when we first got started,
12 yes.
13   Q.    Did you receive any further training
14 once you returned back here to Chicago?
15   A.    No, only on the general protocol of
16 our specific office location. We had offices --
17 Secure Communities had offices at the time in
18 Chicago, Miami and California. Just recently they
19 all moved to California. So they are no longer in
20 Chicago, but, you know, only on the getting to
21 know the agents and, you know, general, like I
22 said, protocol of our specific office.
23   Q.    Do you recall receiving any other
24 immigration law training once you returned back to

Page 37

1  Chicago?
2    A.    No.
3    Q.    Can you explain what an immigration
4  detainer is?
5    A.    In my best words, it is a -- it is
6  not an order because the arresting agency doesn't
7  have to adhere to it, but it is a recommendation
8  by the ICE agent to detain the individual for 48
9  hours so that they may be transferred over to ICE
10 custody.
11   Q.    Was that a topic that you might have
12 covered at your two to three week training?
13   A.    Yes.
14   Q.    Turning to Government Exhibit 1,
15 which you have in front of you. I'm going through
16 this list. You talk about the four systems that
17 are numbered there. Were there any other systems
18 that provided you with information?
19   A.    Yes, such as public search sites
20 like IDOC was, you know, not a required system.
21 There was a Social Security Number validator, you
22 know, website. Yes, there were a couple other
23 websites that we would check, but they're only
24 public, you know, search websites.

10  (Pages 34 to 37)

BECKMAN, JESSICA
February 21, 2014

Page 38

1    Q.    Would you check those websites for
2  every hit that you received?
3    A.    No, not every single hit.  Only if
4  necessary.  Only if we felt it was necessary to
5  gather more information.
6    Q.    Is there anything on this form that
7  you recall that would trigger a need for extra
8  investigation into this case?
9    A.    No, other than the printout of the
10 IDOC with his picture and his IDOC number, no.
11   Q.    We referenced earlier a note on the
12 left side of that Form AS8 '05, is that your
13 handwriting?
14   A.    Yes.
15   Q.    Do you recall why or what that
16 stands for?
17   A.    Yes, that is taken directly from the
18 first page of the CIS printout page eight.  Next
19 to CO colon it says AS8, which I believe stands
20 for asylee status.  I don't recall what the 8 -- I
21 just know that status refers to an asylee.
22 So we -- that is where that information is coming
23 from.  The reason I wrote it on the front page is
24 just for quicker reference for the agent.

Page 39

1    Q.    Sure.  And would that status
2  represent an individual or could it be attached to
3  someone they were related to?
4    A.    That is attached to the individual
5  based on the Central Index System results.
6    Q.    Okay.
7    A.    Yes, attached to the individual.
8    Q.    And do you have any recollection of
9  whether that status could be related, not just
10 this case, but any case to anyone else's family
11 member or to only the individual who was searched
12 for by the system?
13   A.    In my experience, especially when a
14 hit was based on fingerprints, it only related to
15 the individual.  Of course, there were cases where
16 people would have their same father's name and we
17 would need to validate their identity.  That is
18 done, you know, like in the interviews we
19 mentioned earlier, but in this case, you know,
20 best evidence suggests that since it was based on
21 fingerprints that was him.
22   Q.    Okay.  And then if you go down to
23 immigration status it is circled LPR?
24   A.    Yes.

Page 40

1    Q.    And where would you receive that
2  information?
3    A.    From the same page, from that same
4  CIS page where it says that he has a card in the
5  lower right-hand corner under other information.
6    Q.    What page number was that?
7    A.    Page eight.  And also just knowing
8  that AS8 is LPR status.  It is a legal permanent
9  resident status just knowing that from our
10 training.
11   Q.    There is an option there on the form
12 to select United States citizen, correct?
13   A.    Yes.
14   Q.    And, in this case, did you see any
15 information that would call for you to circle that
16 instead of the LPR status?
17   A.    No.
18   Q.    Did you have any duty to investigate
19 whether an individual might have been a United
20 States citizen?
21   A.    No.  Beyond this paperwork, no.  No
22 interviews or anything like that beyond this
23 paperwork.  Nothing suggested he was a US citizen.
24   Q.    On the CIS report, you know, we have

