**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **SERGEY MAYOROV,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **No. 13 C 5249** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | **Judge Rebecca R. Pallmeyer** |
| | ) | |
| **Defendant.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff Sergey Mayorov, a United States citizen, pleaded guilty to residential burglary in Illinois state court in 2010. He received a four-year prison term but was placed in Illinois' "impact incarceration" program, an alternative sentencing program in which individuals serve just 120 days in "boot camp." An offender who successfully completes boot camp will be released from custody without having to serve a custodial prison sentence. Halfway through Mayorov's time in boot camp, United States Immigration and Customs Enforcement ("ICE") Officers issued an immigration detainer against him. The ICE detainer requested that the Illinois Department of Corrections ("IDOC") hold Mayorov up to an additional 48 hours after he would otherwise be released so that he could be detained by the Department of Homeland Security ("DHS") for investigation of whether he was lawfully present in the United States. Because ICE is prohibited as a matter of law from detaining United States citizens, however, the government had no authority to issue this detainer.

Under IDOC rules, a person subject to a detainer is not eligible to participate in boot camp, so Mayorov was transferred to a state prison, where he remained for about ten months before ICE cancelled his detainer, and IDOC reinstated him to boot camp. Mayorov completed the program successfully and was released from custody on April 14, 2012.

Mayorov brings this action pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq.*, and asserts claims of negligence and false imprisonment against the

Government for its actions in issuing a detainer against him. The detainer, he alleges, resulted in his spending 325 days in prison that he otherwise would not have served. The Government asserts various affirmative defenses that, if applicable, defeat Mayorov's claims. The Government also argues that Mayorov's claims fail on the merits. Both parties have moved for summary judgment. For the reasons that follow, the court concludes that the Government's affirmative defenses do not bar Mayorov's claims, but that the Government is entitled to summary judgment on Mayorov's claim of false imprisonment. Disputes of fact preclude summary judgment on his negligence claim, however. The Government's motion for summary judgment [32] is therefore granted in part and denied in part. Mayorov's motion for summary judgment in his favor on liability [29] is denied.

## BACKGROUND

Sergey Mayorov was born in 1990 in Belarus. (Pl.'s Local Rule 56.1 Stat. of Mat. Facts [31], hereinafter "Pl.'s 56.1," ¶ 6.) He immigrated to the United States in 1999 as a child of his asylee mother, then known as Tatyana Mayorova, and became a lawful permanent resident on July 22, 2005. (*See* Def.'s Resp. [42] to Pl.'s 56.1, ¶¶ 7–8.) Mayorov's mother became a naturalized United States citizen on March 22, 2007. (*Id.* ¶ 10.) On her N-400 naturalization application, Mayorov's mother listed Mayorov as a dependent minor who lived with her. (*Id.* ¶ 9.) She also elected to change her name from Tatyana Mayorova to Tanya May in her application. (*Id.* ¶ 10.) Because Mayorov was under eighteen years old and in the legal and physical custody of his mother at the time she naturalized, he automatically became a United States citizen the same day pursuant to the Child Citizenship Act of 2000 ("CCA"), *see* 8 U.S.C. § 1431(a).[1] (Def.'s Resp. to Pl.'s 56.1 ¶¶ 11–12.) Mayorov did not apply for a naturalization

---

[1]  8 U.S.C. § 1431(a) provides that "[a] child born outside of the United States automatically becomes a citizen of the United States when . . . (1) [a]t least one parent of the child is a citizen of the United States, whether by birth or naturalization; (2) [t]he child is under the age of eighteen years; and (3) [t]he child is residing in the United States in the legal and physical custody of the citizen parent pursuant to a lawful admission for permanent residence."

certificate, but the CCA confers citizenship automatically—a certificate is not required. (Pl.'s Resp. [37] to Def.'s Local Rule 56.1 Stat. of Mat. Facts [34], hereinafter "Def.'s 56.1," ¶ 9.)

On December 27, 2010, Mayorov pleaded guilty to residential burglary in the Circuit Court of Cook County and was sentenced to four years in prison. (Def.'s Resp. to Pl.'s 56.1 ¶ 19.) The sentencing judge recommended, however, that Mayorov participate in Illinois' "impact incarceration program," a program that sends qualified individuals to boot camp for 120 days in lieu of prison confinement. (*See id.* ¶¶ 18–20; Plea Colloquy, Ex. 20 to Pl.'s 56.1 [31-21], 7–9; Sentencing Order, Ex. H to Def.'s 56.1.) Upon successful completion of boot camp, Mayorov would be released from IDOC custody without having to serve any prison time. (Pl.'s 56.1 ¶ 19.)

On December 28, 2010, prior to entering boot camp, Mayorov was processed into IDOC's Stateville Correctional Center. (Def.'s Resp. to Pl.'s 56.1 ¶ 21.) There, two ICE officers, Mayra Reynoso and Jennifer Wall, interviewed Mayorov as part of Stateville's inmate intake procedures. (*Id.* ¶ 22.) In their depositions, Reynoso and Wall testified that they knew that Mayorov was designated for boot camp; they also knew that inmates who had immigration detainers lodged against them were not eligible to participate in boot camp. (*Id.* ¶ 23; s*ee* Reynoso Dep., Ex. 7 to Pl.'s 56.1 [31-7], hereinafter "Reynoso Dep.," 45:1–24; Wall Dep., Ex. 8 to Pl.'s 56.1 [31-8], hereinafter "Wall Dep.," 46:5–15.) An immigration detainer is a document issued by DHS that, among other things, asks a state or local law enforcement agency to detain an individual for up to 48 hours (excluding weekends and federal holidays) after the agency's detention authority has ended so that DHS can determine whether the person is lawfully present in the country. (*See* Detainer for Sergey Mayorov, Ex. N to Def.'s 56.1.)

There is conflicting evidence about whether Mayorov told Reynoso and Wall that he was a United States citizen. In his deposition, Mayorov does not explicitly say that he told the agents this (and was not directly asked about the matter), but he does make such an assertion in his affidavit. (Mayorov Affidavit, Ex. 22 to Pl.'s 56.1 [31-22], ¶ 3 ("During my processing at

Stateville [], I informed the ICE officers present that day, who[m] I have come to know were Officers Mayra Reynoso and Jennifer Wall, that I was a United States citizen.").  Neither agent remembers meeting Mayorov, but it is undisputed that they did in fact speak with him as part of the Stateville inmate intake procedures on December 28, 2010.  (*See* Wall Dep. at 49:23–50:2; Reynoso Dep. at 28:12–16; *see* Def.'s Resp. to Pl.'s 56.1 ¶ 22.)  Reynoso and Wall reviewed DHS's database entries for Mayorov and his mother, and Reynoso made a notation beside Mayorov's name on the inmate log explaining that she and Wall did not issue a detainer because Mayorov was a "Child of USC [U.S. citizen]."  (Def.'s Resp. to Pl.'s 56.1 ¶¶ 26–28.) Reynoso does not recall what led her to make this notation.  (Reynoso Dep. at 48:1–49:7.) Mayorov recalls that initially, either Reynoso or Wall was skeptical about his legal status:

. . .

> She said "I don't know for sure, but I don't see any paperwork on you.  It doesn't look like you're going to boot camp.  Let me go ask my boss.  Step into the next room over."  I stepped in there and the boss was a lady.  She started asking me what was my mom's name.  She found her in the system and then I don't know what she did.  She said[,] "What year did your mom become a citizen or naturalized?"  "It was '07. I was 16 back then[,]" and she said[,] "Oh, you were under 18 when your mom became naturalized?"  I said "Yeah."  She said[,] "You're fine."  I just signed some papers and I just went to the next physical, dental.

. . .

Q.  What did this second lady do to, quote, find [Mayorov's mother]?

A.  She had a computer in front of her.  I'm sitting on the end where I can't see it.  She just started typing and then she asked me for my mom's name.  I said[,] "Tanya May" and she said[,] "I found her."  I think she made a phone call to somebody.  She made a phone call and then she was like – she said[,] "You're fine.  You're fine.  Your mom was naturalized in '07.  How old were you in July or June of '07" somewhere around there.  I was like[,] "I was 16." She said[,] "You're fine.  You can go to boot camp."

. . .

Q.  Did the first lady tell you why you couldn't go to boot camp?

A.  Yeah, I'm not a citizen.

Q.  At that point, did you know you were a citizen?

A. I was sure of it, yes.

Q. Why were you sure of it?

A. My mom became naturalized in '07. I'm under her care. I'm a minor at 16.
So I figured I'm a citizen too.

(Mayorov Dep., Ex. 10 to Pl.'s 56.1 [31-10], 23:15–25; 24:1–2; 28:3–15.) Because no detainer issued at that time, Mayorov was cleared to participate in boot camp. (Inmate Log, Ex. 3 to Pl.'s 56.1 [31-3], Ex. A; Reynoso Dep. 48:12–49:7; Wall Dep. 48:15–49:6.) Neither Reynoso nor Wall noted the findings of their investigation in the ENFORCE database, or any other government database. ENFORCE is DHS's principal database of information related to persons encountered during immigration and criminal law enforcement investigations conducted by ICE and other DHS agencies. (*See* Def.'s Resp. to Pl.s 56.1 ¶ 29 (citing http://www.dhs.gov/xlibrary /assets/privacy/privacy_pia_ice_eid.pdf) (last visited 2/15/2015).) At least as of April 10, 2014, ENFORCE listed Mayorov's "country of citizenship" and place of "primary citizenship" as Belarus. (*Id.* ¶ 31.) The Government does not explain why the agents chose not to update Mayorov's ENFORCE profile to reflect that he was a United States citizen once they decided not to issue a detainer, beyond asserting that they were under no obligation to do so. (*Id.* ¶ 29.)