Page 41

1  a printout here.  Is any of this information --
2  can you click on any of this information that is
3  provided to get further information, other data?
4    A.    It is not a web-based.  So you can't
5  click on anything.  If you go up to the command
6  bar, you can enter in, say, card to view their
7  card.  Under other information where it says EADS
8  and card, that means that information is available
9  so if you were to enter that into the command line
10 you would view their card, but, no, there is
11 nothing you can actually click on.  It is a
12 DOS-based system.
13   Q.    Would any of these hits result in
14 providing an alien number for an individual?
15   A.    The hits that we received from
16 the computer is where I got the alien number, I
17 believe.  Yes, on page four where it says ARN.
18 That was based on the individual's fingerprints.
19 That is the A-number that came back from the FBI
20 from, you know, running their FBI number.  We
21 would then input that A-number onto the command
22 line in CIS and the information would populate.
23   Q.    Do you receive any A-file that is
24 associated with the individual that you get the

11 (Pages 38 to 41)

BECKMAN, JESSICA
February 21, 2014

Page 42

1  hit on?
2      A.   No.
3      Q.   Did you ever look into an A-file for
4  any individual?
5      A.   No.
6      Q.   I think you mentioned earlier that
7  the immigration status line could be filled out
8  before or after --
9      A.   Yes.
10      Q.   -- the ICE agent had reviewed your
11  package of materials?
12      A.   Yes.
13      Q.   In this case, do you recall whether
14  this was done by you before or after?
15      A.   I don't recall obviously, but in
16  this case I probably circled it before I handed it
17  to the agent.  The agent that -- you know, the
18  circles are really just to help assist the agent
19  in immediately looking over the packet.  They're
20  obviously able to change that status at any time
21  in their own investigation, but this looks like it
22  was probably filled out before giving it to the
23  agent.
24      Q.   Okay.  If you wouldn't mind

Page 43

1  comparing the exhibits that you were shown
2  earlier, I think it is page 20.  If you compare
3  page 20 and page one.
4      A.   Yes.
5      Q.   Do you have any idea why there is a
6  difference of three months between the date the
7  report was finished, page one, versus the March
8  16th date on page 20?
9      A.   So the 12/30/2010 date and the
10  3/16/2011 date?
11      Q.   Yes.
12      A.   No, I actually don't recall why that
13  would be.  Normally detainers are placed the same
14  day.  So I don't actually recall.
15      Q.   And, to your recollection, do you
16  remember being involved with this certain hit
17  between December 30th, 2010, and March 2011?
18      A.   No, not at all.
19      Q.   Okay.  And then if we confirm all
20  the reports -- four reports you discussed earlier
21  in the data that we have -- just TECS.  I'm sorry.
22  I take that back.  The TECS report pages two to
23  five, I believe.
24      A.   Ask the question again.

Page 44

1      Q.   The TECS report is page two to five.
2      A.   That's the hit?
3      Q.   Right.
4      A.   Yes.
5      Q.   What date was that done?
6      A.   12/30/2010.  It says that is the
7  date at the top that we received the hit.  So that
8  would have been the date that we received the hit.
9  And, you know, come to think of it sometimes these
10  individuals would be in custody for a couple of
11  months fulfilling their charges or awaiting trial
12  or for whatever reason.  Obviously this is
13  Stateville so they wouldn't just be there for a
14  day.  They would be in custody for years
15  sometimes.
16          So if we would know that this
17  person was in custody for months, the agent would
18  obviously not need to place a detainer that same
19  day.  That's the best way that I can remember it
20  is they probably waited three months because they
21  knew he would be in custody for three months and
22  it just wasn't necessary to place it that exact
23  same day.  So that would make the most sense as to
24  why it was three months later.