The ICE Secure Communities Processing Center in Chicago ("Secure Communities") conducts immigration investigations using fingerprints maintained by all state and local law enforcement agencies within a particular jurisdiction. (*Id.* ¶ 33.) On December 30, 2010, Secure Communities received a "query"[2] on Mayorov's fingerprints from prison officials at Stateville. (Def.'s Resp. to Pl.'s 56.1 ¶ 35.) When Secure Communities receives a query, an ICE contractor prepares a packet of information collected from government databases related to the individual, including the person's date of birth, current citizenship status as reflected in a

---

[2] Neither party explains what a "query" is in this context, nor does the record reveal who initiated it. From what the court gathers, either the Government or state and local law enforcement at Stateville sent the "query" to Secure Communities, which in turn used the fingerprint to identify Mayorov and gather information about his citizenship status.

person's CIS and ENFORCE entries, and other evidence probative of a person's citizenship status. A different ICE employee then reviews the packet and decides whether to issue a detainer. (*Id.* ¶¶ 34, 37.) On March 8, 2011, ICE contractor Jessica Beckman prepared a packet of information on Mayorov and forwarded it to Giuseppe DiMaggio, an ICE agent working at Chicago's Secure Communities office in March 2011. (*Id.* ¶ 36.) The packet did not state that Mayorov was a United States citizen, but it did include information that reflected Mayorov's date of birth, the date he received lawful permanent residence, evidence that he received lawful permanent residence through a parent, and at least his mother's original first name. (*Id.* ¶ 37.) DiMaggio's job was to review the packet and decide whether to issue a detainer against Mayorov. (Def.'s Resp. to Pl.'s 56.1 ¶ 36.) In making that decision, one thing DiMaggio assesses is whether the individual might have derived citizenship under the Child Citizenship Act. (*See* DiMaggio Dep. II at 10–12.)

DiMaggio described the steps that he takes when considering whether to issue a detainer. First, as a routine part of his analysis, DiMaggio searches the Central Index System ("CIS"), a database maintained by DHS that contains information about a person's citizenship status, country of birth, parents' names, and other information related to a person's legal status in the country. (*See* Mayorov CIS Entry, Ex. D. to Def.'s 56.1.) If a CIS entry identified a person as a child of an asylee, DiMaggio explained that he would investigate the person's parents' citizenship status. (DiMaggio Dep. I, Ex 5 to Pl.'s 56.1 [31-5], 38:12–39:10.) Mayorov's CIS entry identified him as the child of an asylee and also listed his mother's original first name, Tatyana. (*See* Mayorov CIS Entry, Ex. D. to Def.'s 56.1.) DiMaggio testified that he did not remember whether he investigated Mayorov's mother's citizenship. (DiMaggio Dep. I at 39:11–40:10.) Yet elsewhere in his testimony, he explained that he could not find Mayorov's mother in the database because she changed her name at the time of naturalization. (*Id.* at 39:21–22) ("I believe that in this case the mother had changed name [sic] and I wasn't able to find her in CIS.") He nevertheless acknowledged that a name search in the CIS database will ordinarily

pick up an individual's aliases or entries for similar names. (*See* DiMaggio Dep. II, Ex. 6 to Pl.'s 56.1 [31-6], 11:5–9; DiMaggio Dep. I at 40:24–41:13.) ("[T]he database sometimes catches certain names that are similar and, you know, sometimes you catch some – you know, a different name, a different first name or a different – you know, if the name is slightly different. Q. More of a fuzzy search, maybe? A. Correct."). Mayorov's mother's CIS database entry states that she was naturalized on March 22, 2007 and includes her original first name, Tatyana, the same name listed on Mayorov's CIS entry.

Neither party has explained whether the CIS database allows ICE officers to search for people using a first name alone, or whether DiMaggio performed a search using Mayorov's mother's first name. It is also unclear whether any such search would have located her file after she changed her first name from Tatyana to Tanya, or even whether the name change is relevant, given that her CIS entry listed her name as Tatyana, the same name listed on Mayorov's CIS entry. Notably, Mayorov's mother's N-400 application lists her last name as "Mayorova" (*see* Tanya May N-400 App., Ex. E to Def.'s 56.1), and the court is additionally uncertain whether a "fuzzy" search for "Mayorov" would have located a last name of "Mayorova." (Def.'s Resp. to Pl.'s 56.1 ¶ 42.) DiMaggio testified that "[i]f [he] had a reason to believe that the subject might have triggered citizenship," he would choose to interview a person before issuing a detainer. (DiMaggio Dep. I at 42:7–11.) He did not, however, do so in this case. (*Id.* at 42:1–3.) And he admitted that he did not review the Alien file[3] for Mayorov or his mother in this case, though such files could have been retrieved within a few weeks. (Def.'s Resp. to Pl.'s 56.1 ¶¶ 46–48.) Mayorov's mother's A-file showed that at the time she naturalized, Mayorov was a minor who lived at her address. (Tanya May A-File, Ex. 14 [31-15] to Pl.'s 56.1.)

---

[3] An Alien file, or "A-file," is the "official file for all immigration and naturalization records." (*See* http://www.uscis.gov/history-and-genealogy/genealogy/files-numbered-below-8-million (last visited Jan. 23, 2015).)

According to DiMaggio, ICE issues immigration detainers to advise state and local law enforcement that ICE has started an investigation into a person's citizenship, but the investigation does not actually begin until the subject of the detainer is in ICE custody. (Pl.'s Resp. to Def.'s 56.1 ¶ 22 (citing DiMaggio Dep. I at 19:14–20:5 ("Q. Do you take any steps – or should I say did you take any steps when issuing detainers to ensure that a potential subject was a U.S. citizen before issuing the detainer? A. We placed the detainer to start an investigation. We don't have the file in front of us. Therefore, you know, we just placed the detainer and when it [sic] comes to our custody, we would start the investigation.").) The Government reiterates DiMaggio's position that "investigation into Mayorov's removability was to take place after he was in ICE custody," and that DiMaggio "was not under any mandatory duty to investigate Mayorov's citizenship before he came into ICE custody." (Def.'s 56.1 ¶¶ 38–39.) Yet DiMaggio also testified that, at least sometimes, he interviews individuals *before* deciding whether to issue a detainer. (*See* DiMaggio Dep. I at 42:7–11.)

Based on the information he reviewed in the packet, DiMaggio chose to issue a detainer against Mayorov and faxed a copy of it to IDOC on March 16, 2011. (Pl.'s Resp. to Def.'s 56.1 ¶¶ 22, 26, 36.) The document is entitled: "Immigration Detainer – Notice of Action." (Detainer for Sergey Mayorov, Ex. N to Def.'s 56.1.) It identified Mayorov as a Belarus national and stated that DHS had initiated an investigation "to determine whether this person is subject to removal from the United States." (*Id.*) The documented requested that IDOC "accept this notice as a detainer," but explained that "[t]his is for notification purposes only and does not limit your discretion in any decision affecting the offender's classification, work, and quarters assignments, or other treatment which he or she would otherwise receive." (*Id.*) Lastly, the detainer requested "that [IDOC] maintain custody of this individual for a period not to exceed 48 hours" after IDOC's detention authority expired, in order to allow time for ICE agents to come and take custody of him. (*Id.*)

On March 16, 2011, Mayorov received a copy of the detainer, which IDOC appears to have referred to as an "immigration warrant." (Receipt for Legal Papers, Ex. P to Def.'s 56.1). On that same day, IDOC held a hearing to determine whether Mayorov could remain in boot camp. (Pl.'s Resp. to Def.'s 56.1 ¶ 41.) At the hearing, Mayorov stated that he was not aware of an "immigration warrant" and that he had a "green card, social security number and graduated from high school." (*Id.* ¶ 42.) It is unclear whether Mayorov believed that having a green card and social security number meant he was a United States citizen. And there is no evidence that he made a claim to citizenship at the hearing. In any event, the IDOC hearing officer concluded that Mayorov could not participate in boot camp anymore, giving the following reasons: "Mayorov [] has an immigration warrant and his guilty plea to the warrant. Inmate isn't appropriate to remain at [boot camp] with the warrant."[4] (*Id.* ¶ 43 (citing Hearing Notes, Ex. Q to Def.'s 56.1).) Mayorov committed no disciplinary infractions while in boot camp; he was disqualified solely because of the detainer. (Def.'s Resp. to Pl.'s 56.1 ¶ 58.) By the time he was disqualified and transferred to state prison, Mayorov had completed 52 of the 120 required days of boot camp. (*Id.* ¶¶ 57, 59.) Mayorov left a voicemail for his mother the same day he was disqualified and gave her the telephone number for ICE, which was listed on the detainer. (*Id.* ¶¶ 60–61.) She tried to contact ICE numerous times and left multiple voice mails, but no ICE official ever returned her phone calls or responded to her messages. (Def.'s Resp. to Pl.'s 56.1 ¶¶ 62–64.)