Page 45

1      Q.   And then could you identify, again,
2  what the documents are between pages 8 and 15
3  of -- 8 and 13.  Sorry.
4      A.   Eight is the Central Index System
5  results that populated when I entered in his alien
6  registration number.  Page nine is the status
7  history so it looks like he applied for a visa
8  back in 2003 and received status in 2005.  That is
9  the things he applied for.  Page ten, it looks
10  like it is the employment authorization and page
11  11 was forms that he has under his name.  Page 12
12  it looks like the I-485, which was the card.  It
13  says cards produced, the Green Card.  And page 13
14  is a screen shot of the actual information on the
15  Green Card.
16      Q.   And do these six pages show you the
17  date you would have run that report or called for
18  that report?
19      A.   No, I don't recall.  I know the date
20  says 3/8/11, but that wouldn't have been -- I
21  wouldn't have run it on the same day.  So perhaps
22  for this individual they were actually run by the
23  agent on 3/8/11 or just reprinted off on that day.
24  But, no, it should have been the same day that the

12  (Pages 42 to 45)

BECKMAN, JESSICA
February 21, 2014

Page 46

1    checks were run by myself on 12/30/2010.
2        Q.    Okay. And then the final pages is
3    15 through 19, would that have been something you
4    ran on the same date?
5        A.    Yes.
6        Q.    And then as far as you know, is it
7    typical for an ICE agent to rerun this?
8        A.    Sometimes.
9        Q.    Why would they do that?
10       A.    If it was printed out for them,
11   there would be no reason for it, but sometimes
12   they would rerun it just to review it again just
13   to make sure there was nothing they missed. There
14   is no real reason they would have to, but maybe
15   they just wanted to print it off again.
16       Q.    And then I see if we turn back to
17   page 18 this document says it was received from
18   NLETS March 8th, 2011, do you see that?
19       A.    Yes.
20       Q.    Do you have -- if you turn to page
21   15, do you see it says "date received 12/28/2010"
22   about halfway down the page?
23       A.    Yes.
24       Q.    Do you have any idea why there would

Page 47

1    be two different dates?
2        A.    Date received I think is the date
3    that he was in custody of IDOC. The date he was
4    arrested.
5        Q.    And still on page 18 it says -- 14.
6    Sorry. It says it was -- you see your name on
7    that?
8        A.    Yes, on page 14.
9        Q.    Do you have any recollection of why
10   you would have run a report in March of 2011?
11       A.    No.
12       Q.    Is there any chance the system could
13   have incorrectly identified you?
14       A.    No. My best guess is sometimes when
15   we receive -- the date that we receive the packet
16   if they're in IDOC custody, we know they will be
17   there a while, we may not have even run the packet
18   until a little bit later. I know that sometimes
19   the IDOC packages were set aside just for this
20   reason because we would get so busy that the
21   people, you know, in immediate custody would have
22   to be run first. Again, we know that individuals
23   in IDOC custody would be there for months. So
24   once we would get a projected release date

Page 48

1    sometimes these packages would be set aside and
2    run later.
3             So now that I'm recalling that,
4    we used to do that sometimes for IDOC inmates.
5    That is my best guess as to why this happened this
6    way. My guess is we knew he would be released at
7    the end of March. We set aside the packet and
8    actually ran the system checks on 3/8/11.
9        Q.    Was it part of your job
10   responsibilities to interview an individual who
11   was subject to an investigation as to whether they
12   would be issued a detainer?
13       A.    No.
14       Q.    Did you ever make a determination if
15   a detainer would be issued?
16       A.    No.
17       Q.    Were you ever consulted to make a
18   recommendation as to whether to issue a detainer?
19       A.    No.
20       Q.    Was there anyone in your department
21   ever consulted?
22       A.    Not that I'm aware of.
23       Q.    Did you ever sign an immigration
24   detainer?

Page 49

1        A.    No.
2        Q.    Do you know if anyone at USIS,
3    including your superiors, was authorized to decide
4    a detainer issue?
5        A.    No.
6        Q.    Was that referred to in any policy
7    manual as far as you know?
8        A.    Yes, that was in the actual
9    contract.
10       Q.    Do you still happen to have a copy
11   of the contract?
12       A.    No.
13       Q.    To your recollection, did you ever
14   have any question about Mr. Mayorov's citizenship
15   when you filled out this form?
16       A.    Not that I recall, no.
17           MR. RAJADURAI: I was going to
18   introduce at least one exhibit here.
19           (Document marked as Plaintiff's
20           Exhibit No. 1 for
21           identification.)
22   BY MR. RAJADURAI:
23       Q.    I can give you a chance to look this
24   over. Have you ever seen that document before?