On November 19, 2009, then-ICE Director John Morton issued a policy memo entitled "Superseding Guidance on Reporting and Investigating Claims to United States Citizenship." In

---

[4]    The Hearing Notes are difficult to comprehend. At one point, the notes state that Mayorov is not aware of the immigration warrant. But the stated reason for Mayorov's ineligibility is that Mayorov "has an immigration warrant and his guilty plea to the warrant." (Hearing Notes, Ex. Q to Def.'s 56.1.) What basis, if any, the IDOC hearing officer had to conclude that Mayorov pleaded "guilty" to the immigration warrant is unexplained. In addition, the notes state that "[d]o [sic] to an immigration warrant from the nation of Belarus inmate Mayorov [] is no longer eligible to remain in the Impact Incarceration Program." (Excerpt from Stateville Subpoena, Ex. 16 to Pl.'s 56.1 [31-18].) Whether an immigration warrant from the nation of Belarus and the detainer are the same thing is also unexplained.

it, Director Morton stated, in part: "As a matter of law, ICE cannot assert its civil immigration enforcement authority to arrest and/or detain a [U.S. citizen]. Consequently, investigations into an individual's claim to U.S. citizenship should be prioritized[.]" (Morton Memo, Decl. Ex. 1 to Kauffman Decl., Ex. O to Def.'s 56.1, hereinafter "Morton Memo," 1.) The parties dispute whether the Morton Memo applies to investigations like the one DiMaggio conducted, or whether it applies only to persons in ICE custody. (*Compare* Miller Dep., Ex. 1 to Pl.'s Resp. to Def.'s 56.1 [37-1], 80:1–81:5; 82:6–16, with Kauffman Affidavit, Ex. O to Def.'s 56.1, ¶ 8.)

On November 23, 2011, after retaining legal counsel, Mayorov sought to intervene in a putative class action, *Jimenez Moreno v. Napolitano*, No. 11-cv-5452 (N.D. Ill. filed Aug. 11, 2011), which challenges the constitutionality of immigration detainers and "placed ICE on further notice that the immigration detainer it lodged against [Mayorov] was causing him to serve a four year prison sentence."[5] (Def.'s Resp. to Pl.'s 56.1 ¶ 65.) On November 28, 2011, an ICE agent, Ronald Easterday, called the National Records Center where Mayorov and his mother's Alien files were stored and discovered that Mayorov derived United States citizenship under the Child Citizenship Act. (Def.'s Resp. to Pl.'s 56.1 ¶¶ 66–67.) ICE canceled the detainer the same day

---

[5]     The court takes judicial notice of the fact that the court in *Jimenez Moreno v. Napolitano*, No. 11-cv-5452 (Lee, J.), recently certified a class consisting of the following:

> All current and future persons against whom Immigration and Customs Enforcement (ICE) has issued an immigration detainer of the Chicago Area of Responsibility where: (1) ICE has instructed the law enforcement agency (LEA) to continue to detain the individual after the LEA's authority has expired; (2) where ICE has not served a Notice to Appear or other charging documents, has not served a warrant of arrest for removal proceedings, and/or has not obtained an order of deportation or removal with respect to the individual; and (3) where the LEA cooperates with ICE in complying with detainers.

(Mem. Op. & Order Granting Class Certification [No. 11-cv-5452, Doc. 144], issued Sept. 29, 2014, 24.) The class seeks declaratory and injunctive relief to stop the Government's current practice of issuing detainers in ways that the class asserts violates the Constitution. Because DHS cancelled Mayorov's detainer, he is not a member of the class. The court further observes that President Obama's recent Executive Action concerning the Administration's policies on immigration enforcement potentially affects the scope of relief the class may receive. (Jan. 14, 2015 Minute Entry, No. 11-cv-5452 [Doc. 152].)

(*id.* ¶ 67), and Mayorov was reinstated to boot camp on February 6, 2012. (*Id.* ¶ 69.) He received credit for completing the first 52 days, finished the remaining days on April 14, 2012, and was then released from IDOC custody. (*Id.* ¶¶ 69–70.) If ICE had not issued the detainer, and assuming Mayorov completed the boot camp program uninterrupted when he first started it, Mayorov claims he would have been released on May 25, 2011, or 325 days earlier. (*Id.* ¶ 71.) IDOC's records confirm that Mayorov's original projected release date was May 25, 2011. (IDOC Records, Ex. 16 to Pl.'s 56.1 [31-17], 150.) It is undisputed that Mayorov suffered significant emotional distress and depression while imprisoned. (Def.'s Resp. to Pl.'s 56.1 ¶ 74.)

In June 2012, Mayorov filed an administrative tort claim with ICE, seeking $5 million in personal injury damages he maintains were caused by the Government's negligent issuance of the detainer, which allegedly caused him to spend 324 days in prison that he otherwise would not have spent. (Pl.'s Resp. to Def.'s 56.1 ¶ 50; Admin. Tort Claim, Ex. T to Def.'s 56.1.) He filed the current action on July 22, 2013, bringing negligence and false imprisonment claims against the Government under the FTCA. He seeks damages resulting from his loss of liberty, emotional pain and suffering, and lost wages. (Compl. [1], Prayer for Relief, (a).) The parties filed cross motions for summary judgment on August 18, 2014.

## DISCUSSION

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. FED R. CIV. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). In considering a summary judgment motion, the court construes the evidence and all reasonable inferences in the light most favorable to the nonmoving party. *O'Connor v. DePaul Univ.*, 123 F.3d 665, 669 (7th Cir. 1997). The court will grant summary judgment against a party that does not produce evidence that would allow a reasonable jury to find in its favor on a material question. *McGrath v. Gillis*, 44 F.3d 567, 569 (7th Cir. 1995). In this case, where both sides seek summary judgment, the court evaluates each motion by viewing all evidence and drawing all reasonable inferences in favor of the party

opposing the motion. *See F.T.C. v. Cleverlink Trading Ltd.*, 519 F. Supp. 2d 784, 792 (N.D. Ill. 2007).

The FTCA permits suits against the United States for personal injuries caused by the wrongful acts of federal employees acting within the scope of their employment under circumstances in which a private person would be liable to a plaintiff. *See* 28 U.S.C. § 1346(b)(1). "FTCA claims are governed by the substantive law of the state where the alleged tort occurred." *Kaniff v. United States*, 351 F.3d 780, 790 (7th Cir. 2003). Here, the alleged tortious conduct took place in Illinois, so Illinois law applies to Mayorov's claims.

The Government has raised a litany of defenses, which the court will address first before discussing whether summary judgment is appropriate for either party on Mayorov's negligence and false imprisonment claims.

## I. Government Defenses

### A. Discretionary Function Exception[6]

The Government first argues that Mayorov's negligence claim falls within the FTCA's "discretionary function" exception, which bars claims that are "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). "The purpose of this discretionary-function exception is to 'prevent judicial "second-guessing" of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.'" *Reynolds v. United States*, 549 F.3d 1108, 1112 (7th Cir. 2008) (quoting *United States v. Varig Airlines*, 467 U.S. 797, 814 (1984)).

The discretionary function exception has two elements. First, "the conduct alleged must involve an element of judgment or choice." *Id.* (citing *United States v. Gaubert*, 499 U.S. 315,

---

[6] The government does not raise this exception for Mayorov's false imprisonment claim. (*See* Def.'s Mem. in Supp. of Mot. for Sum. Judg. [33], hereinafter "Def.'s Mem.", 1.)

322 (1991)).  Conduct does not fit this description, and therefore is not discretionary, "when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow."  *Berkovitz v. United States*, 486 U.S. 531, 536 (1988).  "This means that where an employee deviates from a course of action prescribed by federal statute, regulation or policy, the employee's acts are not immune from suit."  *Keller v. United States*, 771 F.3d 1021, 1023 (7th Cir. 2014).  Second, the "challenged discretionary conduct must amount to a permissible exercise of policy judgment," *Reynolds*, 549 F.3d at 1112, because the exception "protects only governmental actions and decisions based on considerations of public policy."  *Berkovitz*, 486 U.S. at 537; *see Reynolds*, 549 F.3d at 1112.  "With respect to the policy requirement, applicability of the exception depends not on the intent of the government actor 'but on the nature of the actions taken and on whether they are susceptible to policy analysis.'"  *Palay v. United States*, 349 F.3d 418, 428 (7th Cir. 2003) (citing *Gaubert*, 499 U.S. at 325).

In this case, the Government argues that no statute or regulation controls the manner in which it investigates foreign-born prisoners, and therefore DiMaggio's actions fall within the exception.  The relevant statute, 8 U.S.C. § 1357(d), provides that an agent like DiMaggio "shall promptly determine" whether to issue a detainer when there is "reason to believe" that a person is not lawfully present in the United States.  8 U.S.C. § 1357(d)(1).  In this Circuit, "reason to believe" in this context means probable cause.  *United States v. Cantu*, 519 F.2d 494, 496 (7th Cir. 1975).  Federal regulations also provide, however, that an authorized immigration official "may at any time" issue a detainer.  8 C.F.R. § 287.7.  These provisions, the Government contends, afforded DiMaggio discretion in the way he chose to investigate Mayorov's removability.  (Def.'s Mem. at 8.)  Mayorov argues that the decision to issue a detainer is not discretionary because ICE officers do not have discretion to violate the Constitution or federal statutes, which in this case required DiMaggio to have *reason to believe* Mayorov was not a United States citizen.  (*See* Pl.'s Resp. to Def.'s Mem. [36], hereinafter "Pl.'s Resp.," 5–6.)