13 (Pages 46 to 49)

BECKMAN, JESSICA
February 21, 2014

Page 50

1    A.   No.
2    Q.   I guess that makes sense. Did you
3  guys ever receive memos from the government to
4  USIS --
5    A.   No.
6    Q.   -- during your time while you were
7  there?
8    A.   No.
9    Q.   Another exhibit, Exhibit No. 2.
10        (Document marked as Plaintiff's
11        Exhibit No. 2 for
12        identification.)
13  BY MR. RAJADURAI:
14    Q.   You can take a second to look at
15  that. Let me know when you're ready.
16    A.   I'm ready.
17    Q.   Have you ever seen this document
18  before?
19    A.   Yes.
20    Q.   When would you have ever seen this?
21    A.   When I -- this was part of the
22  ENFORCE database. EARM is a web-based branch of
23  ENFORCE. So, you know, I've seen documents like
24  this before. I don't recall obviously this exact

Page 51

1  document.
2    Q.   And you mentioned ENFORCE, can you
3  just give a general description of ENFORCE?
4    A.   Sure. ENFORCE was a database for
5  which we created the events as we call them for
6  each individual. It is just a way to log all of
7  their information, what we found in the packet,
8  and that's also where detainers are placed.
9    Q.   And do you know who would have
10  filled out this form?
11    A.   It is taken directly from ENFORCE.
12  So the information is directly populated into EARM
13  from ENFORCE.
14    Q.   So you were not involved in
15  preparing this?
16    A.   Correct.
17    Q.   And when would you have seen this in
18  your role at the company?
19    A.   I mean, we had access to this, you
20  know, at all times. We had access to ENFORCE and
21  EARM at all times. So once a detainer was placed,
22  once all the information is in there, we're able
23  to access it any time.
24    Q.   Once a detainer is placed, would you

Page 52

1  typically turn to the ENFORCE database to review
2  an individual's case file?
3    A.   No.
4    Q.   After a detainer is issued -- start
5  over. In your role, did you ever look into an
6  individual's file after a detainer was issued
7  against them?
8    A.   No, we did not have access to
9  A-files.
10    Q.   I think we briefly touched on this
11  earlier. If you turn back to Government
12  Exhibit 1, right there in front of you. On page
13  eight, this is a DOS system, but did you ever have
14  access to an individual's parent's information?
15    A.   Yes. On this, but only as it shows
16  on this page like their father's first name, their
17  mother's first name. So basically only their
18  first and last name of their parents would
19  populate in some of these databases.
20    Q.   Were you ever given training to pull
21  materials concerning another individual's family
22  members?
23    A.   No, not at all.
24    Q.   Would there be any circumstance you

Page 53

1  can think of a time you would look into an
2  individual's parent's citizenship information?
3    A.   No, the agents would do that, if
4  necessary.
5    Q.   Is it possible that the parent's
6  field wouldn't be populated?
7    A.   Is that -- I'm sorry. Ask the
8  question --
9    Q.   Is it possible that the parent's
10  field wouldn't have been populated here?
11    A.   Yes. Sometimes it was not
12  populated, yes.
13    Q.   And was there any duty for you to
14  further investigate an individual's family
15  connections?
16    A.   No.
17    Q.   Was there ever a situation when the
18  ICE agent would come back to you for you to
19  procure more information about an individual?
20    A.   Rarely.
21    Q.   In what cases would that happen?
22    A.   Only if one of the database checks
23  had not been done or if they needed, you know,
24  more research on something that they weren't able

14 (Pages 50 to 53)

BECKMAN, JESSICA
February 21, 2014

Page 54

1  to get themselves, but that was normally done by
2  them if they needed more printouts like this.
3  They would just do that themselves.
4      Q.   Okay.  And you said you were never
5  at Stateville Correctional?
6      A.   Correct, I have never been there.
7      Q.   Have you been to any of their
8  correctional facilities as part of your job
9  duties?
10     A.   No.
11     Q.   How frequent was your communication
12 with ICE agents?
13     A.   Constant.  We were in the same work
14 space.
15     Q.   Are you aware of whether ICE agents
16 at the Stateville Correctional Center interviewed
17 new inmates?
18     A.   I believe they do, but I'm not
19 familiar with how they -- how that prison system
20 works.
21     Q.   What was the role of the ICE agents
22 here that you worked with in the Stateville space?
23     A.   To review the information that we
24 would give them, interview the arrestees when