The court concludes that the discretionary function exception does not bar Mayorov's negligence claim. "In examining the nature of the challenged conduct, a court must first consider whether the action is a matter of choice for the acting employee." *Berkovitz*, 486 U.S. at 536. On this point, absent from the Government's position is any suggestion that DiMaggio could choose *not* to issue a detainer once he determined there was "reason to believe" an individual was in the country unlawfully. The fact that DiMaggio lacked autonomy in making detainer determinations is significant, as it distinguishes his actions from the mine-run prosecutorial discretion cases the Government uses to support its argument, and in which courts routinely hold that prosecutorial discretion is protected by the discretionary function exception. *See, e.g.*, *Reynolds*, 549 F.3d at 1113 (noting that "challenges to the quality of an investigation or prosecution are generally barred by the discretionary-function exception" because an attorney has discretion to determine both *whether* to prosecute a case *and how* to prosecute a case—such as what evidence to present and what witnesses to call); *General Dynamics Corp. v. United States*, 139 F.3d 1280, 1283 (9th Cir. 1983) (concluding discretionary function exception applied to investigation that led to criminal indictment that was later dismissed). True prosecutorial discretion allows prosecutors to decide *not* to charge individuals—even if the evidence is substantial. In contrast, DiMaggio's charging decision was one-sided. If the evidence established that there was "reason to believe" a person is here unlawfully, he *must* issue a detainer; he has no "choice." *Reynolds*, 549 F.3d at 1112.

In addition to the federal statute constraining DiMaggio's actions, the Morton Memo issued to ICE personnel on November 19, 2009, bolsters the court's conclusion that the discretionary function exception is not available here. The Morton Memo provided guidance to ICE officers on how to handle suspected undocumented immigrants who claim they have United States citizenship. The memo explained that "[a]s a matter of law, ICE cannot assert its civil immigration enforcement authority to arrest and/or detain a [U.S. citizen]. Consequently, investigations into an individual's claim to U.S. citizenship should be prioritized." (Morton

Memo, Ex. A. to Pl.'s 56.1 at 1.)   Under the section heading "Claims by Detained Individuals,"

the Memo explains that "[i]f an individual already in custody claims to be a [U.S. Citizen], an

officer must immediately examine the merits of the claim[.]"   (*Id.* at 2.)   As explained above,

there is conflicting evidence about whether the Memo applies to individuals *not* in ICE custody.

Mayorov offers the testimony of Assistant ICE Director for Field Operations, Philip Miller.   Mr.

Miller testified about the Morton Memo as follows:

> Q.    The policies described in [the Morton Memo], are they applicable in the context of detainers?
>
> A.    Yes.
>
> . . .
>
> Q.    Would an immigration officer take this memorandum under consideration prior to issuing an immigration detainer?
>
> A.    If the information was available, yes.
>
> Q.    And when you say "if the information was available," what information are you referring to?
>
> A.    If there was information to suggest that the person who they were considering to issue the detainer on, if there was information available at that moment that the person was in fact a U.S. citizen.
>
> Q.    And when you say "that moment," when were you referring to?
>
> A.    When they're conducting their investigation prior to the issuance of the immigration detainer.

(Miller Dep., Ex. 1 to Pl.'s Resp. to Def.'s 56.1 [37-1], 80:1–81:5.)   The government counters

Miller's testimony with an affidavit from Kerry Kauffman, an ICE Supervisory Detention and

Deportation Officer.   Mr. Kauffman averred that the Morton Memo section pertaining to "Claims

by Detained Individuals" "applies only to individuals who are in the actual physical custody of

ICE and ICE agents.   It does not, and was not intended to, apply to individuals in the custody of

local or state authorities, or in the custody of the Federal Bureau of Prisons."   (Kauffman

Affidavit, Ex. O to Def.'s 56.1, ¶ 8.)   Further, Kauffman declared that "[n]one of the sections of

the Morton Memo pertain to agents initiating investigations of foreign-born persons identified by

our Operation Secure Communities as the result of a biometric hit,"[7] (*id.* ¶ 9), and that "[i]t is only after a local, state, or federal prisoner is taken into ICE custody that the Morton Memo has any application." (*Id.* ¶ 10.)

The government argues that Miller's testimony does not directly conflict with Kauffman's because Miller's testimony does not specifically discuss the "Claims by Detained Individuals" section of the Memo. The court disagrees. Miller clearly believed that an immigration officer would "take this memorandum under consideration prior to issuing an immigration detainer" if available information suggested that the person to be detained was a United States citizen. (Miller Dep. 80:10–13.) There was such information in Mayorov's case: the packet DiMaggio received included Mayorov's date of birth, the date he received lawful permanent residence, evidence that he received lawful permanent residence through a parent, and at least his mother's original first name. (Def.'s Resp. to Pl.'s 56.1 ¶ 37.) Had DiMaggio located Mayorov's mother in the database, he would have discovered that she was naturalized. Discovery of Mayorov's mother's citizenship status, coupled with the knowledge that Mayorov was a minor lawful permanent resident, would have at least given DiMaggio "reason to believe that [a] subject might have derived citizenship" from his mother. (DiMaggio Dep. 42:10–11) And in such cases, DiMaggio testified that, at least sometimes, he would interview a subject *before* issuing a detainer.

That being said, the court notes that the Morton Memo seems to require a person to invoke a claim of citizenship before the Memo's policies apply. (*See, e.g.*, Morton Memo, Ex. A to Pl.'s 56.1 at 2 ("If an individual already in custody *claims* to be a [United States citizen], an officer must immediately examine the merits of the claim[.]").) Yet neither Mr. Miller nor Mr. Kauffman stated that invoking a claim of citizenship is a prerequisite before the Memo's policies

---

[7]    A "biometric hit" occurs when fingerprint submissions submitted to Secure Communities from state and local law enforcement match with the prints of individuals listed in a DHS database. (DiMaggio Dep. I at 35:13–14.) Mayorov's prints triggered a "biometric hit" in this case. (*See* Pl.'s Resp. to Def.'s 56.1 ¶ 17.)

are implicated, and the Government does not make this argument in its brief. And the record itself contains conflicting information about whether Mayorov made such a claim. In his affidavit, he states that he told Reynoso and Wall that he was a citizen (*see* Mayorov Affidavit, Ex. 22 to Pl.'s 56.1 ¶ 3), but Reynoso only wrote "child of [United States citizen]" beside Mayorov's name on the inmate log. (Def.'s Resp. to Pl.'s 56.1 ¶ 26.) Complicating matters further, the Secure Communities packet did not contain the inmate log, so it is doubtful DiMaggio saw Reynoso's notation, which could have alerted DiMaggio to investigate Mayorov's status further. In the final analysis, mindful that the burden is on the government to prove that the discretionary function exception applies, *see Keller*, 771 F.3d at 1023 ("The discretionary function exception is an affirmative defense to liability under the FTCA that the government must plead and prove."), the court concludes that the government has not met its burden of showing there are no disputes of fact on that defense in this case.

At least one other court in this district has declined to apply the discretionary function exception on similar facts. In *Makowski v. United States*, No. 12-cv-5265, — F. Supp. 2d —, 2014 WL 1089119 (N.D. Ill. March 18, 2014) (Gottschall, J.), the plaintiff was a United States citizen born abroad. *Id.* at *1. He pleaded guilty to a drug offense and received a prison sentence along with a recommendation for boot camp. *Id.* However, because ICE had issued a detainer against him, he was deemed ineligible for boot camp and spent more than two months in prison before the detainer was cancelled and he was transferred to boot camp. *Id.* In denying a motion to dismiss a false imprisonment claim under the FTCA, the court concluded that the plaintiff had "plausibly alleged" that ICE had failed to follow mandatory federal policy when it neglected the Morton Memo's requirement that ICE "promptly investigate any claims of citizenship." *Makowski*, 2014 WL 1089119 at *11.

The Government argues here that *Makowski* is distinguishable because it involved a motion to dismiss, while the evidence it produced in this case (Kauffman's declaration) purportedly establishes that the Memo does not apply to individuals not in federal custody. (*See*

Def.'s Reply to Pl.'s Resp. at 8.) Whether the Memo is applicable might well be considered a question of law—but if it is indeed a question of fact (as the Government's argument assumes), it is disputed. Miller's testimony suggests that the Morton Memo applies to individuals in all types of custody, not just federal. Viewing the evidence in the light most favorable to Mayorov, the court is persuaded that the Morton Memo represents ICE policy as it pertains to handling United States citizens who are erroneously believed to be in the country unlawfully.

Lastly, even assuming that DiMaggio's actions met the first prong of the discretionary function test, they fail to meet the second prong, which asks whether the "challenged discretionary conduct [amounted] to a permissible exercise of policy judgment." *Reynolds*, 549 F.3d at 1112. Our Court of Appeals has recognized that the "exception is not limited to decisions made at the policy or planning level, but rather extends to decisions at the operational level that are in furtherance of governmental policy." *Palay v. United States*, 349 F.3d 418, 429 (7th Cir. 2003) (citing *Gaubert,* 499 U.S. at 325). "[T]he status of the actor matters," however, because the exception may be invoked only if the "decisionmaker [is] charged with making policy-related judgments." *Id.* at 430. DiMaggio was not tasked with incorporating policy-related judgments into his detainer decisions. Instead, he merely applied ICE policy as taught to him by his superiors. (*See* DiMaggio Dep. 11:15–22; 12:22–24; 13:2–5.) *See also Caban v. United States*, 671 F.2d 1230, 1233 (2nd Cir.1982) (concluding that immigration agents' actions in issuing detainers are not covered by the discretionary function exception because these actions "are not the kind that involve weighing important policy choices").

For these reasons, the court concludes that the discretionary function exception does not bar Mayorov's negligence claim.

### B. Misrepresentation Exception

As its second defense, the Government invokes the "misrepresentation exception": 28 U.S.C. § 2680(h) provides that the FTCA does not apply to "[a]ny claim arising out of . . . misrepresentation." This exception bars liability resting on either negligent or intentional

misrepresentations. *Janowsky v. United States*, 913 F.2d 393, 396 (7th Cir. 1990). The Government argues that Mayorov's claims are barred by this exception to the extent the claims are based on "misrepresentation[s] in conveying to IDOC information regarding Mayorov's immigration records." (Def.'s Mem. at 13; *see also* Def.'s Resp. at 8 ("[T]o the extent that Mayorov's negligence claim is based on insufficient or incorrect records maintained by ICE or CIS, that claim is barred by the negligent misrepresentation exception to the FTCA.").)