Page 55

1  necessary and place the detainers, if necessary.
2      Q.   Was there ever a case after an
3  interview that you had to change a citizenship
4  status from this processing sheet for an
5  individual?
6      A.   No, the agents would, again, do it
7  themselves.  They wouldn't ask that we change the
8  status on the sheet.  They would just do that
9  themselves.
10     Q.   Okay.  If there is no database
11 record on an individual, would you still print the
12 results?
13     A.   Yes.  The blank results, yes.
14     Q.   And then would you pass that packet
15 of information or the note --
16     A.   Yes.
17     Q.   You pass on the cover sheet?
18     A.   We would pass the printouts of the
19 blank information, the unpopulated information and
20 the cover sheet with the negative, you know,
21 searches checked to the agent.
22     Q.   Okay.  Do you know what happens to
23 the copies of the hard packet that you provide to
24 the agents after an immigration detainer is

Page 56

1  issued?
2      A.   They are logged into the system and
3  in the Excel spreadsheet and then filed in a file
4  room.
5      Q.   And that would be USIS?
6      A.   No.  At that location.  At the 101
7  West Congress location.
8      Q.   Based on the materials we have here,
9  do you know where Sergey's materials would be?
10     A.   No, they often change the location
11 of the files.
12     Q.   If a detainer is not issued, is that
13 information kept as well?
14     A.   Yes.
15     Q.   Same process?
16     A.   Yes.
17     Q.   I may have asked this not very
18 clearly earlier.  USIS, they had a contract with
19 ICE, is that correct?
20     A.   Yes.
21     Q.   And under that contract, do you know
22 what their obligations were, what tasks were
23 performed?
24     A.   I'm not sure I understand the

Page 57

1  question.
2      Q.   You mentioned background checks
3  earlier, was that the only tasks they were
4  contracted with ICE to perform?
5      A.   As far as I know, yes.
6      Q.   Do you know who replaced Craig
7  Thompson in his role?
8      A.   Yes, that was Katarina Olivari.
9  Again, she is no longer there.  They laid everyone
10 off there, but her name was Katarina Olivari.  She
11 replaced him for a very short time in the last
12 three months or so before they moved the
13 operations to California.
14         MR. RAJADURAI:  I don't have any
15 other questions.
16         MR. KUHN:  None.  Do you want to
17 read the transcript over and have a chance to make
18 any changes in case he missed anything?
19         THE WITNESS:  No, it's not
20 necessary.
21         MR. KUHN:  She'll waive.
22         AND FURTHER DEPONENT SAITH NAUGHT...
23
24

15  (Pages 54 to 57)

BECKMAN, JESSICA
February 21, 2014

Page 58

1          UNITED STATES DISTRICT COURT
           NORTHERN DISTRICT OF ILLINOIS
2              EASTERN DIVISION
3
4       I, Steven Brickey, Certified Shorthand
5   Reporter, do hereby certify that on the 21st day
6   of February, A.D., 2014, the deposition of the
7   witness, JESSICA BECKMAN, called by the Defendant,
8   was taken before me, reported stenographically,
9   and was thereafter reduced to typewriting under my
10  direction.
11      The said deposition was taken at 219 South
12  Dearborn Street, Chicago, Illinois, and there were
13  present counsel as previously set forth.
14      The said witness, JESSICA BECKMAN, was first
15  duly sworn to tell the truth, the whole truth, and
16  nothing but the truth, and was then examined upon
17  oral interrogatories.
18      I further certify that the foregoing is a
19  true, accurate, and complete record of the
20  questions asked of and answers made by the said
21  witness, JESSICA BECKMAN, at the time and place
22  hereinabove referred to.
23      The signature of the witness, JESSICA
24  BECKMAN, was waived by agreement of counsel.

Page 59

1      The undersigned is not interested in the
2  within case, nor of kin or counsel to any of the
3  parties.
4      Witness my official signature in and for
5  Cook County, Illinois, on this _____ day of
6  _____, A.D., 2014.
7
8
9
10
11      _____
       STEVEN BRICKEY, CSR
12     8 West Monroe Street
       Suite 2007
13     Chicago, Illinois 60603
       Phone: (312) 419-9292
14     CSR No. 084-004675
15
16
17
18
19
20
21
22
23
24

16 (Pages 58 to 59)