As Mayorov observes, however, his disqualification from boot camp "was not caused by any inaccurate information the detainer contained or might have communicated to IDOC." (Pl.'s Resp. at 10.) Instead, the issuance of the detainer itself is what triggered IDOC's decision to remove him from the program. The detainer simply states that an "[i]nvestigation has been initiated to determine whether [Mayorov] is subject to removal from the United States." (Ex. N to Def.'s 56.1.) No inaccurate information was conveyed to IDOC, and therefore Mayorov's false imprisonment claim is not based on the presence of a misrepresentation.

The fact that the harm suffered relates to a communication from government agents does not trigger the misrepresentation exception in every case. In *Murrey v. United States*, 73 F.3d 1448 (7th Cir. 1996), a medical patient's estate sued the Government under the FTCA after the patient died from internal bleeding following surgery at a government hospital. *Id.* at 1450. The estate's theory was that the hospital's doctors failed to warn the patient of the risks involved with the surgery and of potential alternative treatments. *Id.* at 1451. The district court accepted the Government's argument that the estate's claim was barred by the misrepresentation exception, but the Seventh Circuit reversed, explaining that

> [t]he exclusion of claims of misrepresentation is designed to protect the government from being sued for fraud and other torts that come under the general legal heading of misrepresentation, whether intentional or negligent, injuring merely the pocketbook. It does not exclude claims of physical injury that happen to involve, as many do, an element of communication or misleading silence.

*Murrey*, 73 F.3d at 1450-51.  Were it otherwise, the exception could be construed to preclude "[a] number of traditional torts" that "involve either misrepresentation or, what is analytically very similar, a misleading failure to disclose true facts," even though the latter torts are "correctly assumed to be within the scope of the government's waiver of sovereign immunity in the [FTCA]."  *Krejci III v. U.S. Army Material Dev. Readiness Command*, 733 F.2d 1278, 1280 (7th Cir. 1984).  As an example, a claim for false imprisonment could easily encompass, as it does in this case, an allegation that the Government misrepresented a fact that caused someone to be restrained without a legal basis.  But Mayorov's false imprisonment claim does not rest on a allegation of misrepresentation.  Instead, he alleges that the detainer itself is what caused his injury, which amounts to a "misleading failure to disclose true facts," and which is analytically distinct from garden-variety misrepresentation tort allegations.  *Krejcii III*, 733 F.2d at 1280; *see id.* (recognizing that an FTCA injury claim is not barred by the misrepresentation exception in a case where a truck driver "carelessly signals cars to pass him," causing an accident despite the fact that the "truck driver's signal misrepresents the condition of the road ahead").  Mayorov's false imprisonment claim is thus cognizable under the FTCA.

Mayorov's negligence claim is a closer call.  Mayorov alleges that the Government "breached a duty to reasonably document the fact of [his] U.S. citizenship, causing a detainer to thereafter be entered against [him]."  (Compl. ¶ 66.)  Elsewhere in Mayorov's complaint, he alleges that despite the Government's "clear duty to ensure that it does not wrongfully exercise enforcement against U.S. citizens, DHS does not have policies and practices in place to update its records to reflect when a dependent minor automatically derives U.S. citizenship under the [Child Citizenship Act]."  (*Id.* ¶ 12.)  Despite this reference to record maintenance policies, the court is persuaded that Mayorov's claim "does not turn on DHS's maintenance of false or erroneous information."  (Pl.'s Resp. at 10.)  Instead, Mayorov's theory appears to be that, based on the accurate information the Government had, such as Mayorov's date of birth, his lawful permanent residence status as of July 2005, and evidence that he received his lawful

permanent resident status through a parent, the Government was negligent in failing to investigate Mayorov's status further before issuing the detainer—most likely by seeing whether his mother derived citizenship, and if so, when.  (*Id.* at 11.)

Supreme Court and circuit precedent interpreting the misrepresentation exception appear to confirm this conclusion.  In *Block v. Neal*, 460 U.S. 289 (1983), a buyer of a house that was financed by the Farmers Home Association ("FHA"), a federal agency, sued the agency after she moved in and discovered numerous defects.  *Id.* at 292.  She claimed that the FHA negligently supervised the home's construction and negligently inspected it.  *Id.* at 295–96. The FHA had conducted three inspections and later confirmed in a final report, signed by the plaintiff, that the construction "accorded with the drawings and specifications approved by [the agency]."  *Id.* at 292.  The district court dismissed the plaintiff's claims, but the Sixth Circuit reversed, concluding that the misrepresentation exception did not apply.  *Id.* at 292–293.

The Supreme Court affirmed the Sixth Circuit, explaining that "the essence of an action for misrepresentation, whether negligent or intentional, is the communication of misinformation on which the recipient relies."  *Id.* at 296.  The misrepresentation exception bars claims "which are wholly attributable to reliance on the Government's negligent misstatements," but "does not bar negligence actions which focus not on the Government's failure to use due care in communicating information, but rather on the Government's breach of a different duty."  *Id.* at 297.  In *Block*, the Court noted, the Government's alleged misstatements in the final report were "not essential to plaintiff's negligence claim," which instead rested on the theory that the Government voluntarily undertook a duty to supervise the construction of the home and that it breached this duty, causing the plaintiff injury.  *Id.*

Relevant to the present case, the Court in *Block* also noted that, but for the misrepresentation exception, the plaintiff also could have brought a claim for negligent misrepresentation.  *Id.* at 298.  Importantly, the partial overlap of "certain factual and legal questions" common to both the negligence misrepresentation and simple negligence claims did

21

not mean that because the misrepresentation claim was barred, the negligence claim was, as well. *Id.* "Any other interpretation would encourage the Government to shield itself completely from tort liability by adding misrepresentations to whatever otherwise actionable torts it commits." *Id.* To the extent Mayorov's negligence claim is based on the mishandling of his immigration records, therefore, the claim is barred by the misrepresentation exception. But Mayorov's theory that the Government breached its duty to reasonably investigate his citizenship based on the accurate information available is not barred by the exception.

The cases cited by the Government are distinguishable. In *Omegbu v. United States*, No. 11–2770, 475 Fed. Appx. 628 (7th Cir. 2012) (unpublished), the plaintiff, a Nigerian citizen, applied for naturalization but was denied because immigration officials concluded he had lied on his application about his criminal history. *Id.* at 628–29. The plaintiff sued the Government under the FTCA for fraud after he discovered that his immigration file had erroneously included the criminal history of another person. *Id.* at 629. The district court concluded that plaintiff's claim was barred by the FTCA's misrepresentation exception, which extends to "claims against the United States for the willful mishandling of records," *id.*, and the Court of Appeals affirmed in an unpublished opinion. *Omegbu*, 475 Fed. Appx. at 629. Unlike in *Omegbu*, however, Mayorov's claim does not necessarily turn on DHS's maintenance of false or erroneous information. Instead, it also encompasses DiMaggio's alleged failure to follow up on accurate information the Government possessed about Mayorov, information which would have revealed his citizenship status. The misrepresentation exception poses no obstacle to either claim.

Similarly, in *Deloria v. Veterans Admin.*, 927 F.2d 1009 (7th Cir. 1991), the plaintiff sued the Veterans Administration ("VA") after the VA refused to provide care for his complaints of post-traumatic stress disorder and injuries from exposure to Agent Orange. *Id.* at 1010. His theory was that certain VA employees conspired to distort facts about his medical history, which resulted in his denial of care. *Id.* at 1011. In affirming the district court's conclusion that the misrepresentation exception barred recovery, the Court of Appeals reasoned that, boiled down,

the plaintiff's claim sounded in misrepresentation, and the plaintiff "cannot sidestep the statutory limits of the FTCA by artfully couching his complaint in different jargon[.]" *Id.* at 1012. The court emphasized that "the United States retains its sovereign immunity with respect to charges of deceit and misrepresentation—regardless of the technical terms in which they are framed." *Deloria*, 927 F.2d at 1013. Here again, Mayorov's claims are distinguishable. Rather than "artfully couching" his claims, Mayorov instead alleges that, *based on the accurate information the Government possessed*, it should have investigated further before issuing a detainer against him. And his false imprisonment claim, as previously discussed, does not depend on establishing that any information contained in the detainer was false.

The court concludes that the misrepresentation exception does not bar Mayorov's claims.

## C.     Constitutional Violations under the FTCA

As yet another defense, the Government contends that Mayorov's negligence claim is actually a Fourth Amendment claim couched as a negligence cause of action, and that "constitutional violations are not actionable under the FTCA." (Def.'s Resp. at 2.) Again, the court disagrees. As the court understands Mayorov's argument, he asserts that the Government negligently issued a detainer, and the issuance caused Mayorov to be removed from boot camp. While there is some overlap between Mayorov's allegations and constitutional principles, these stem largely from the existence of 8 U.S.C. § 1357(d)(1), which provides that an agent like DiMaggio "shall promptly determine" whether to issue a detainer when there is "reason to believe" that a person may not be lawfully admitted to the United States or is not lawfully present in the United States. The "reason to believe" standard, as previously discussed, is coterminous with probable cause under the Fourth Amendment. *Cantu*, 519 F.2d at 496. The essence of Mayorov's negligence claim is that but-for the Government's negligent investigation, no detainer would have issued because there was not "reason to believe" Mayorov was in the country illegally. There is no necessary connection between Mayorov's

allegations and a constitutional violation, nor would such a connection, if it existed, obviously doom the negligence claim. *Cf. Sisk v. United States*, 756 F.2d 497, 500 (7th Cir. 1985) ("Although the type and nature of injuries remedied in FTCA actions can be significantly different from those in § 1983 actions, this is not always the case."). In any event, and mindful that the Supreme Court has "declined to construct a stringent line of demarcation between a *Bivens* remedy [for constitutional violations] and an FTCA remedy," *Del Raine v. Williford*, 32 F.3d 1024, 1043 (7th Cir. 1994), the court concludes that Mayorov's negligence action sounds in tort and is otherwise actionable under the FTCA.

### D. Analogous State Law Causes of Action

Finally, the Government argues that it is entitled to summary judgment because Illinois law would not recognize the type of negligence and false imprisonment claims that Mayorov presses in this case. "The FTCA authorizes suits against the United States for torts committed by federal officials [only] if the same acts would create liability for private persons under applicable state tort law." *Reynolds*, 549 F.3d at 1111 (citing 28 U.S.C. § 1346(b)(1)). This requirement means the court must find a parallel to Mayorov's claims under Illinois law. *See United States v. Olson*, 546 U.S. 43, 44, (2005) ("We here interpret these words to mean what they say, namely, that the United States waives sovereign immunity 'under circumstances' where local law would make a 'private person' liable in tort.") The Government maintains that because "[t]here are no reported Illinois cases awarding damages for negligence in a police investigation," Mayorov has not shown that a "private person" would be liable under similar circumstances as required under § 1346(b)(1). (Def.'s Resp. to Pl.'s Mem. [41], hereinafter "Def.'s Resp.," 3.) Similarly, the Government argues that Illinois law [does not] permit the finding of false imprisonment in this case if the United States were a private person." (*Id.* at 11.) The court finds neither of these arguments persuasive.

In *Indian Towing Co v. United States*, 350 U.S. 61 (1955), the Supreme Court considered the level of generality at which to decide whether a private analogue exists under

state law.  *Id.* at 67.  The plaintiffs sought recovery for damages caused by the negligent operation of a lighthouse light (at the time, lighthouses were exclusively operated by the government).  *Id.* at 62.  The lower courts had concluded that the case must be dismissed because of the lack of a private analogue, but the Supreme Court disagreed, rejecting the argument that the FTCA "exclud[es] liability in the performance of activities which private persons do not perform [such that] there [is] no liability for negligent performance of 'uniquely governmental functions.'"  *Id.* at 64.  This argument, the Court explained, was tautological, because "all Government activity is inescapably 'uniquely governmental' in that it is performed by the Government."  *Id.* at 67.  Instead, the purpose of the FTCA was to make the tort liability of the United States "the same as that of a private person under like circumstance, in accordance with local law."  *Indian Towing*, 350 U.S. at 64.  The operation of a lighthouse by the government, the Court observed, can be analogized to a private person "who undertakes to warn the public of danger and thereby induces reliance."  *Id.* at 64–65.  That is, "[p]rivate individuals, who do not operate lighthouses, nonetheless may create a relationship with third parties that is similar to the relationship between a lighthouse operator and a ship dependent on the lighthouse's beacon," and which creates liability for the private individual should the individual act negligently in warning the public of danger.  *Olson*, 546 U.S. at 47 (discussing *Indian Towing*, 350 U.S. at 64–65, 69).

*Indian Towing* teaches that the level of generality at which an analogous state cause of action can be found is to be framed broadly.  *See United States v. Olson*, 546 U.S. 43, 46 (2005) ("As this Court said in *Indian Towing*, the words 'like circumstances' do not restrict a court's inquiry to the *same circumstances*, but require it to look further afield.").  "Not to be confused with 'identical circumstances,' the 'like circumstances,' standard is not overly stringent, and should be applied broadly so as to achieve the statute's intended purpose of putting the federal government on equal footing with private entities."  *Belluomini v. United States*, 64 F.3d 299, 303 (7th Cir. 1995).  The question for this court is whether the Illinois Supreme Court would

recognize the causes of action Mayorov presses in this case. *See Midwest Knitting Mills, Inc. v. United States*, 950 F.2d 1295, 1298 (7th Cir. 1991) (noting that in FTCA cases, federal courts predict what a state Supreme Court would do if presented with the case). As more fully explained here, the court concludes Illinois would recognize both of Mayorov's claims.

### i. Negligence

Under Illinois law, "[t]o recover damages based upon negligence, a plaintiff must prove that the defendant owed a duty to the plaintiff, that the defendant breached that duty, and that the breach was the proximate cause of the plaintiff's injury." *Krywin v. Chicago Transit Auth.*, 238 Ill. 2d 215, 225, 938 N.E.2d 440, 446 (Ill. 2010). For Mayorov's negligence claim, the issue is whether the Illinois Supreme Court would recognize a duty of reasonable investigation owed by a private security company to a third party.

Illinois statutes appear to recognize such a duty: as Mayorov notes, state laws require licensing, liability insurance, and training for private security contractors and their employees. (*See* Pl.'s Reply. to Def.'s Resp. [43-1], 5 (citing 225 ILCS 447/25-20).) Types of training that private security contractors must receive include instruction in investigative and enforcement techniques, "procedures for report writing," the "law on private security forces and on reporting to law enforcement agencies," as well as potential civil and criminal liability that attaches to "acts related to private security." *See* 225 ILCS 447/25-20(a)(1)–(10). Further, private security contractors and their employees are required to maintain general liability insurance coverage. 225 ILCS 447/25-10(b). And in Illinois, violations of statutes that set standards of care are prima facie evidence of negligence. *See Williams v. City of Champaign*, 524 F.3d 826, 830 (7th Cir. 2008) (applying Illinois law). Keeping in mind the principle that "'like circumstances,' standard is not overly stringent, and should be applied broadly," *Belluomini*, 64 F.3d at 303, the court is persuaded that Illinois' robust regulation of private security forces establishes a duty of reasonable investigation for third parties that would support a cause of action, were the Government a private entity.

Case law appears to recognize such a duty as well. For example, in *Easley v. Apollo Detective Agency, Inc.*, 69 Ill. App. 3d 920, 387 N.E.2d 1241 (1st Dist. 1979), a private security company was sued after one of its guards assaulted a woman in her apartment. *Easley*, 69 Ill. App. 3d at 923, 387 N.E.2d at 1242. The woman sued the security company for negligently hiring the assailant without conducting a proper background check, and a jury awarded her damages. *Easley*, 69 Ill. App. 3d at 930, 387 N.E.2d at 1245–47. The appellate court affirmed the judgment in her favor, observing that "the jury could properly find that Brown was unfit, that a reasonably adequate investigation would have determined this fact, and that [the defendant company's] virtually non-existent investigation exhibited a reckless disregard for plaintiff's safety and constituted the proximate cause of plaintiff's injury." *Easley*, 69 Ill. App. 3d at 932, 387 N.E.2d at 1248–49. In other words, the private security company acted negligently toward a third party victim by failing to reasonably investigate the background of one of its employees who then caused harm to the victim. *Easley* is not a perfect fit here, as in that case it was a third party, rather than the subject of the investigation, who was harmed by the negligent investigation. The distinction is not fatal, however. Instead, what matters for the purposes of a private analogue analysis is the duty to conduct a non-negligent investigation, not where the harm flows from the failure to carry out this duty. Just as a private security company is charged with reasonably investigating its employees before hiring them, were the Government a private entity, it would have some duty under Illinois law to reasonably investigate a person's citizenship status before issuing a detainer.

Other Illinois state law cases confirm this conclusion. In *Kincaid v. Ames Department Stores, Inc.*, a store employee sued her employer and two of its security guards for false imprisonment after the guards caused the employee to be arrested for shoplifting. *Kincaid*, 283 Ill. App. 3d 555, 558–59, 670 N.E.2d 1103, 1106 (1st Dist. 1999). Defendants argued on appeal that they had probable cause to arrest the plaintiff, but the appellate court refused to vacate a

jury award to the plaintiff on this basis.[8]  *Kincaid*, 283 Ill. App. 3d at 566, 670 N.E. 2d at 1110–11.  Relevant to this case, the court stated that "[a] defendant has probable cause to arrest if, at the time of the arrest, *after pursuing reasonable avenues of investigation*, the defendant knew facts that would have led a person of ordinary prudence to entertain an honest and strong suspicion that the person arrested was guilty."  *Kincaid*, 283 Ill. App. 3d at 564, 670 N.E.2d at 1109 (emphasis added).  While the actual claim was false imprisonment, Mayorov argues that *Kincaid* is relevant in determining whether a private negligence action analogue exists because the case "concern[s] the type of injury [the Government's] negligent investigation caused to Mayorov."  (Pl.'s Reply to Def.'s Resp. [43-1], 6.)  The court agrees.  The torts of negligence and false imprisonment are distinct, but in this case, overlapping, because Mayorov asserts, in effect, that the Government's negligent investigation of his citizenship status caused him to be imprisoned—his alleged injury.  And *Kincaid* suggests that a defendant must perform a reasonable investigation before probable cause is satisfied.

Recently, in a case neither party cites, an Illinois appellate court questioned whether *Kincaid* properly states the rule of law applicable to probable cause determinations.  In *Grainger v. Harrah's Casino*, 385 Ill. Dec. 265, 18 N.E.3d 265 (3rd Dist. Sept. 16, 2014), a casino patron sued the casino, one of its security officers, and a state gaming agent after the patron was detained on suspicion of having a fake driver's license.  *Grainger*, 385 Ill. Dec. at 268, 18 N.E.3d at 268.  In refusing to overturn a jury verdict in favor of defendants, the court rejected the plaintiff's argument that he was entitled to a jury instruction reflecting *Kincaid*'s language that the defendants were required to conduct a "reasonable investigation" before detaining him.  *Grainger*, 385 Ill. Dec. at 277, 18 N.E.3d at 277.  The plaintiff sought the instruction because even a cursory examination of state records would have revealed that his driver's license was

---

[8]      It was, however, reversed on other grounds: the jury award was vacated and the case remanded for a new trial because the trial court erroneously admitted a letter that the court concluded constituted inadmissible hearsay.  *Kincaid*, 283 Ill. App. 3d at 566, 670 N.E. 2d at 1111.

valid. *Grainger*, 385 Ill. Dec. at 268, 18 N.E.3d at 268. The court reasoned that the authority *Kincaid* cited, *Lappin v. Costello*, 232 Ill. App.3d 1033, 1042, 598 N.E.2d 311, 318 (4th Dist. 1992), outlined a definition of probable cause for purposes of § 1983 unlawful arrest actions, not for state law claims of false imprisonment. *Grainger*, 385 Ill. Dec. at 277, 18 N.E.3d at 277. *Lappin*, according to the court in *Grainger*, "neither holds nor suggests that this higher standard [i.e., reasonable investigation] should also apply in false imprisonment cases brought under state common law. If anything, it suggests just the opposite." *Id.* The court concluded that "[t]o the extent that *Kincaid* suggests that a defendant in a false imprisonment case cannot have probable cause to detain the plaintiff unless he performed a 'reasonable investigation' prior to the detention, we decline to follow that decision." *Id.*

While *Grainger* may be right that *Kincaid* misstated the probable cause standard under Illinois law, the court finds the distinction to be semantic and not substantive. As *Grainger* noted, the Illinois Supreme Court's own recent definition of probable cause is "a state of facts which, if known, would lead a person of ordinary caution and prudence to believe or entertain a strong and honest suspicion that the person arrested is guilty." *Grainger*, 385 Ill. Dec. at 276, 18 N.E.3d at 276 (quoting *Poris v. Lake Holiday Prop. Owners Ass'n*, 368 Ill.Dec. 189, 203, 983 N.E.2d 993, 1007 (Ill. 2013)). The Government argues here that "there is no common-law tort of negligently determining the existence of probable cause" (Def.'s Resp. at 7), but that misses the point of the private analogue analysis. Mayorov's theory in this case is that the "state of facts" DiMaggio possessed triggered a duty to investigate Mayorov's citizenship status further, and that his failure to do so before issuing the detainer caused Mayorov's injuries. Whether the duty to reasonably investigate springs from the definition of probable cause is irrelevant; what matters is whether a duty exists. As the Supreme Court has cautioned, "'like circumstances' do not restrict a court's inquiry to the same circumstances, but require it to look further afield." *See Olson*, 546 U.S. at 46. Looking further afield, this court concludes that the Illinois Supreme Court would recognize a negligence action in this context.

### ii.    False Imprisonment

A private person may be held liable in Illinois for false imprisonment when "his personal liberty was unreasonably or unlawfully restrained against his will and [the] defendant(s) caused or procured the restraint." *Vincent v. Williams*, 279 Ill. App. 3d 1, 5–6, 664 N.E.2d 650, 654 (1st. Dist. 1996). Significantly, "[a]n unlawful arrest by an officer caused or procured by a private person is the same as an arrest by the private person." *Vincent*, 279 Ill. App. 3d at 6, 664 N.E.2d at 654; *see also Carey v. K-Way, Inc.*, 312 Ill. App. 3d 666, 669, 728 N.E.2d 743, 746 (1st Dist. 2000). In this case, Mayorov's theory of liability is that the Government's issuance of a detainer caused IDOC to falsely imprison him. Private security contractors are required to be trained on "[c]ivil and criminal liability for acts related to private security," 225 ILCS 447/25-20(a)(2), and if the Government's conduct in the case were that of a private person, the court concludes that Illinois courts would recognize a false imprisonment claim. Other courts have reached the same conclusion. *See, e.g.*, *Makowski*, 2014 WL 1089119, at *10 (concluding that ICE can be held liable for false imprisonment by issuing an improper detainer that results in disqualification from IDOC boot camp and subsequently imposed prison time); *cf. Uroza v. Salt Lake County*, No. 11-cv-0713, 2013 WL 653968, at *8 (D. Utah Feb. 21, 2013) (holding that ICE can be held liable for false imprisonment by issuing an immigration detainer because the detainer allegedly caused the detention).

Significantly, the FTCA explicitly waives sovereign immunity for "any claim" based on the "acts or omissions of investigative or law enforcement officers" "arising out of . . . false imprisonment [and] false arrest." 28 U.S.C. § 2680(h). Courts of Appeals in other circuits have concluded that immigration officials are "law enforcement officers" within the meaning of § 2680(h), and this court agrees. *See, e.g.*, *Medina v. United States*, 259 F.3d 220, 224 (4th Cir. 2001). The fact that the FTCA explicitly waives the Government's sovereign immunity for false imprisonment claims supports the notion that a private analogue exists for false imprisonment, as the claim was something Congress expressly contemplated when carving out

exceptions to the FTCA's liability exemptions. *Cf. Liranzo v. United States*, 690 F.3d 78, 94–96 (2d Cir. 2012) (reasoning that the "plain language of [§ 2680(h)] suggests" that the Government waives its sovereign immunity for false imprisonment claims when the government actors are law enforcement officers).

Having found that none of the Government's affirmative defenses bar Mayorov's claims, the court turns at last to the question of whether either party is entitled to summary judgment on the issue of the Government's liability for negligence and false imprisonment under the FTCA.

## II.    Negligence (Count II)

Under Illinois law, "[t]o recover damages based upon negligence, a plaintiff must prove that the defendant owed a duty to the plaintiff, that the defendant breached that duty, and that the breach was the proximate cause of the plaintiff's injury." *Krywin*, 238 Ill. 2d at 225, 938 N.E.2d at 446. As discussed above, the duty in this case was for the Government to reasonably investigate Mayorov's citizenship status before issuing a detainer. The Government admits that Mayorov suffered injuries due to his removal from boot camp. (*See* Def.'s Resp. to Pl.'s 56.1 ¶ 74 ("Mayorov suffered significant emotional distress and depression while imprisoned.").) The negligence inquiry, therefore, turns on two questions: whether the Government breach its duty to reasonably investigate Mayorov's citizenship status; and, if so, whether that breach proximately caused Mayorov's injuries.

### A.    Breach

Mayorov identifies numerous steps that he argues the Government should have taken to establish that Mayorov was a United States citizen. For example, according to Mayorov, "[b]ased on the information contained in the Secure Communities Processing Packet, DiMaggio only needed to perform a simple records check and conduct a routine investigation into Mayorov's mother's citizenship to determine that Mayorov likely derived U.S. citizenship under the Child Citizenship Act." (Pl.'s Mem. at 5.) Mayorov points out that the CIS database entry for Tanya May states that she was naturalized on March 22, 2007 and includes her original name,

Tatyana Mayorova. "Tatyana" is the same first name listed on Mayorov's CIS entry regarding his mother. (*Id.*) DiMaggio, according to Mayorov, could have conducted a simple name search for either "Tanya May" or "Tatyana Mayorova" in the CIS database, or he could have interviewed Mayorov or his mother to learn of Mayorov's citizenship. (*Id.*) DiMaggio testified both that (a) he could not remember if he conducted a name search of Mayorov's mother; and (b) he did in fact conduct such a search but could not locate her because she had changed her name. (DiMaggio Dep. I at 39:11–40:10; *id.* at 39:21–22.) Disputed issues of fact remain on the question of the thoroughness of DiMaggio's investigation and whether a search for Mayorov's mother's original first name (or searching for "Mayorov" when her listed named was "Mayorova") would have located her. It is undisputed that Mayorov's CIS entry stated that she was naturalized and gave the date of her naturalization. Whether such a finding should have prodded DiMaggio to interview the mother or otherwise investigate her status before issuing a detainer is an outstanding question of fact not appropriate for resolution on summary judgment.

Further, DiMaggio could have retrieved Tanya May's A-file. That process would have taken just a few weeks and would have revealed that Mayorov was a minor who lived at her same address when she naturalized. DiMaggio did not take that step. (Def.'s Resp. to Pl.'s 56.1 ¶¶ 46, 48.) Based on the information contained solely in the packet of information in DiMaggio's possession, though, Mayorov's mother's name was listed on his Central Index System entry. Her CIS entry, in turn, would have reflected that she was naturalized before Mayorov turned 18. (*See* DiMaggio Dep II at 12:12–24; 13–14:1–4.) True, DiMaggio testified that such information was insufficient to determine whether Mayorov was a citizen, given that Mayorov must establish that he was "in the legal and physical custody" of his mother before Mayorov could derive automatically under the CCA, *see* § 1431(a)(3):

> Q. So based on the information on these two CIS entries, would you be concerned about issuing a detainer to Mr. Mayorov?

A.  We still have to investigate because, as I said, they have to live physically, you know, in the same address where the parents lived.  So we still have to investigate to see if he was eligible to become a U.S. citizen or to derive.

Q.  And is that also part of the CCA check then to find if they live at the same address?

A.  Yes, that's one of the requirements.

(*Id.* at 5–16.)  But elsewhere, as mentioned above, DiMaggio explained that he would sometimes interview subjects even before issuing a detainer if there was reason to believe the person was a United States citizen.  (*See* DiMaggio Dep. I at at 42:7–11.)

Viewing these facts in the light most reasonable to Mayorov, the court denies summary judgment to both parties on the question of breach.[9]

## B.    Causation

"Proximate cause" encompasses both cause-in-fact and legal cause.  *Krywin*, 238 Ill. 2d at 225–26, 938 N.E.2d at 446.  Cause-in-fact exists where there is a "reasonable certainty" that a defendant's actions caused a plaintiff's injury.  *Id.* at 226, 446.  Whether cause-in-fact exists depends on "whether the defendant's conduct is a material element and substantial factor in bringing about the injury.  Conduct is a material element and a substantial factor if, absent the conduct, the injury would not have occurred."  *Id.* at 226, 447.  Proximate cause is established "only if the defendant's conduct is 'so closely tied to the plaintiff's injury that he should be held legally responsible for it," *Young v. Bryco Arms*, 213 Ill. 2d 433, 446, 821 N.E.2d 1078, 1086 (Ill.

---

[9]       Mayorov also argues that "ICE did not provide [him] with any procedure to challenge the unlawfulness of [the] detainer in violation of his basic due process rights."  (Pl.'s Mem. at 11.)  The court rejects this argument as undeveloped.  *See Estate of Moreland v. Dieter*, 395 F.3d 747, 759 (7th Cir. 2005).  Further, on the merits, the appropriate mechanism to challenge the lack of adequate process is through a *Bivens* action, not an FTCA claim. *Cf. Michigan v. U.S. Army Corp of Engineers*, 667 F.3d 765, 776 (7th Cir. 2011) ("[S]tate tort law—not federal law—is the source of substantive liability under the FTCA.").  *Russ v. United States*, 62 F.3d 201, 204 (7th Cir. 1995) ("Because 'law of the place' refers to state law, and state law cannot provide liability for the violation of a federal constitutional right, constitutional wrongs cannot be remedied through the FTCA.") (citing *F.D.I.C. v. Meyer*, 510 U.S. 471, 477–478 (1994)).  The court will consider the process Mayorov received only in the broader context of whether the Government breach a duty to Mayorov to reasonably investigate his citizenship status.

2004) (quoting *Simmons v. Garces*, 198 Ill.2d 541, 558, 763 N.E.2d 720, 732 (Ill. 2002)), and is a question of fact. *Krywin*, 238 Ill. 2d at 226, 938 N.E.2d at 447.

The issuance of the detainer was the cause-in-fact of Mayorov's boot camp removal. IDOC's Hearing Notes stated that "[d]o [sic] to an immigration warrant from the nation of Belarus inmate Mayorov [] is no longer eligible to remain in the Impact Incarceration Program." (Review Hearing Notes, Ex. Q to Def.'s 56.1.) As described above, the IDOC hearing notes are not a model of clarity, but given the proximity between the issuance of the ICE detainer and IDOC's subsequent hearing on Mayorov's boot camp eligibility, Mayorov's claim that it was the ICE detainer that caused him to be removed survives summary judgment. (*Cf.* Def.'s Resp. to Pl.'s 56.1 ¶¶ 57–59.)

The more difficult question is whether the detainer proximately caused Mayorov's boot camp removal, and the court declines to enter summary judgment in favor of either party on this issue, for a few reasons. First, the Secure Communities Processing Packet that DiMaggio received showed that Mayorov was in boot camp. But it is unclear whether DiMaggio knew the effect an immigration detainer would have on Mayorov's eligibility, which goes toward the "reasonable foreseeability" of Mayorov's injury. Reynoso and Wall both testified that they were aware that a detainer would render Mayorov ineligible. (*See* Reynoso Dep., 45:1–24; Wall Dep., 46:5–15.) Further, the Government has stipulated that ICE was aware that a detainer affected one's eligibility for boot camp, and also that persons disqualified from boot camp must serve their alternative prison sentences rather than being released upon successful completion. (Def.'s Resp. to Pl.'s First RFAs, Ex. 4 to Pl.'s 56.1 [31-4], Requests 27–29.) And even though IDOC was ultimately responsible for disqualifying Mayorov from boot camp, under Illinois law, the independent action of a third party does not necessarily eliminate a proximate cause finding in a negligence case. *See Huang v. Brenson*, 379 Ill.Dec. 891, 897–98 7 N.E.3d 729, 735–36 (1st. Dist. 2014). More factual development is needed to decide the issue.

For all these reasons, the court denies summary judgment to either party on the issue of the Government's liability for negligence toward Mayorov in investigating his citizenship and issuing a detainer against him that caused his removal from boot camp.

### III.    False Imprisonment (Count I)

To recover damages for false imprisonment under Illinois law, a plaintiff must establish "that his personal liberty was unreasonably or unlawfully restrained against his will and that defendant(s) caused or procured the restraint." *Arthur v. Lutheran Gen. Hosp.*, 295 Ill. App. 3d 818, 825–826, 692 N.E.2d 1238, 1243 (1st Dist. 1998). "Probable cause is an absolute bar to a claim for false imprisonment." *Poris v. Lake Holiday Prop. Owners Ass'n*, 368 Ill. Dec. 189, 983 N.E.2d 993, 1007 (2013). But, "imprisonment under legal authority is not false imprisonment." *Arthur*, 295 Ill. App. 3d at 826, 692 N.E.2d at 1243. That is, "[f]alse imprisonment claims do not lie for a detention made by virtue of legal process issued by a court or an official with jurisdiction to issue such process." *Id.*

The court grants summary judgment to the Government on Mayorov's false imprisonment claim. Mayorov cannot establish, as a matter of law, that he was unreasonably or unlawfully restrained. He was lawfully in IDOC custody, which under Illinois law defeats his false imprisonment claim. *Arthur*, 295 Ill. App. 3d at 826, 692 N.E.2d at 1243. The fact that IDOC chose to remove Mayorov from boot camp does not change the fact that he at all times remained in state custody pursuant to a lawfully obtained conviction. This distinguishes his case from other detainer-related false imprisonment cases. For example, in *Uroza v. Salt Lake City*, the plaintiff was arrested on criminal charges but posted bail the same day. 2013 WL 653968 at *1. ICE later issued a detainer against him, but the county jail continued to hold the plaintiff for 36 days beyond the detainer's 48-hour time period. *Id.* The district court denied a motion to dismiss a false imprisonment claim against ICE, concluding that the plaintiff had sufficiently alleged that the detainer had caused his unlawful detention. *Uroza*, 2013 WL 653968 at *8. This was so because under Utah law, as under Illinois law, "a party need not

personally cause false imprisonment to be liable for it." *Id.* (citing *Pixton v. Dunn*, 238 P.2d 408, 408–09 (Utah 1951)); *compare Vincent*, 279 Ill. App. 3d at 6, 664 N.E.2d at 654 ("An unlawful arrest by an officer caused or procured by a private person is the same as an arrest by the private person.").  Because the plaintiff alleged that the detainer caused his unlawful detention for 36 days, the court concluded that ICE could be held liable for false imprisonment as the "directing or instigating force" of the plaintiff's detention.  *Uroza*, 2013 WL 653968 at *8 (citing *Pixton*, 238 P.2d at 408–09).  Unlike in *Uroza*, where the detainer was the *sole* reason the plaintiff continued to be detained, in the present case, Mayorov's detention was "made by virtue of legal process."  *Arthur*, 295 Ill. App. 3d at 826, 692 N.E.2d at 1243.

*Makowski* differs from this case as well.  There, the plaintiff, a United States citizen, pleaded guilty to drug charges and received a seven-year prison sentence with a recommendation for boot camp.  *Makowski*, 2014 WL 1089119, at *2.  As the result of an erroneous detainer issued against him, he served 70 days in prison before the detainer was lifted and he was allowed to participate in the boot camp alternative sentencing program.  *Id.* at *10.  The district court denied a motion to dismiss the plaintiff's false imprisonment claim against the Government, concluding that Makowski had "sufficiently alleged that he was unlawfully restrained as a result of the detainer" because Makowski had asserted that "he was detained pursuant to the immigration detainer, not the state criminal charges."  *Id.* at *10.  At the motion to dismiss stage, a court accepts a plaintiff's well-pleaded allegations as true.  *See Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011).  In contrast, in the posture of this case, at summary judgment, even construing the evidence in the light most favorable to Mayorov, he cannot, as a matter of law, establish he was unlawfully detained because he was in the state's custody pursuant to a lawful burglary conviction.  Mayorov's claim for damages based on false imprisonment must fail.  *See Arthur*, 295 Ill. App. 3d at 826, 692 N.E.2d at 1243.

This resolution of the false imprisonment claim—and, specifically, the determination that Mayorov cannot establish that he was unreasonably or unlawfully restrained—is, the court

recognizes, in apparent tension with the conclusion that disputed issues of fact on causation preclude summary judgment on the negligence claim. The potential inconsistency appears be a product of the different legal doctrines and affirmative defenses that accompany Illinois negligence and false imprisonment claims. For example, the court has noted that under Illinois negligence law, independent actions of a third-party, here IDOC, do not necessarily vitiate a proximate cause finding. See supra, Part II.B. On the other hand, in the context of Illinois false imprisonment cases, proof that a person is in custody pursuant to a lawfully-obtained criminal conviction dooms a claim of false imprisonment. See supra, Part III. The parties will be welcome to brief this issue further in connection with trial preparation.

## CONCLUSION

For the reasons discussed above, Plaintiff's motion for summary judgment [29] is denied, and the Government's motion for summary judgment [32] is granted in part and denied in part. Questions of fact remain with respect to Mayorov's negligence claim, but his false imprisonment claim fails as a matter of law.

ENTER:

Dated: March 23, 2015

_____
REBECCA R. PALLMEYER
United States District Judge